Field *v.* The People.

---

ALEXANDER P. FIELD, appellant, *v.* THE PEOPLE OF THE STATE OF ILLINOIS, *ex relatione* JOHN A. McCLERNAND, appellees.

*Appeal from Fayette.*

The Constitution is a limitation upon the powers of the legislative department of the government; but it is to be regarded as a grant of powers to the other departments. Neither the executive nor the judiciary, therefore, can exercise any authority or power, except such as is clearly granted by the Constitution.

Under the Constitution of the State of Illinois, the appointing power has not the power of removal from office.

The Governor has not the power, at his will and pleasure, to remove the Secretary of State. When he is once appointed, the power of appointment is suspended until a vacancy occurs.

A life office cannot exist under the Constitution of Illinois.

When the Constitution creates an office and leaves the tenure undefined and unlimited, the officer holds during good behavior, and until the legislature, by law, limits the tenure to a term of years, or authorizes some functionary of the government to remove the officer at will, or for good cause. This power the legislature has an undoubted right to confer.

Legislative construction, although entitled to great weight, is not binding upon courts.

It is a general rule that when a Constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one, or the performance of the other. But this rule is modified by this other rule, that where the means for the exercise of a granted power are also given, no other or different means or powers can be implied either on account of convenience, or of being more effectual.

The settled doctrine is, that construction for the purpose of conferring power, should be resorted to with great caution, and only for the most persuasive reasons.

The office of Secretary of State is created by the Constitution of the State of Illinois, without any limitations to its duration; it consequently remains so until the legislature provides one.

When the supreme judicial tribunal of a State has declared what the law is on a given point, when the same point comes again in litigation, all other courts in the State are bound to conform to the decision.

§ 1 and 2 of article 1, and § 1 of article 3 of the State Constitution, are to be regarded as merely declaratory and directory, and confer no specific powers.

THIS cause was heard in the Court below before the Hon. Sidney Breese. It was very ably argued in this Court.

CYRUS WALKER, JUSTIN BUTTERFIELD, A. P. FIELD, and LEVI DAVIS, for the appellant.

J. B. THOMAS, S. A. DOUGLASS, JAMES SHIELDS, and JOHN A. McCLERNAND, and the Attorney General, WICKLIFFE KITCHELL, for the appellees.

The cause was argued before the appointment of the present Reporter, which fact will account for the neglect to cite the authorities presented, or a synopsis of the points made on the argument. None of the counsel have furnished him with their briefs, and the only argument furnished is a newspaper copy of Mr. Douglass', which is too long to insert here without occupying too much of the volume with a single case.

WILSON, Chief Justice, delivered the following opinion :

This case was brought into this Court by appeal. It is an information in the nature of a *quo warranto*, filed by John A. McClernand against A. P. Field, to know by what authority he holds and exercises the office of Secretary of State of the State of Illinois. The facts of the case are, that Field was legally appointed Secretary of State, in 1829 ; and has continued in the discharge of the duties of said office ever since. On the second Monday of August, 1838, Thomas Carlin was elected Governor of the State of Illinois, and on the 1st day of April, 1839, by virtue of his authority as Governor, he appointed John A. McClernand Secretary of State, in the room and place of A. P. Field, the then acting Secretary.

The question presented for the opinion of the Court, is, whether A. P. Field, the appellant, or J. A. McClernand, is entitled to the office of Secretary of State. To the parties immediately before the Court, the case is of some interest ; but it derives its great importance from the fact, that the fundamental principles of the government are drawn in question. In deciding who is entitled to the office of Secretary, it becomes necessary to decide whether the Governor of this State possesses the constitutional power of dismissing from office the Secretary of State, and appointing a successor, at his will and pleasure. For, upon the validity of the Governor's claim to this power, depends the appellee's title to the office of Secretary of State, which he claims under an appointment from the Governor.

The case, then, resolves itself into the single question, Does the Governor possess the constitutional power of removing from office the Secretary of State, and appointing a successor, at will ?

In deciding this question, recurrence must be had to the Constitution. That furnishes the only rule by which the Court can

(1) Browne, Justice, being connected by affinity with the relator, declined sitting in this cause.

be governed. That is the charter of the Governor's authority. All the powers delegated to him by, or in accordance with, that instrument, he is entitled to exercise, and no others. The Constitution is a limitation upon the powers of the legislative department of the government ; but it is to be regarded as a grant of powers to the other department. Neither the executive nor the judiciary, therefore, can exercise any authority or power, except such as is clearly granted by the Constitution.

In deciding upon the powers of the Governor, it will be necessary to enquire how far the provisions of the Constitution relied upon in support of his claim of power, have received a practical exposition by the several departments of government. An exposition of the Constitution, so made, and long acquiesced in, as to the powers of the several departments and functionaries of government, must prevail, unless it can be clearly shown to be founded in error.

The political axioms of other governments, have been referred to by the counsel for the appellee. The practice of other governments analogous to ours, in the objects of their creation, in their form, and in their constitutional grants of executive power, are certainly entitled to respect, in settling the unsettled practice of ours. But it must be obvious that the practice and maxims of governments widely different from ours in their character, and the theory and principles upon which they are constituted, must be incongruous with ours, and inapplicable to a question involving the powers and duties of its functionaries.

The practice, therefore, of the general government, which is relied upon, and the maxims derived from the British government, that the power of appointment to, and removal from office, is an executive function, can be no further applicable to our government, than it is made so by the provisions of the Constitution.

The general government differs from ours in its powers and attributes ; and although we have adopted the common law of England, we have neither adopted the form of that government, nor recognised the principles upon which it is founded. According to the theory of that government, the king is the sovereign power of the State. When a question of prerogative, therefore, arises there, recurrence is had to the charters of the people's rights and liberties, to ascertain whether the right in question has been surrendered by the king to the people ; and if the grant cannot be shown, the right is adjudged to the king, upon the principle that all rights of which he has not divested himself, by express grant to the people, come within his prerogative. But upon the principle of our government, that the sovereign power of the State resides in the people, and that only such powers as they have delegated to their functionaries, can be exercised, where a claim of power is advanced by the executive, the question is,

not whether the power in question has been granted to the people, but whether it has been granted to the executive; and if the grant cannot be shown, he has no title to the exercise of the power.

As the right of the Governor to remove the Secretary must be granted by the Constitution, or it does not exist, it therefore devolves upon those who advocate the claim of the executive power, to show the grant upon which it is founded; to point out the clause and section of the Constitution from which it is derived. How has this been done? Has any express grant been produced? No; it is not pretended that any express grant is to be found in the Constitution. But it is contended that the power in question is granted to the Governor by implication. That from the grant of other powers, this one of removing the Secretary from office is necessarily implied, as the means of rendering those grants available; and the following clauses of the Constitution are relied on in support of this position:

" Art. 1. Sec. 1. The powers of the government of the State of Illinois shall be divided into three distinct departments, and each of them be confided ·to a separate body of magistracy, to wit : Those which are legislative to one, those which are executive to another, and those which are judiciary to another."

" Sec. 2. No person or collection of persons, being one of those departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted."

" Art. 3. Sec. 1. The executive power of the State shall be vested in a Governor."

" Art. 3. Sec. 7. He [the Governor] may require information in writing from the officers in the executive department, upon any subject relating to the duties of their respective offices, and shall take care that the laws be faithfully executed."

" Art. 3. Sec. 20. The Governor shall nominate, and by and with the advice and consent of the Senate, appoint a Secretary of State, who shall keep a fair register of the official acts of the Governor, and, when required, shall lay the same, and all papers, minutes, and vouchers relative thereto, before either branch of the General Assembly, and shall perform such other duties as shall be assigned him by law."

These are the provisions of the Constitution, from which it is insisted the Governor's power to remove the Secretary is implied. It is also claimed, upon the principle assumed, that the power of removal is incidental to the power of appointment; and again, that it is an executive function, and as such, belongs to the Governor.

It may be proper to observe, that there is some discrepancy between the views of some of the counsel for the appellee and those of the Circuit Court. While they all insist upon the authority

claimed in the case, they do not agree as to the source from which it is derived ; nor do they all carry the practical application of the principles assumed, to the extent claimed for them by the Circuit Court. While some contend, with the Court below, that the Governor's power of removal extends to all the officers in the executive department, others limit it to the Secretary. As the opinion of the Circuit Court has been published, and referred to by counsel, I will, in the examination of this question, advert to it, as containing the doctrine of the advocates of the power of removal.

I will examine the provisions of the Constitution relied on, and the positions assumed, in the order in which they are stated.

The first enquiry, then, is, can the power claimed by the Governor, be implied from the foregoing provisions of the Constitution ? That other powers than those expressly granted, may be, and often are, conferred by implication, is too well settled to be doubted. Under every Constitution, the doctrine of implication must be resorted to, in order to carry out the general grants of power. A Constitution cannot, from its very nature, enter into a minute specification of all the minor powers, naturally and obviously included in, and flowing from the great and important ones which are expressly granted. It is therefore established as a general rule, that when a Constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one, or the performance of the other. The implication under this rule, however, must be a necessary, not a conjectural or argumentative one. And it is further modified by another rule, that where the means for the exercise of a granted power are given, no other or different means can be implied, as being more effectual or convenient. By an application, then, of these rules, to the constitutional grants of power to, or injunctions of duty upon the Governor, considered separately, or in connexion, we can determine whether the authority to remove the Secretary is essential to the exercise of any powers conferred, or the performance of any duties enjoined on the Governor, or whether the exercise of such a power is contemplated by the Constitution.

The first and second sections of the first article of the Constitution divide the powers of government into three departments, the legislative, executive, and judicial, and declare that neither of these departments shall exercise any of the powers properly belonging to either of the others, except as expressly permitted. This is a declaration of a fundamental principle ; and although one of vital importance, it is to be understood in a limited and qualified sense. It does not mean that the legislative, executive, and judicial power should be kept so entirely separate and distinct as to have no connexion or dependence, the one upon the other ;

but its true meaning, both in theory and practice, is, that the whole power of two or more of these departments shall not be lodged in the same hands, whether of one or many. That this is the sense in which this maxim was understood by the authors of our government, and those of the general and State governments, is evidenced by the Constitutions of all. In every one, there is a theoretical or practical recognition of this maxim, and at the same time a blending and admixture of different powers. This admixture in practice, so far as to give each department a constitutional control over the other, is considered, by the wisest statesmen, as essential in a free government, as a separation. This clause, then, is the broad theoretical line of demarcation, between the three great departments of government. But we are not therefore, when a question arises as to the extent of the powers of either, to confine our views to this general clause, which confers no specific powers. We should look to the division as actually made, to see what powers are clearly granted ; for such only can be exercised. As no power, then, is granted to the Governor by these sections, it necessarily follows that none can be implied. A power by implication, can only be claimed as necessary to the exercise of one expressly granted.

The next grant of power relied on, is, that " The executive power of the State shall be vested in a Governor." This clause is treated by the Court below, as conferring numerous and ample powers upon the Governor. All that are usually denominated executive powers, by theoretical writers, are supposed to be included in this grant to the Governor, except such as are expressly conferred upon other departments. This, I think I shall be able to show, is a mistaken view of the subject. This clause, like the preceding ones, is a declaration of a general rule ; and the same remarks are applicable to this, as a grant of power, that have been made in reference to them. It confers no specific power. What would have been its operation, if the Constitution had contained no specific enumeration of executive powers, is a very different question from that now presented, and might have admitted of a different answer. But it has been settled by the Supreme Court of the United States, that an enumeration of the powers of a department of the government, operates as a limitation and restriction of a general grant. It has also been laid down by the same high authority, " That the general principles contained in the Constitution, are not to be regarded as rules to fetter and control, but as matter merely declaratory and directory ; for even in the Constitution itself, we may trace repeated departures from the theoretical doctrines that the legislative, executive, and judicial powers shall be kept separate and distinct."(1)

(1) 1 Peters' Cond. R. 445.

Field *v*. The People.

This departure from the general theory, is much greater in our Constitution than in that of the United States. The reasoning therefore of the judge of the Supreme Court of the United States, must apply to it with a correspondingly increased force, and exclude all claim of power from this general declaration.

The authority of the Governor to require information from the officers in the executive department, relative to the business of their respective offices, and the obligation of the Secretary to keep a register of his official acts, are relied upon, in connexion with the injunction that the Governor shall see that the laws are faithfully executed, as implying an authority in him to dismiss the Secretary. Let it be conceded that the Secretary is one of the executive officers of whom the Governor may require information, does this imply a right to dismiss him from office ? If it does, then by the same rule the General Assembly may dismiss the Governor from office ; because he is under a constitutional obligation to give them information of the state of the government ; and the obligation upon him to give the information, implies a right in them to demand it. The object of the information is the same in both cases. It is intended to aid the legislature in their deliberations, and the obligation to communicate it, is as imperative upon one officer as the other. The same reasons, therefore, that would subject the Secretary to removal, under this provision of the Constitution, will apply, with equal force, to the case of the Governor. The Constitution has made no distinction, and recognises no executive standard of obedience or responsibility to its precepts.

If the right to require information from an officer, implied the right to remove him, the legislature would have the power not only to remove the Governor, but a power, concurrent with him, to remove all the officers in the executive department ; for the legislature has, under its general powers, authority to call on all of them for official information.

The Governor's authority to call upon the Secretary and other officers in the executive department, is indisputable ; and his authority to enforce a compliance with his call, is equally clear. But to do this, he must have recourse to the mode prescribed by law ; he cannot, at discretion, adopt means unknown and unauthorized by law. The performance of a duty enjoined by law, may be enforced by its process ; and the rule, that when an instrument gives a power, it also gives, by implication, the means necessary to its exercise, is intended to render available those grants of power, which, without its application, would be inoperative and nugatory, by reason of the means necessary to their exercise not being also provided. But when the means of enforcing a given power are furnished by law, the rule does not apply. It cannot, therefore, apply in the present case. The duty of the Secretary to give the

official information required, and to register the official acts of the Governor, is a legal injunction ; and the law has provided ample means for enforcing its observance : first, by a private action, for any private injury that may possibly result from his neglect of duty ; and secondly, by a *mandamus*, by which a specific performance of the duty may be enforced ; and, lastly, if his contumacy should be thought to deserve it, he may be impeached, and, upon conviction, dismissed from office.

These are the means, in addition to an oath of office, and where pecuniary responsibility is involved, an official bond, which the law has provided for the purpose of securing the performance of the official duties of the officers in the executive department. They are the usual and appropriate remedies for official delinquency ; and being specially provided by law, they are, in contemplation of law, adequate to the end proposed, and all others are rejected. All the duties of the Secretary are assigned by law, and may all be enforced by its mandate, without recourse to an executive power which has not been given by express grant, or by necessary implication ; for the implication must be a necessary, not a conjectural, or even a convenient one.

But these remedies, which the law has expressly prescribed as the means of securing an observance of official duty, the Circuit Court considers inadequate to insure that despatch and promptitude which the executive may demand, and the interest of the public require ; and, by way of illustration, supposes the case of the Secretary refusing to put the seal of State to the Internal Improvement Bonds, or to keep a register of the official acts of the Governor, and enquires whether, in such cases, the Governor must submit to the law's delay ? I think it may be safely answered that he must ; that in a government of laws, all are bound to submit to the law ; and neither the executive, nor any other functionary, can stretch his powers beyond it, in order to obviate an imaginary inconvenience or defect. The forms of the law are the outworks, by which the citadel of liberty and the rights of person and property are defended ; and when they are broken down, the fortress itself must soon surrender.

Official responsibility is essential to a correct administration of the law ; and if that object is not effected by the remedies already provided, it is the province of the legislature to provide such as are more ample and efficacious. But this is alike beyond the remedial powers of the executive and the judiciary. Their appropriate functions are to expound and execute the law. In the exercise of the first of these functions, it is laid down as a rule of great importance in reference to a Constitution, "not to enlarge the construction of a given power beyond the fair scope of its terms, merely because the restriction is inconvenient, impolitic, or even mischievous." (1)

(1) 1 Story on Const. 409.

The arguments in favor of the Governor's power of removal, in the extreme cases of official abuse of trust by t.ie Secretary, Auditor, and Treasurer, that are instanced, apply with equal force to other officers.

If this prompt remedy of dismissal from office may be applied to these officers, because a *mandamus* or impeac'iment would be too dilatory a proceeding to suit the exigency of the case, why should it not be applied to State's attorneys and judges. Suppose a State's attorney should refuse to perform his duties, or a judge to hold courts ; the Constitution which requires a speedy administration of justice, would be violated, and the end and object of government defeated. But it cannot be contended that the Governor may apply a remedy, by dismissing these officers for neglect of duty, and appointing others. Yet the injury to the public is at least as great as any that can result from the Secretary's neglect of his duty ; and the means of redress are at least as tardy and as remote. Again, suppose the Governor should refuse to put his signature to the commissions of officers legally appointed ; upon the happening of such an event, the machinery of government would be stopped, or greatly retarded, for the want of officers to execute the laws. But where is the remedy, except by address or impeachment ? What do these examples, and many others that might be instanced in addition to these, and those put by the Circuit Court, prove, but that every delegated trust is more or less liable to abuse, and that if we elect to be governed by the permanent and known rules of a Constitution, rather than the capricious and arbitrary will of one, or more, we must wait the time necessary to carry them into operation ? That according to the principles of law and justice, a conviction for crime or delinquency, must precede punishment, we must delay its infliction until the accusation is legally proven ? In despotic governments, where the will of the ruler is the law of the land, there is no delay between its promulgation and execution. The quickening influence of fear, the principle upon which such governments are founded, reaches every department, and keeps the head of every functionary, from that of the Bashaw to the Cadi, always in danger.

Upon a doubtful question, where the scales are equipoised, policy and convenience may be allowed a preponderating influence ; but they cannot be regarded as the legitimate source of power, without violating the settled rules of construction, and subjecting the Constitution to fluctuate and change, with the changing opinions of men, of times, and of parties. This would defeat the objects of its creation. It was intended as a fixed and permanent rule of government, and without the attribute of certainty it would be of no value ; we could not tell from what has been decided, how the same question would be decided again.

But does policy sanction a concentration of power in the hands

of one man, to be used at discretion ?   This doctrine is contrary to the opinions of the ablest writers upon government, and is also opposed to the Constitution, which has divided and subdivided the powers of government, and as far as practicable, made one a check upon another.   And upon the principle that arbitrary, discretionary power is more liable to abuse than that regulated by law, the Constitution has made the law, and not the will of the executive, the rule to which all its officers are bound to conform and to which they are amenable.

But it is argued from the Secretary's obligation to register the official acts of the Governor, and when required, to give him official information, that such an official intercourse of confidence must exist as to imply an authority in the Governor to remove the Secretary.

This is assuming the existence of a confidence, which ought to be established before any conclusion is drawn from it.   Where is the evidence of any intercourse between these officers, of a character so confidential, as to render one dependent upon the other for his official existence, as the means of securing his fidelity ? It is not to be found in the nature of the duties enjoined upon the Secretary, or the information which he may be required to give ; nor does it receive any countenance from the Constitution or the laws.   They both relate to public, not private matters, such as are recorded for the information of the public, and being enjoined by a public law, all idea of privacy or confidence must be excluded. I can imagine no other foundation for the idea of confidence, than a supposed analogy between the officers in the executive department of our government, and those in the executive department of the general government ; but there is no analogy between the legal obligations of the officers of the respective governments, or the relation in which they stand to the respective executives.

The President may require the opinion of the heads of departments, their views, counsel, and advice, relative to the legality or policy of measures.   In this exercise of the right, he calls on one or more, according to the difficulty or importance of the subject ; but whether the consultation is separate, or in cabinet council, it is always private and confidential, and is so regarded, not only by the officers, but by the law also ; for none of the officers, or their clerks (who are sworn to secrecy) can be required to give testimony of transactions, or matters of a confidential character.   But neither in contemplation of law, nor in fact, is there any official confidential intercourse between the Governor and the Secretary, or other officers of the executive departments.   He may call upon them for information relative to matters connected with their offices.   He may, for example, enquire of the Treasurer, what amount of money is in the Treasury, of the Auditor, what amount of warrants are outstanding, and of the Secretary, what are the

kind and number of commissions to which he has put the State seal ; or whether the laws are all distributed, &c. These are all public matters, in reference to which there can be neither secrecy nor confidence, and it is only in relation to such that the Governor can require information. He has no right to the opinion or advice of the Secretary, as to the legality or propriety of measures of any kind ; and as all the duties of the Secretary are prescribed by law, and as it is only in relation to them that he can be required to give information, there cannot, therefore, in the nature of things, be any implication of confidence from communications relative to a public law, or to matters of fact recorded for public information.

The reasoning in favor of the Governor's authority to remove the Secretary, because of the latter's duty to register his official acts, might be applied with great propriety to the Governor's secretary, but it can have no application to the Secretary of State ; an officer whose office is created, and whose duty to keep a register of the acts of the Governor is prescribed, by the Constitution. In the performance of this, as of other duties, he does not act as the Governor's officer, subject to his control and direction, but as the officer of the Constitution, bound to the performance of such duties only as have been assigned by that instrument and the law.

Why, it is asked, require him to keep a register of the official acts of the Governor, if it was not intended to give the executive a control over him ? To do this, would defeat the object of the requisition. The Constitution has placed him beyond the control of the executive, that he might keep a true and faithful record of the official acts of the executive. The authority claimed for the Governor would be incompatible with the performance of this duty. In giving a construction to one clause of the Constitution, we should also take into view such other parts as have a bearing upon the subject, and if possible, give to it such an interpretation as will allow all its parts, an operation in harmony with the whole instrument. For what purpose, then, is a register of the official acts of the Governor required to be kept, and laid before the General Assembly, when called for ? Clearly for the purpose of informing them of his official conduct. And when it is recollected, that ours is a government of checks and balances, and that to the representatives of the people, and to them alone, is delegated a direct authority to enquire into his official conduct, and if he has corruptly abused the authority confided to him, or by transcending the limits prescribed by the Constitution, usurped that not delegated, to call upon him by impeachment, to answer at the bar of the Senate, the charges of official misconduct which they may prefer against him. Is it not the manifest intention of this provision to perpetuate in a legal, authentic, and responsible form, the evidence of the official acts of the executive, tobe recurred to at all times, by those who have a constitutional right to animadvert

Field *v.* The People.

upon their legality, and the motives which originated them ? For
what other object could it be intended ? It can serve no other
purpose. And that it was intended for this, is also proved by the
fact, that it is only at the instance of the General Assembly, not
of the Governor, that this register is to be laid before them. It
is not by his authority that it is made. He has no right to com-
mand or forbid the reading of his acts. He cannot say what shall
be set down, or what shall be omitted. The Secretary acts under
the imperative injunction of the Constitution, and the obligation of
an oath. As the Governor, therefore, has no right to direct how
the duty shall be performed, it would seem preposterous to give
him the power to dismiss the officer for not conforming to direc-
tions which he has no authority to give.

If this view, relative to the object and intention of this pro-
vision of the Constitution, be correct, the authority claimed for the
Governor would counteract and defeat it. What security, or
even prospect would there be, for the representatives of the peo-
ple obtaining the record evidence of executive abuse, or usurpa-
tion of power, when by giving him absolute control over the offi-
cer who is to make and keep the record, you put it into his power,
by a word or look, to suppress it ? If he could be guilty of acts
that would merit impeachment, can it be supposed that he would
suffer the evidence of them to be placed upon record, and laid
before the legislature as the means of his conviction, by an officer
whose official conduct he has the means of controlling ? Would
he not rather, if the officer's sense of duty were stronger than his
love of office, dismiss him from it and appoint one whose princi-
ples would not interfere with his subservience to the will of the
executive ?

As the opinion that the Secretary is a confidential officer re-
ceives no countenance from the Constitution, or the nature of the
official intercourse between him and the Governor ; all reasoning
founded on that assumption must be fallacious. No authority to
remove the Secretary, can be implied from his registering the offi-
cial acts of the Governor ; but on the contrary, his obligation to
perform this duty affords a strong implication of his independence
of the executive control, because that is necessary to a faithful
performance of the duty. The rule relied upon in support of the
Governor's claim of power, that every injunction of duty includes,
by implication, the power necessary to its performance, applies,
also, to the Secretary, and would be violated by subjecting him to
executive control. I have shown that the discharge of the duty
enjoined by the Constitution, may render the Secretary obnoxious
to the displeasure of the Governor ; such a construction of it,
therefore, as would render him obnoxious to his authority, would
defeat its obvious intention.

The injunction, that the Governor shall see that the laws are
faithfully executed, it is also urged, gives him the control, and

Field *v.* The People.

consequently the power of removal of the officers of the executive department. This inference is not justified by the premises. It has neither the sanction of authority nor the practice of other State executives; both of which are opposed to it. The practice of the President, as I will show, is founded upon other grounds, and his power does not extend to the removal of any officers whose offices are created by the Constitution, and whose duties are regulated by law. But as this position has been earnestly urged, and relied upon, I will examine it more fully than I should otherwise consider necessary. This clause of the Constitution, like those dividing the powers of government, and declaring the attributes of each, is, the declaration of a general principle, which is "not to be regarded as a rule to fetter and control, but as matter merely declaratory and directory."(1) It confers no specific powers, "nor does it enjoin any specific duty." " This power of general supervision," says an able commentator on American law, " is a duty enjoined on the federal and State executives." " It would be dangerous, however, to treat this clause as conferring any specific power which they would not otherwise possess. It is to be regarded as a comprehensive description of the duty of the executive to watch with vigilance over all the public interests."(2) The Governor is not to execute the laws himself, but is to see them executed. This duty is performed by lending the aid and power of the executive arm, to overcome resistance to the law. The history of the federal and State governments, affords practical expositions of this clause of the Constitution, in conformity with this construction. The executive is to see the laws executed, not as he may expound them, but as they may be expounded by those to whom that duty is intrusted. To the legislature is delegated the authority to make the law, to the courts the authority to expound them, and to the executive the authority to see them executed, as they are thus interpreted. His interpretation is proper only when specially required by law, or where the ordinary means are inadequate to the object of their design. But to assume the power of expounding, and also that of executing the law, would be a usurpation of the functions of the judiciary, and concentrating, in one department, powers expressly declared, by the Constitution, to belong to two separate and distinct departments.

The manifest intention of the Constitution, and the authority cited in the absence of all precedent and principle militating against it, would seem to be conclusive against the executive claim of power, under this provision, to direct the Secretary how he shall execute the duties assigned him by law ; and if he has no power to direct him how he shall execute his duties, he certainly has no power to dismiss him for not conforming to his directions.

(1) Peters' Cond. R. 213.                    (2) Walker's Am. Law 103.

But it is, notwithstanding, insisted that this clause of the Constitution confers the power of dismissing not only the Secretary, but all the other officers in the executive department. If it confers the power of supervision and dismissal as to one officer, it also gives the same authority over every other one in the government (except, perhaps, the judges) upon whom the performance of a duty may be enjoined by law. The injunction to see the laws executed, is general, and sufficiently comprehensive to embrace every law, and every officer ; and if under it the Governor may dismiss from office the Secretary, Auditor, Treasurer, and Attorney General, which is claimed for him, I cannot see why he may not dismiss every other one, without regard to the manner of their appointment, or the tenure of office ; and thus, by the construction of one clause of the Constitution, bring all the officers, and the operation of all the laws of the State, under executive control. This would counteract the whole scope and design of the Constitution, by substituting the changing and capricious will of one man, for the fixed and known rules of the law.

From this consequence I can see no escape, if the principle contended for be adopted. The argument in support of executive power, limits it to the removal of the officers in the executive department ; but where is the authority for the discrimination? It is not to be found in the Constitution. It confers no authority over them that can be brought in aid of this construction, but, on the contrary, it would conflict with the performance of the duties assigned them, particularly that of registering the acts of the Governor, required of the Secretary. The language of the Constitution is general, and embraces all the officers, as much as part. If the executive, therefore, may say to one officer how he shall execute a law, and dismiss him if he does not obey, he may say so to another. He may not only direct the Auditor what warrants he shall issue, and the Treasurer what ones he shall pay, or refuse payment of, but he may direct the Attorney General and State's attorneys whom they shall prosecute, the Court what judgment it shall render, and the sheriff in what manner he shall execute it. This power, in the hands of any ruler, would leave to the citizens no safety for life, liberty, or property.

Although these consequences would, I believe, be alike deprecated by all, they are such as must flow from an exposition of this clause that would give to the executive, authority to direct how an officer should execute a law, and dismiss him from office if he did not obey the direction. It is no answer to say that the Governor has no right to violate the law, but only to see it executed. The right to direct how a law shall be executed, presupposes the right of exposition. How else can its meaning and intention be known? To direct an officer in the performance of his duty, he must decide what that duty is. This power, also, includes the right to

decide upon the validity of the law ; for if it is in violation of the Constitution, it is no law, and cannot legally be enforced. But it is useless to talk of constitutional restraints, if the executive may decide upon the law, and the duty of the officer, and enforce his decision, it must prevail, right or wrong.

This construction of the Constitution is incompatible with the legal obligations of the officers of government, with the supremacy of the law, and with well settled principles. It is not denied that all the duties of the Secretary, and other officers, are prescribed by law ; and the principle is also conceded, and relied upon, that when the law imposes upon an officer the performance of a duty, it also confers the power necessary for its performance. Its injunctions would be nugatory and idle, if they did not imply authority to enforce them. But how could the Secretary, or other officer, perform the duties enjoined upon him by law, in the manner the law prescribes, if the Governor might interpose his authority and suggest a different mode ?

With every disposition that his directions should conform to the law, the Governor may err, unless we impute to him infallibility ; and then, the same liberal concession must be extended to the Court, or there may be a difference of opinion between them. And which is to prevail ? Will executive authority be a justification to the officer ? Can he plead that in his defence when prosecuted for a violation of his official duty ? Certainly he cannot. In what situation, then, does this executive authority place the officer ? If he prefers his duty to executive dictation, he may be dismissed from office. If he submits to it, he incurs the penalty imposed by law for a violation of its injunctions, and may also be impeached, and dismissed from office ? A construction of the Constitution involving consequences so absurd and unjust, must be rejected as altogether inadmissible.

But this question is settled by the adjudication of the highest judicial tribunal in the nation. In the case of Marbury *v*. Madison, (1) the Supreme Court of the United States decided, that where the duty of an officer is prescribed by law, he is bound to conform to the law, and not to be guided by the will of the President. In the performance of a duty prescribed by law, he acts under the authority and direction of the law, and not under that of the Executive. This case was an application to the Supreme Court for a *mandamus* to compel the Secretary of State to deliver a commission withheld by direction of the President. In delivering the opinion, the Court remarked, in reference to the President's authority to control the Secretary in the performance of the duty which the law enjoined upon him : " This is not a proceeding which may be varied, if the judgment of the executive shall suggest

(1) Peters' Cond. R.

one more eligible, but is a precise course, accurately marked out by law, and to be strictly pursued. It is the duty of the Secretary of State to conform to the law, and in this he is an officer of the United States, bound to obey the laws. He acts in this respect, as has been very properly stated at the bar, under the authority of law, and not by the instructions of the President. It is a ministerial act which the law enjoins on a particular officer for a particular purpose."

This decision requires no comment. It is based upon the supremacy of the law, alike over the officer who administers it, and the President who appoints him. It is made directly upon the question under consideration, and under constitutional provisions, in some respects identical, and in others more favorable to executive authority than those of ours. I must, therefore, consider it decisive against all claim of executive authority to control an officer in the performance of a duty prescribed by law. The Constitution of the United States declares the executive power to be vested in the President ; it confers the right to require the opinion of the officers in the executive department ; and like ours, it enjoins upon the executive the duty of seeing the laws executed. And as the President cannot, under any or all of these provisions, control the Secretary of State in the performance of a duty enjoined by law, it follows, conclusively, that the Governor's title to such a power over the Secretary of this State, must be equally invalid ; and as he has no right to direct him how he shall perform the duties assigned him, he can have no right to dismiss him for a non-compliance with an unauthorized assumption of authority. As he has no right to command, he has no title to obedience.

The office of Secretary of State is created by the Constitution, without any limitation of duration being provided. It is therefore contended that the incumbent of this office holds it at the pleasure of the appointing power ; and a rule laid down by Judge Story, that an officer, the tenure of whose office is undefined, holds at will, is relied upon in support of the position. But if this rule is admitted to apply to the officers under our Constitution, and to confer upon the authority to whom the appointment of such officers is given, the power of removal, it would not establish the Governor's right to remove the Secretary, because he alone does not confer the office upon him. That is done by the advice and consent of the Senate ; their advice and consent would, consequently, be necessary to his removal.

But this rule is not applicable to the officers of our government ; nor is it so applied by Judge Story. It is laid down in a treatise upon the Constitution of the United States, and as applicable to the officers under it. The Constitution of the United States created no office the tenure of which is not provided for ; and the judicial officers alone are to hold during good behavior ; the infer-

ence, therefore, is, that all others that may be created shall hold during pleasure, unless Congress shall provide a different tenure.

But under our Constitution, a large proportion of the offices which it has created, are unlimited in duration ; and not only the judicial officers hold during good behavior, but all militia officers until sixty years of age. For some of the offices to which the Constitution fixes no tenure, (County Commissioners, for example,) the legislature is required to provide one, while no tenure is required to be given to others.

What, then, is the most reasonable and natural conclusion to be drawn from these constitutional provisions ? Are all these officers intended to be upon the same footing ? Certainly not. The tenure of one class of officers is intended to be beyond legislative control, while that of others is left to be fixed by the legislature, as may suit the changing exigencies of time and circumstances. But as the offices are created without limitation as to time, they remain so, until the legislature provides one.

That the legislature has a right to limit the tenure of the office of Secretary, and that of all other offices to which no tenure is given by the Constitution, I have no doubt. No proposition is better settled, than that a State Constitution is a limitation upon the powers of the legislature, and that the legislature possesses every power not delegated to some other department, or expressly denied to it by the Constitution. The creation of offices, the delegation and the regulation of the powers and duties of officers, and prescribing the period for which they shall be exercised, are legislative functions, and no restraint upon their exercise, in reference to the tenure of the office of Secretary, is imposed by the Constitution. There can be no objection, therefore, to giving such limitation to that office as the interest of the State may require. And that it is the intention of the Constitution that those officers, the tenure of whose office is not fixed by the Constitution, should hold without limitation, until a limit was given by law, is strongly inferable from the fact, that the appointment of some of them is given, not only to the legislature, but to the people. It cannot be supposed that the Convention which formed the Constitution intended to confer upon the people or any department of the government, a right which could not be exercised. But that mockery must be imputed to them, by the adoption of the rule contended for.

Suppose the legislature had given no tenure to the office of Auditor, or of County Commissioner, how could the legislature in the one case, and the people in the other, remove the officer whom they had elected ? Such a proceeding on the part of the legislature, or the people, would be unprecedented, and in the case of the people, impracticable. But this objection does not exist in reference to any of the officers of the general government whom the President may remove.

The rule, laid down by Judge Story, is an inference from the Constitution of the United States. But our Constitution, being entirely different in relation to the tenure of its officers, and the appointing power, warrants a different inference ; and the inference that an officer under our Constitution, the tenure of whose office is undefined, holds, until the law provides a limit, is in accordance with the rule of the common law, and has been so decided in another State, which, like ours, has adopted the common law. In the case of the Fayette county lawyers, the Supreme Court of Pennsylvania, after remarking that the office of an attorney was one recognised by the Constitution and law of Pennsylvania, lays it down as the rule of the common law, " That the grant of an office without limitation, being taken more strongly against the grantor, endures for the life or good behavior of the grantee." This rule may admit of exceptions under our government ; but where the grant is intended for the benefit of the people, and the power conferred is to be exercised to promote their interest, I am not aware of any exception. In such a case, a liberal interpretation of the grant is for the benefit of the people·; inasmuch as the power granted cannot, if retained by them, be used for their benefit, but may. be so used by the functionary to whom it is so delegated.

The federal government not having adopted the common law, its courts are not bound to the rigid observance of its. rules that the courts of this State are. But it is not the rule relied upon by the Circuit Court that gives the President the power of removal. This power he has in the case of superior officers, in virtue of his right of supervision and control over them, and his consequent responsibility for them. And that the rule is a deduction therefrom, seems evident from the fact, as generally conceded, that Congress cannot, by giving a tenure to the office of these officers, abridge the President's power of removal. (1)

The President's right to remove the inferior officers of the government, is given by law.

The rule that an officer whose tenure of office is undefined, holds at will, having been early adopted in reference to ambassadors and heads of department, the courts of the United States have, in conformity with that rule, decided that other officers, whose tenure of office was undefined, should hold, subject to the same rule, without regard to the authority that conferred the appointment. But these decisions do not conflict with the rule we have adopted, because our Constitution admits of no such deduction as that of the Constitution of the United States, upon which these decisions are founded ; and the legislature has enacted no law defining the tenure of the office of Secretary of State. On

(1) 3 Story on Const. 390.

the other hand, the rule that an officer, the tenure of whose office is undefined, holds during good behavior, has been recognised by every department of this government. In applying this rule, therefore, to the present case, we conform to the principle which governed the United States courts, in the cases adverted to. We adhere to, and carry out, the interpretation invariably given to the Constitution of this State, as the courts of the federal government adhered to the legislative interpretation, which had been given to the Constitution of the United States. Nor can I perceive any good reason for making the tenure of an office the rule by which to subject the officer to, or exempt him from, executive authority. The power of removal from office, is intended as the means of putting aside corruption and imbecility, and of compelling a performance of the duties prescribed. These are the legitimate causes for the exercise of this power when it exists, and they may occur in any office for one year, as well as one for life.

The rule that an officer, the tenure of whose office is undefined, holds during good behavior, until a limit is provided by law, is also established by judicial and legislative expositions of the Constitution of this State. The first case in which that principle was recognised by this Court, was that of Street v. County Commissioners of Gallatin county.(1) That case was an application for a *mandamus* to restore a clerk who had been dismissed by the Court without cause shown ; and it was allowed by the unanimous consent of the whole Court. And again, in the case of Matheny v. Mobley, this Court decided that a judge of the Circuit Court had no power, under the Constitution, to remove, at will and pleasure, a clerk. In my apprehension, that case is not distinguishable, in principle, from the present one. The office of clerk and of Secretary are both created by the Constitution, without any limitation of tenure. The appointment of clerk is given, by express grant of the Constitution, to the Court, and that of Secretary to the Governor, with the advice and consent of the Senate ; and no power to remove either is granted by the Constitution. Upon the principle that the clerk is entitled to hold his office during good behavior, until a different tenure is provided by law, it would seem that the Secretary would be entitled to hold his upon the same terms. This is virtually admitted by the Circuit Court, in its effort to prove the principles upon which the case of Matheny v. Mobley was decided to be incorrect. If they were not applicable to the present case, the comments of the Circuit Court would have been gratuitous, and if they were applicable, that Court should have been governed by them.

In delivering the opinion, as published, the Circuit Court says : " I feel constrained to say, that I cannot accord with them (the Supreme Court) in all the doctrines and principles of that case,

(1) Breese 25.

and therefore cannot apply them to this." As he cannot accord with the Court in the principles laid down, he cannot apply them. The doctrine, before this decision, was considered well settled, that when the supreme judicial tribunal of a State had declared what the law was on any point, when the same point came again in litigation, all other courts were bound to conform to its decision. A different rule would destroy all that stability and uniformity in the rules of law, which is so essential to the administration of justice, and the safety of the citizen. If every judge can decide according to his private sentiments, without regard to precedent and authority, there may be as many rules of decision as there are circuits ; and the decision of one day would furnish no rule for the decision of the next. " Judges," says the Circuit Court, " are bound, in deciding a point of law, to follow a preceding decision upon the same point. Yet if such decision is founded in error, they are not bound by it." The correctness of this principle cannot be controverted, when applied to a court of equal or superior authority with the one deciding the point. But is it not obvious that the judge has misapplied the principle, in assuming for the Circuit Court authority to reverse a decision of the Supreme Court? Who does not see that such doctrine is subversive of the fundamental principles of the government ? It is reversing the order of authority prescribed by the Constitution and the law, and rendering nugatory the right of appeal. It will readily be admitted that an erroneous decision ought not to prevail, but who has the right to declare it so ? This authority includes the right of supervision and control, and if the Circuit Court has it, in reference to a decision of the Supreme Court, upon the same principle, a justice of the peace will have it, in reference to a decision of the Circuit Court ; and one step further will give the right of supervision to the parties in the cause ; thus resolving all authority back into the original elements. This would be the consequence of carrying out the position assumed.

The correctness of the opinion in the case of Matheny *v.* Mobley, is tested by the rule adverted to, that when the tenure of an office is undefined, the officer holds at the will of the appointing power. I have shown that this rule is not only in contravention of that of the common law, but that it is one not warranted by our Constitution ; and could not, therefore, be applied to a clerk, or other officer under it. It is also objected to the opinion delivered in that case, that the Court said, that if the clerk is to be considered the officer of the judge, and not of the law, that upon a vacancy occurring in the office of judge, the clerkships would, under that rule, be vacated also. Is not this true ? Is it not a consequence necessarily flowing from the nature of the tenure by which the officer holds his office ? It has been always so considered, and is well settled. An officer, or an estate, held at will, is

terminated by the demise, or other act of either party, that can be considered a determination of his will. This is the universal operation of the rule. In England, all the officers who hold at the will of the king, go out of office upon his demise, because this is very naturally considered a determination of his will, which, alone, continued them in office. But the Circuit Court thinks the will or act of the judge continues in full force, after he ceases to be judge, by death or otherwise, and that a clerk appointed by him continues in office, and bound to the performance of his duties by his official bond. That he so continues, and is so bound, is evidence that he does not hold his office at the will of the judge appointing him. If he did, his office would terminate with that of the judge ; and his bond, which is given for the performance of his official duties, would not be obligatory for acts performed after the termination of his office.

For the purpose of obviating the inconvenience incidental to the rule of an officer holding his office at the will of the authority that confers it, statutes have generally been passed, where the rule exists, continuing the officer in office after the termination of the authority that appointed him, until he is superseded by the appointment of another. This was done in England, where the judges held at the will of the crown. (1) And the same precaution is generally observed here, for the purpose of preventing an *interregnum* in offices held for a limited period. But as no such provision is made in relation to officers who hold by an unlimited tenure, it may be fairly inferred that they are not considered as holding their offices at the will of the power that confers them, or that they are liable to terminate with the termination of that power. Otherwise, the same regulation would be necessary to continue a clerk or Secretary of State in office, after a vacancy, by death or otherwise, in the office of judge or Governor, that was necessary in England to continue the judges in office after the death of the king ; and as it is necessary here to continue in office a sheriff or other officer, appointed for a limited time, till a successor can be appointed and qualified.

The authority of the case of Matheny *v.* Mobley is also impugned, upon the ground of policy and convenience. Authority in the Court to dismiss its clerk, is considered necessary to secure his subservience, and to promote the dignity and usefulness of the Court. I admit, without hesitation, that the Court should possess every power necessary to secure these objects. But an argument to prove the necessity of such power, might be addressed with much more propriety to the legislature than to the Court. The rule already stated, that a given power is not to be enlarged, by construction, beyond the fair scope of its terms, merely because the restriction is " inconvenient, impolitic, or even mischievous," for-

(1) Black. Com. 227.

bids the Court the exercise of any discretion.   It has been well remarked, that the duty of the Court is to follow and obey.   Now, if a principle so just and conclusive could be overlooked, could there well be found a more unsafe guide in practice, than mere policy and convenience ?   " Men, on such subjects, complexionally differ from each other.   The same men differ from themselves at different times."(1)

But does policy or necessity require a more absolute control over the clerk than the law has given ?   According to the opinion of the Circuit Court, its authority is altogether inadequate to insure the respect of the clerk, or his obedience to its mandates ; he may, it is thought, contemptuously question the correctness or justice of the judgments of the Court, and refuse to enter them ; or he may be too ignorant to perform the duties of his office ; and although they are left unperformed, the power of the Court is inadequate to correct the mischief.   " It is no answer," it is said, " to say the clerk may be removed on complaint.   Who is to make the complaint ?   Is it, when made, to be tried by a jury ?   Might not a disobedient or refractory clerk be, notwithstanding, so popular as to prevent a verdict against him ? "   If this description of the impotency of the Court were correct, it certainly might, with great propriety, claim an extension of its authority.   But is it correct ? Has the Court no power to punish the clerk for a contempt of its authority, or for refusing or neglecting to perform the duties of his office ?   And is the fact of his delinquency to be ascertained by the verdict of a jury ?   This view of the authority of the Court is totally unlike that which the law has conferred.   It has provided that if any clerk of the Circuit Court shall neglect or refuse to perform any of the duties enjoined upon him by law, or shall in any manner be guilty of malfeasance in office, he shall be removed from office by the Court, upon proper complaint being made to the said Court or judge, and the said complaint being proved true to the satisfaction of the said Court or judge.(2)   Here, express authority is given to the Court to remove the clerk for refusing or neglecting to perform any of his official duties.   Incapacity is also a sufficient cause of removal ; for it matters not from what cause his duties are left unperformed, it constitutes a cause of removal ; and the fact of malfeasance or dereliction of duty, is not, as the Circuit Court seems to suppose, to be tried by a jury, but is to be proved to the satisfaction of the Court alone, to justify his dismissal.

This power, in addition to that of fine and imprisonment for all contempts or disobedience to the authority of the Court, would seem amply sufficient to insure the subordination of its clerk, and the protection of its dignity, character, and authority.

The Circuit Court has also fallen into a like error with respect

(2) 1 Story on Const. 410.            (2) R. L. 153; Gale's Stat. 172.

to the authority of the Supreme Court over its clerk. It says : " Suppose the clerk of the Supreme Court should refuse to enter a judgment of the Supreme Court, where is the remedy ? Would a suit on his bond answer ? Would an indictment or impeachment answer ? Neither ; for in both cases he would be permitted to show, in his defence, if he were the officer of the law and not of the Court, that the judgment ordered to be entered was unjust and erroneous ; and thus bring into review, before another less competent tribunal, the correctness of the decisions of the Supreme Court." I do not know to what tribunal the Court below can refer, as having cognizance of such a question. But without enquiring into the correctness of this reasoning, whether it would be competent, under any regulations, for the clerk to show, or for any other tribunal, of less authority than the Supreme Court, to determine its decisions to be erroneous, and thereby exonerate the clerk from the obligation of recording them ; it is sufficient, by referring to the law, to show that no such proceeding as the Circuit Court alludes to is authorized ; but that full power is given to the Supreme Court to dismiss its clerk for cause, without the intervention of a jury, or an appeal to any other tribunal. The law provides, " That the Supreme Court, or a majority thereof, shall have power to remove any clerk of said Court for neglect of duty, incompetency to perform the duties of his office, or for any malconduct, in office, of which he may be guilty, or for any other cause which shall be satisfactory to said Court, or a majority thereof."(1) This law is plain and clear, and leaves no doubt or question as to the authority of the Court, or the responsibility of the clerk.

The authority, therefore, which the law has conferred upon the Supreme and Circuit Courts over their respective clerks, would seem amply adequate to insure their subordination, and a prompt performance of their official duties. And, on the other hand, the regulations under which their authority is to be exercised, are sufficient to protect the clerk from its capricious or wanton abuse.

These acts of the legislature prove the premises, upon which the Circuit Court has predicated its argument against the authority of the case of Matheny v. Mobley, to be untenable. They also prove a practical construction of the Constitution by the legislature. By their passage, that department of the government has clearly expressed its sense of the unlimited duration of an office to which the Constitution has given no limit, and that the officer is not removable at will. They also constitute a practical exposition of the authority of the legislature over the subject. If the Court had been thought to possess the constitutional power to remove the clerk, at will, the acts of the legislature conferring that

(1) R. L. 159 ; Gale's Stat. 177.

power, under the regulations it has prescribed, would have been not only nugatory, but, by the restrictions which it imposed upon the exercise of the right, in direct violation of the Constitution.

So, too, the offices of Auditor of Public Accounts and Attorney General, like that of Secretary of State, are also created by the Constitution, without any limitation of tenure. And the duration of both these offices has been limited by the legislature to two years, and the officers have, in accordance with this law, been elected at every regular session of the legislature, since its passage. If they had not been considered as holding their offices under the Constitution, during good behavior, until a different tenure was provided by law, there would have been no necessity for providing a limit. They could have been elected at any time, and as often as the legislature might have considered expedient. But, inasmuch as the Constitution provided no limit, it was considered necessary to provide one by law, in order to determine the duration of the offices. If, therefore, this was necessary, in reference to the Auditor and Attorney General, it must be equally so in reference to the Secretary of State. These respective offices have the same *origin*, and the same unlimited tenure. The manner of the appointment being different, can make no difference as to the duration or tenure of office ; and one cannot be regarded as holding at the will of the appointing power, more than the others. The office of each being alike in its origin and tenure, the same legal rules, as to the manner of holding, must prevail in regard to them.

But it is objected to this law, providing for the election of Auditor and Attorney General, being considered a legislative exposition of the Constitution, in relation to the tenure of an office to which no limit is given ; because, it is said, the legislature did not legislate upon, or fix the tenure of these officers, although it is admitted, that the effect of the legislation may be to determine their time of service. If this is not legislating upon the tenure, I do not know what to call it ; it is legislating upon nothing else. The admission, too, that the law has limited and fixed the time of service of these officers, is admitting all that the law was referred to, for the purpose of proving, in the case of Matheny *v.* Mobley ; and it is all that it is now referred to for. By showing that the office of Auditor is created by the Constitution, without limitation of duration, and that the legislature has provided a limit, by declaring that they shall be elected every two years, it proves that they considered these officers as holding their offices without limitation, as to time, and that their time of service could only be limited or terminated by law. And if they held their offices without limitation, and a law was necessary to fix a limit, and terminate the period of their continuation in office, it would seem to be a necessary inference, that the Secretary and clerks, whose offices are cre-

ated by the same instrument, and have the same unlimited tenure, must hold them upon the same terms.

But these are not the only instances in which the rule, that an officer, whose office is unlimited in duration, during good behavior, until a limit is given by law, has been recognised, and acted upon by different departments of the government. In the case now under consideration, the rule has received the sanction of a co-ordinate branch of the government. Some resolutions of the House of Representatives and Senate have also been referred to upon this question ; but these resolutions are to be regarded as merely expressive of personal or political feeling. They were speculative, not practical expressions of opinion, and consequently without the authority of official responsibility.

The decision of the Senate upon this question, at the last session of the legislature, by which they in effect decided, that the Governor had no power to remove the Secretary of State, at will, is of a different character. The question came directly and properly before it, and was decided under official responsibility, and the solemn obligations of an oath. Nor was it made hastily, without reflection and deliberation, but upon full and able discussion. A decision so made, says Judge Story, by a coördinate branch of the government, "under a deep sense of its importance and difficulty, in the face of the nation, with a view to present action, in the midst of jealous interests, and by men capable of urging and repelling the grounds of argument, from their exquisite genius, their comprehensive learning and deep meditation upon the absorbing topic, constitutes one of the most unexceptionable sources of interpretation of which the Constitution is capable, and approaches, nearest to its nature of any other, to a judicial one." That this decision was not the result of political bias, may be fairly inferred from the notorious fact, that the Senate was equally divided in political sentiment ; yet, notwithstanding this, and the additional circumstances of the weight of executive influence in favor of executive authority, there was a decided majority against the Governor's claim of power to remove the Secretary. When, therefore, legislators, who, from their general habits of life, and the functions of their office, are more accustomed to look to policy and expedience, than to strict legal rules, decide a question of a political aspect against their political predilections, they must be supposed to have considered the obligation imperative, from the plainness of the question.

Upon the same principles that the Governor's right to remove the Secretary is urged, it is also contended that he may remove the Auditor and other officers in the executive department. No construction of the Constitution can be a correct one, which, by extending the powers of one department of government, will narrow down, or render inoperative, the powers expressly granted to an-

other ; and this would be the effect of allowing to the Governor the right to remove the Auditor and other executive officers. The right to appoint these officers is given by the Constitution to the General Assembly ; but if the Governor may immediately remove those whom they appoint, and substitute for them those of his own selection, is not the right of the legislature converted into an idle and useless ceremony ? and one of the most important powers of the government, given, by express grant of the Constitution, to one department, taken from that department, by construction, and virtually given to another, contrary to the expressed intention of the Convention ?

This would be a most strained stretch of executive authority, for which no warrant can be found in the spirit of the Constitution, or the rules of interpretation.   The settled doctrine is, that construction for the purpose of conferring power, should be resorted to with great caution, and only for the most persuasive reasons.

The enquiry then arises, what will authorize or justify the constructive grant of power claimed for the executive ?   What fatal evil is to be corrected, or what absurd consequence is to be avoided, that *will warrant the* exercise of a power not expressly granted, or even hinted at by the Constitution, and one greater, of more controlling influence, and more liable to abuse, if allowed to the extent claimed, than any, or probably all the powers expressly granted by the Constitution ?   If any such exists, I confess I have not astuteness of mind to discover it ; and others have failed to point it out.   But on the other hand, it is admitted, that the power of removal is not expressly granted by the Constitution, and I have attempted, and I think succeeded, in proving, by the reasons adduced, and, more conclusively, by authority, that it cannot be implied from any of the provisions relied upon.

I have shown, by authority, that the first and second section of the first article, and first section of the third article of the Constitution, are to be regarded as merely declaratory and directory, and confer no specific powers ; and that authority and reason are equally conclusive against any implication of executive power, under the injunction to see that the laws are executed, or under the authority to require information from the officers in the executive department ; to direct or control any of those officers in the performance of duties enjoined by law (and all are so enjoined), and consequently against the power of removing them, which includes the power of supervision.

I have also shown, that the power of removal is unnecessary to the exercise of any of the powers granted, or the performance of any of the duties enjoined upon the Governor ; but that this power would be incompatible with the performance of the duties enjoined upon other officers generally, and especially that of the Secretary, to register the official acts of the Governor.   The as-

Field *v.* The People.

sumption, that the Secretary is the confidential officer of the Governor, is also shown to be gratuitous and without foundation. The inference and arguments drawn from it must therefore be fallacious.

If these positions have been established, the arguments drawn from the Constitution itself have been answered. But it has been further shown, that the Constitution has received a judicial and legislative exposition, adverse to the power claimed. That, in accordance with the rule of the common law, it has been settled by judicial adjudications, and by early and subsequent legislative action, that an officer whose office is created by the Constitution, without limitation of duration, holds, accordingly, without limit, until one is given by law. To this authority may also be added, the implied disavowal of the power of removal by the executive department, arising from the fact, that it has never before been exercised, or claimed on any occasion, by any executive, since the adoption of the Constitution, for now upwards of twenty years. To this it is answered, that the right was never before denied ; but this does not obviate the force of the objection. The power could not be denied until claimed. The attempt to exercise a power, must, in the nature of things, precede resistance to it. Until the right is asserted, there is nothing to deny. It is not contended that the omission, for any length of time, to assert a power clearly granted, can operate as a bar to its exercise ; but a claim of power resting upon mere inference and presumption, may, by inference and presumption, be rebutted ; and an omission to assert it for a length of time sufficient to bar a title to an estate, ought to be sufficient, aside from other and stronger objections, to raise a presumption of want of title sufficient to bar, at least, a doubtful claim of power. And when, in connexion with this circumstance, we also take into consideration the doctrine, that the practical operation of the several departments of the government affords an exposition of their constitutional powers inferior only to a judicial one ; and that so far as the principles upon which this clause depends, have been drawn in question, the practical operation of every department, up to this time, has been adverse to it ; authority and consistency would therefore seem to leave no discretion in the determination of this clause. If the power of removal from office, was one of little importance, or if opportunities for its exercise were of rare occurrence, the presumption against its existence, from its not having been exercised or claimed, would be measurably obviated. But the reverse of this is unquestionably true. So important was this power considered, and consequently so urgent the necessity for settling its extent and practice under the general government, that it was among the first subjects that engaged the attention of the first Congress under the Constitution of the United States. If it had been supposed that this power had been granted by our Constitution, why has it never before been

asserted? It can hardly be pretended, that there has never been either occasion or temptation to its exercise. Such an assertion would imply a degree of fidelity and perfection in all the officers of the executive department, which facts and circumstances do not warrant; and also, such a degree of moderation, forbearance, and exemption from the contagion of example, on the part of the executives, as has rarely, if ever, been known to exist in connexion with power. It is no disparagement to the executives who have presided over the State, to say, that we cannot claim for them an exemption from the passions common to others, or the concomitant partialities and antipathies of party feeling. And when it is recollected that we have had mutations of party, and party ascendancy, can it be asserted that there has been no sufficient temptation to removal from office; especially, when a want of identity of political faith with the executive is considered a legitimate cause? How then has it happened that this prerogative of removal (which some consider so essential an executive attribute, and all must admit to be a most potent means of gratifying party and political predilections and resentments, and of maintaining political power, by keeping to its side those in office, and by winning over those who seek it) has never before been resorted to. Can any reason be assigned for its having so long remained dormant, unappropriated, and unclaimed, except that it was never before believed to exist?

But other arguments than those drawn from the Constitution, have been advanced in support of the Governor's right to remove the Secretary. While the exposition which the Constitution has received from the practical operation of the several departments of our government is rejected, the practice and principles drawn from other governments, totally unlike ours in their powers, objects, and nature, are relied upon as authority to change the settled construction of the Constitution, and extend the powers of the Governor, not only beyond the boundaries fixed by the uninterrupted and unquestioned practice of the government, since its formation, but to confer upon him powers which no other Governor in the Union, with perhaps but one exception, has been shewn to possess.

To carry out this object, two positions are assumed. First, that the power of removal is incidental to the power of appointment; and next, that the power of appointment to office, and removal therefrom, are executive functions, and as such belong to the Governor. The enquiry, then, is, how far these assumed axioms are true? and if true, how far they are applicable to the present case?

If the principle, that the right of removal is incidental to, and is to be exercised by the power that confers the office, is to be tested by the practice of the republics of America, it will be found to be untenable. I have shown that the practice of our own govern-

ment is opposed to it ; and by recurring to the practice of the general government, it will be seen that the practice under that is also opposed to it.  I am not familiar with the practice of the State governments generally, but so far as my knowledge extends, their practice accords with that under our government.  But admit it to be correct, as contended for, it would not give the Governor the right to remove the Secretary from office, but would take from him all title to the exercise of this right, upon this or any other principle.  The Constitution gives to the Governor and Senate, conjointly, the appointment of the Secretary.  To them, conjointly, then, under the rule contended for, would belong the right to remove him.  But, notwithstanding the unequivocal language, and obvious intention, of the Constitution, it is insisted, that the Governor alone appoints the Secretary ; and a decision of the Supreme Court of the United States is relied upon, in support of the position. · The Constitution of the United States gives to the President, by and with the advice and consent of the Senate, the power to make treaties, and to appoint ambassadors, judges, and all other officers, whose appointments are not otherwise provided for, and which shall be established by law.  But Congress may vest the appointment of inferior officers in the President alone, &c. Our Constitution gives the appointment of the Secretary to the Governor and Senate, in language identical with the language of this provision in relation to appointments by the President and Senate.  The question before the Supreme Court of the ‚United States, in the case referred to, (1) was not, whether the President alone, or whether the President and Senate conjointly conferred appointments.  The question which it did decide, was in relation to its jurisdiction ; but that which was intended to be presented was, whether the President could control the Secretary of State in the performance of a duty prescribed by law ; and the Court said he possessed no such power.  In the investigation of this point, it is said, in relation to appointments to office by the President and Senate, that the nomination is the sole and voluntary act of the President, and that the appointment is also the sole and voluntary act of the President, though it (the appointment) can only be performed by and with the advice and consent of the Senate. Does this prove that the President alone makes the appointment ? Does it not rather prove that the appointment is made by the joint action and coöperation of the President and Senate ?  The action of the Senate is as necessary to create the appointment as that of the President.  Without its vote of advice and consent, no appointment can be made.  How, then, can it be contended that they have no participation in the matter ?  We are not to lose sight of the sense and substance of the Constitution, by confining our atten-

(1) Marbury *v*. Madison.

tion exclusively to the form of expression.  The whole clause, and every other clause having a bearing upon the subject, are to be taken together, and construed according to the plain and generally received meaning and acceptation of its language, and the obvious intention of its authors.  As it is obvious, then, that the President alone, and consequently the Governor, does not confer the office, as he alone does not create the officer, he alone cannot, according to the rule laid down, remove him ; as the advice and consent of the Senate is necessary to confer the office, it must, according to this rule, be necessary to remove him.

After giving to the President and Senate the appointment of ambassadors and other superior officers, the Constitution provides that the appointment of inferior ones may be vested in the President alone.   Is it not clear, then, that he alone does not appoint those just before enumerated, and declared to be appointed by the President with the advice and consent of the Senate ?   A construction of the Constitution which would give the President alone the appointment of judges, and ambassadors, &c., would be rather an amendment, than a construction of it.   It would leave out a part, and a very important part of the clause in relation to the appointment of officers.   The coöperation of the Senate was intended for some purpose.   The provision requiring it, was not inserted in the Constitution without design.   It appears, from the journal of the Convention, that it was adopted as an amendment to the original drafts upon the report of a committee ; and was intended to give to the Senate a participation in, and control over appointments to office.   That this was the light in which this provision was viewed by the first Congress, and that it was then understood that the Senate, conjointly with the President, was the appointing power, is proved by their debates.   This is also Judge Story's view of the subject.   He says, " The power to nominate, does not naturally or necessarily include the power to remove ; and if the power to appoint does include it, then the latter belongs conjointly to the executive and the Senate."(1)

Again he says, " The President is to nominate, and thereby has the sole power to select, for office ; but his nomination cannot confer office, unless approved by a majority of the Senate.   His responsibility and theirs is thus complete and distinct."(2)

According to these authorities, and the plain and obvious meaning of the Constitution, the Senate, as a coördinate branch of the government, conjointly with the President, is the appointing power, under the Constitution of the United States ; and as our Constitution gives the Governor and Senate the appointment of Secretary, in the identical language of that of the United States, in reference to appointments by the President and Senate, it fol-

(1) 3 Story on Const. 390.          (2) 3 Story on Const. 376.

lows conclusively, that the Governor and Senate conjointly appoint the Secretary, and that the Governor alone cannot remove him, because he alone does not appoint him. The Secretary being appointed by and with the advice and consent of the Senate, upon the principle laid down by the Court below, their advice and consent is necessary to remove him.

Whatever degree of weight, therefore, may be allowed to the maxim, that the power of removal is incidental to, and included in the power of appointment, it cannot be brought in aid of the Governor's claim of power to remove the Secretary. If it has no application under our government, it can have no influence upon the present case ; but if, on the other hand, it is, according to the assumption of the Court below, a principle of universal application, whenever the tenure of the office of the appointee is unlimited, it will be conclusive against the Governor's power to remove the Secretary ; because, under this rule, the advice and consent of the Senate is as essential to the removal, as it is necessary to the appointment ; and that has not been given.

It is also contended, that the Governor may remove the Auditor and Treasurer, &c. This position, and the position that the right of removal is incidental to that of appointment, cannot both be correct. The General Assembly appoint these officers ; how then can the Governor remove them, if that right belongs to the power that appoints them. ?

The arguments and positions in favor of the power claimed for the Governor, cannot be reconciled with each other. One clear and plain grant of power is sufficient to justify its exercise ; but it is certainly a presumption that no such grant can be found, when the advocates of the power rely with more confidence on general maxims, drawn from other governments, than upon the provisions of the Constitution itself. The application of one of these maxims to the present case, I have shown, would defeat, rather than sustain the claim of executive power. The next political maxim relied upon is, that the right of appointment and of removal from office are executive functions, and, as such, belong to the executive. The practice of the President, under the Constitution of the United States, is also relied upon as evidence of a similar authority in the Governor, because of the supposed similarity between that Constitution and ours.

It is assumed, as an undeniable proposition, that the power to appoint to, and remove from office, are executive functions ; and upon this assumption, the argument in favor of the Governor's right to remove the Secretary, is based. The most improbable and fanciful theory may be established, if the premises upon which the arguments in its favor are founded, may be assumed without proof. But the truth of the premises should be established before we presume to draw conclusions. The assumption, that appointment to, and removal from office is an executive function, war-

ranted by our Constitution, as a political maxim, is subject to exceptions, and is applicable only to governments which give that power to the executive. Such as deny to the executive the exercise of this prerogative are exceptions to the rule. It is rather a monarchical than a republican maxim of government ; so far as I know, or as has been shown, we may search in vain, in the republics of the Union, for a constitutional grant to the executive, of the power of removal from office ; while that of appointment is variously modified. In England, the power of appointment and removal belongs to the king ; but that does not prove that it does or should belong to the Governor. We have adopted the common law of that country, but not its government, or political maxims. According to the theory of that government, the king is the sovereign power. He is the fountain of all honors and offices ; all are conferred by him, and may be recalled by him, at pleasure. They are the officers of the king and not of the government or people ; hence the maxim, under that government, that the power of appointing and removing officers is an executive function. But as the theory and principles of our government are essentially different, it necessarily follows, that the maxims and rules of government flowing from, and applicable to it, are also different.

According to the theory of our government, the people are the sovereign power. All offices are created and administered for their benefit and convenience, and not for the benefit or convenience of the chief magistrate. All the officers of government derive their authority directly or indirectly from the people ; and an officer who is to execute or administer the laws, is not less an officer of the people, nor more an officer of the executive, or the legislature, because the people have declared by the Constitution that he shall receive his appointment through their instrumentality. In making the appointment, they act as the agents of the people, but when that act is performed, their agency and authority ceases. The President is appointed by electors, but that does not make him their officer, or subject to their control. So, where no other power than that of appointment is given to a department of the government, none else can be exercised, unless where the appointee is the mere agent, and bound to execute the will of the appointing power.

If, in claiming the power of removal as an executive function, it is meant, that this power belongs, ex-officio, to the Governor ; that it grows out of, and belongs to, the office, the position is altogether untenable ; the executive power under this, and every other constitutional government, is just such power as the Constitution confers upon him. That is the only source of power. Neither the practice nor maxims of other governments can confer upon him any functions or powers. But it is laid down, as " a well settled political proposition, that, whenever the legislative powers of a gov-

ernment are undefined, it includes the judicial and executive attributes."(1)    The executive and judiciary, therefore, can exercise no powers but such as are granted, while the legislature can exercise all powers not forbidden.

It is also argued, that the Constitution of this State was modelled after that of the United States ; and that, inasmuch as the President has the power, under that instrument, of removing officers in the executive department, the same power was intended to be given to the Governor.    This reasoning is more plausible than sound, and, like that predicated upon the assumption that the Secretary is the confidential officer of the Governor, and that the power of appointment and removal is an executive function under our Constitution, is based upon incorrect premises.    Some of the provisions of the two Constitutions are similar, but they are essentially different as regards the grants of executive power.    They both contain the same general division and definition of the powers of government, and both grant to the executive the pardoning power, and constitute him commander-in-chief.    They are also alike, in requiring him to see that the laws are executed, and to give information to the legislative department, of the state of the government.    The right of the President to require the opinion, and of the Governor to require information from the officers in the executive department, I have shown to be different, and intended for a different purpose.    And I think I have also shown, that the power of removal cannot be inferred from these, or any of the provisions in which the two Constitutions are similar.    The power of appointment to office, delegated to the respective executives, and the power of supervision intended to be conferred, will, by a recurrence to the Constitution, be found to be widely different.    If the constitutional grants of executive power can be shown to be similar in reference to some subjects, but are different in respect to appointment to office, it must be evident that different powers were intended to be conferred.    That could be the only motive for a deviation from the supposed model.

But is there not as much reason for supposing that the Constitutions of the State governments served as models for the formation of ours, as that of the United States ?    There is scarcely a provision in it that is not to be found in one or other of the State Constitutions, either identical, or in a form slightly modified ; and as the objects and general powers of our government bear a nearer resemblance to those of the other State governments, than to those of the general government, their practice, under constitutional provisions similar to ours, would seem to afford a precedent (so far as precedent is entitled to influence,) of more weight than that of the general government.    But, so far as my knowledge upon this point extends, (though I confess it is limited,) I do

(1) 1 Peters' Cond. R. 213.

not know of but one Governor in the Union who possesses the power claimed for the Governor of this State. And we may fairly presume that none other does, as the evidence of its exercise has not been adduced, by any of the able counsel, who did not omit to bring forward every practice or exercise of executive power, calculated to countenance or support that which they advocated.

In order to ascertain how far the practice of the President can be regarded as a precedent for the like practice by the Governor, it is necessary to enquire how far their constitutional powers of appointment to office are alike ; and also, whether the officers whom the President may remove, and the Secretary of this State, bear the same relation to the respective executives ? Upon a similarity in these points, and upon both executives having the same interest in, and control over, the subjects to which the duties of the officers relate, must depend the degree of influence which the practice of the general government is entitled to have upon that of ours. The same grant of power does not necessarily or naturally give the same control over subjects or officers of a different character.

But, recurring to the Constitution of the United States and of this State, there will be found a great disparity between the executive powers of appointment to office conferred by the two Constitutions ; and by recurring to the organization of the offices under the two governments, as great a disparity will be found to exist in relation to the control and supervision conferred upon the respective executives over the officers in the executive department ; and none of the reasons upon which Congress, in 1789, recognised in the President the right to remove those officers, are applicable to the Governor's claim of power.

By the second section of the second article of the Constitution of the United States, it is provided, that the President " shall have power, by and with the advice and consent of the Senate, to make treaties, provided two thirds of the Senators present concur, and shall nominate, and by and with the advice and consent of the Senate shall appoint ambassadors, other public ministers, and consuls, judges of the Supreme Court, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law. But Congress may by law vest the appointment of such inferior officers, as they may think proper, in the President alone, in the courts of law, or in the heads of departments."

This clause gives to the President and Senate the appointment of all the superior officers of the government ; and Congress has given most of the others. There is some propriety, therefore, in calling appointment to office an executive function, under the general government. But can it be so called, under ours ?

The Constitution of this State, after giving the appointment of

clerks to the courts, and that of almost all the other officers to the people and the legislature, provides, by the twenty-second section of the third article, that " The Governor shall nominate, and by and with the advice and consent of the Senate, appoint all officers whose appointments are not herein otherwise provided for ; " with the further proviso that inspectors, &c. and all other office s whose jurisdiction is confined to the county, may be appointed in such manner as the General Assembly shall prescribe. Although the Constitution provides, I believe, for the appointment of all the officers it creates, and gives to the legislature the right of prescribing the manner of appointing all county officers, still, this section would have left to the Governor some chance of appointment to office, besides those specially given him, if this was all that had been said upon the subject. But it is not. By the tenth section of the Schedule, it is declared, that " An Auditor of Public Accounts, an Attorney General, and such other officers for the State as may be necessary, may be appointed by the General Assembly, whose duties may be regulated by law."

The practical construction which this section has received, takes from the Governor all appointments except such as are expressly given him. I do not express any opinion upon the propriety of this construction ; and I am still less disposed to advocate the policy of giving all appointments to office, to the legislature, rather than to the executive. But that is not the point for adjudication.

What officers, then, has the Constitution given the Governor the right to appoint, that establishes the analogy between the constitutional powers of the President and the Governor ? The President may, in conjunction with the Senate, appoint all the superior officers of the general government. The Governor may, in conjunction with the senate, appoint a Secretary of State, and he may appoint his staff officers. These are all. How, then, can it be said, that there is an analogy between the two Constitutions, in reference to the power of appointment delegated to the respective executives ? On the contrary, there is a marked contrast between their constitutional powers.

And does the Governor's right to appoint two staff officers, and a Secretary of State, create a general rule, and constitute appointment to office an executive function, under our Constitution ? I think not. But, to prove that it does, the Court below gives a long list of officers, embracing nearly all belonging to the government, who may be appointed by the people, the legislature, or the judiciary, and says, that these are all the instances in which appointments can be made, except by the executive. And these, it is contended, are exceptions to the general rule, that appointment to office is an executive function. Now, to say that the appointment of three officers, and one of them in connexion with

another branch of the government, constitutes a general rule, and that the appointment by the people, the legislature, and the judiciary, of several hundred times that number, are merely exceptions to this general rule, is, to my mind, a confusion of language, and confounds and reverses.all preconceived ideas of general rules, and the exceptions thereto.

As the right of appointment to office has not been given to the Governor as a general rule, as it has to the President, the analogy between their powers, relied upon, does not hold good ; and whatever may be the theoretical or political denomination of this power under other governments, it cannot be considered an executive function, under our Constitution, because it does not belong to the executive. Under the English government, the power to declare war and to coin money, as well as to appoint to office, are executive functions, because they belong to the executive. But they cannot be so denominated, even under the general government. These powers not having been granted to the executive of that government, they cannot, under it, be called executive functions. So diversified is the practice of the governments of the States, in reference to the appointment of officers, that no general rule can be deduced from it ; certainly none to justify the assumption that it is an executive function. Under these governments, then, it is an executive, or legislative, or popular function, or power, according as the respective Constitutions have made it so.

The disparity between the powers of the President and Governor, is not greater in reference to appointment to office, than it is in reference to their supervision and control of the officers of the executive department, when appointed.

The Constitution of the United States and of this State contain the same declarations, that the executive powers of the government shall be vested in the respective executives ; and, in the Constitution of the first, this declaration is carried out by its other provisions. ‹ It creates no other officers in whom a portion of this power is vested, or required to be vested, by law. Those officers whom the President may remove, are created by law, as aids and helps to him, in the performance of his duties. But the declaration in our Constitution, that the executive power of the government shall be vested in the Governor, is to be understood in a much more limited sense ; inasmuch as, by its other provisions, it is greatly circumscribed and narrowed down. Unlike the Constitution of the United States, ours has created other executive officers, in whom a portion of this power is required to be vested by law, not to be assigned by the Governor. He can assign no duties to the Secretary. That idea is negatived by the Constitution, requiring all his duties, in addition to such as it has prescrib-

ed, to be assigned by law. He is, therefore, the officer of the Constitution, and not of the Governor.

By an examination of the laws of Congress, organizing the offices of the executive department of the general government, and by recurring to the Constitution, it will be found, that this distinction exists in reference to all the officers in the executive department of the two governments. And by a recurrence to the congressional debates of 1787, it will be seen, that the power of removal was conceded to the President, because of his executive powers, of his responsibility for the performance of the duties of the executive department, and of his supervision and control of the executive officers. None of these apply to the Governor.

The law creating the office of Secretary of Foreign Affairs, (now called Secretary of State,) provides, " That the Secretary for the department of Foreign Affairs shall perform and execute such duties as shall from time to time be enjoined on, or intrusted to him, by the President of the United States, agreeably to the Constitution, relative to correspondence, commissions, or instructions to, or with, public ministers or consuls from the United States, or to negotiate with public ministers from foreign states or princes, or to memorials, or other applications from foreign public ministers, or other foreigners, or to such other matters respecting foreign affairs, as the President of the United States shall assign to the said department. And furthermore, that the said principal officer shall conduct the business of the said department, in such manner as the President of the United States shall from time to time order or prescribe." This law, it will be observed, requires of the officer the performance of no duties but such as shall be assigned him by the President, and they are to be performed under his supervision and direction. Upon the passage of this law, in 1789, the question arose whether this officer should be removable from office by the President alone, or by the President and Senate, the generally recognised appointing power. Men of the highest talents and purest patriotism took different sides of the question. The republican party, generally, were opposed to the President's exercise of the power of removal. They contended, that when that power existed, it should be exercised by the same power that conferred the appointment ; that it resulted from, and was incidental to, the power of appointment ; and as the consent of the Senate was necessary to confer an office, it should be necessary to remove the officer. That this power, vested in the President alone, would be an arbitrary and monarchical prerogative, that might, in the hands of an ambitious and corrupt man, be used for the base and unworthy purpose of gratifying personal and party resentments, of depressing the freedom of opinion and action, and of converting all the officers into mere tools and creatures of the executive.

The federal party advocated the power of dismissal by the President alone, and argued that it resulted from the powers and duties of the President, and was essential to their exercise. That as the President was responsible for the executive department, he should have the control of the officers who were to assist him in its administration. They contended that all the public ministers, and heads of department, were the mere aids and helps of the President in the performance of his duties ; and as they received their directions from him, and were, by law, bound to conform to his will and instructions, in the manner of performing the trust confided to them, he should have the power of removing them, as the means of compelling their obedience. They also argued, that the danger of dismissing good officers for a difference of political opinion, or to make room for favorites or dependents, must be imaginary. That no man, elevated to so exalted a station, could descend to such a prostitution of the power and confidence reposed in him. And Mr. Madison declared, that removals made, from motives so unworthy, would subject a President to impeachment, and removal from office.

These last arguments prevailed. Which, from their prescience of coming events, were best entitled to prevail, each one will decide for himself. By a small majority in the House of Representatives, and by the casting vote of the Vice-President in the Senate, it was decided, that the President alone should have the power of removing the Secretary of Foreign Affairs, and consequently all other heads of departments, and ambassadors, &c., who, like him, are subject to the control and supervision of the President.

In relation to this decision, it is remarked by Judge Story, " That the final decision of this question, so made, was greatly influenced by the exalted character of the President then in office, [Washington,] was asserted at the time, and has always been believed."(1) That it was contrary to the exposition that had before that time been given to the Constitution, is asserted by high authority, and is proved by the Federalist, a work composed by several of the ablest statesmen of the age, for the purpose of answering objections brought against it by its opponents, and to propitiate for it the favor of the public."(2)

But, whatever may be the opinion of the correctness of this exposition of the Constitution, the long acquiescence in, and practice under it, may well be considered as having established it too firmly to be shaken. That the power of removal is liable to great abuse cannot be doubted ; and that if required to be exercised in conjunction with the Senate, the danger of that abuse would be greatly diminished, if not entirely removed, admits of as little doubt. But whether, if to be thus exercised, its efficiency, as a

(1) 3 Story on Const. 394.                    (2) Federalist, No. 77.

means of putting aside imbecility and corruption, and frustrating
fraud or treachery, would, under all circumstances, be equal to the
emergency, may well be doubted.

These questions, however, have no connexion with the present
case.  It is not necessary, for the support of my views in respect
to it, that I should controvert that exposition of the Constitution
that allows to the President the power of removal ; nor am I dis-
posed to animadvert upon its exercise.  But I propose to show,
by a reference to the debates upon that question, that none of the
reasons upon which this power was allowed the President, are ap-
plicable to the Governor.

One of the reasons assigned for the President's authority to re-
move the executive officers, is his control over the executive de-
partment, and the executive officers.  In the debate of 1789, Mr.
Ames said, " The Constitution places all executive power in the
hands of the President ; and could he personally execute all the
laws, there would be no occasion for establishing auxiliaries ; but
the circumscribed powers of human nature, in one man, demands
the aid of others."  Mr. Madison held the same language.  " It
is evidently the intention of the Constitution," said he, " that the
chief magistrate should be responsible for the executive depart-
ment.   So far, therefore, as we do not make the officers who are
to aid him in the duties of that department responsible to him, he
is not responsible to the country."  Mr. Lawrence also contend-
ed, that, " In the Constitution, the heads of department are con-
sidered the mere assistants of the President, in the performance of
his executive duties.  He has the superintendence, the control,
and inspection, of their conduct ; he has an intimate connexion
with them, they must receive from him his orders and direc-
tion."(1)

Is it not clear, from these views of the advocates of the Presi-
dent's power of removal, that there is no analogy between his
power and duties, and those of the Governor, or between the
character and  accountability of the executive officers of the gen-
eral government, and of this government ?  The Governor has
not, like the President, the whole control of the executive de-
partment ; the Secretary, and other officers, are not placed under
his control, to receive his orders and direction, or to aid him in
the performance of his duties.  The office of Secretary, and that
of the other officers of the executive department, like that of the
Governor, are created by the Constitution, and their duties, like his,
are assigned by law.  Each constitutes different parts of the ma-
chinery of government, and is bound to move in the order pre-
scribed by law.  Where, then, is the analogy between these officers
and those who are under the absolute direction of the President, to
be controlled or dismissed at will ?

(1) 4 Cong. Debates 156, 166.

As, by the Constitution of the United States, the President has the control of the whole executive department, it having created no other officers in whom any portion is vested, or required to be vested, by law ; and as those who are to assist him in its administration, are by law placed under his supervision and control, he thereby becomes politically responsible for its proper administration.   This responsibility was strongly urged as a reason for giving him authority to remove those officers for whose conduct he was responsible.   " It would seem incongruous and absurd, (said Mr. Sedgwick,) that an officer who, in the reason and nature of things, was dependent upon his principal, to conduct such business as was committed to the charge of his superior, (for this business is committed solely to his charge,) I say, it would be absurd, in the highest degree, to continue such a person in office contrary to the will of the President, who is responsible for business being conducted with propriety, and for the general interest of the nation. The President is made responsible ; and shall he not judge of the talents, ability, and integrity of his instruments ? "   Again, Mr. Stone remarked, " If we establish an office, avowedly to aid the President, we leave the conduct of· it to his discretion.   Hence, the whole executive power is left to him."   Again, " Is it not made expressly the duty of the Secretary of Foreign Affairs to obey such orders as shall be given to him by the President ; and would you keep in office a man who should refuse or neglect to do the duties assigned him ?   Is not the President responsible for the administration ?   He certainly is."(1)

Many more extracts could be given from the debates upon this question, all tending to prove, that the power of removal by the President, was advocated and allowed, upon the ground, that the business that the officers were to conduct was his business, which he assigned them, and which was conducted under his supervision and control.   That, as the officer was the mere organ through whom he transacted the business of this department, and as he was responsible for his acts, these considerations should entitle him to the right of dismissing him, as the means of insuring his obedience and vigilance.

Here, again, is a contrast, in place of an analogy, between the powers and responsibility of the executives of the two governments ; and also between the character and accountability of the executive officers of the respective governments.

The Governor is, neither in fact nor in theory, personally or politically responsible for the official conduct of the Secretary, or any other officer.   He cannot assign him the performance of a single duty, or control him in the performance of those assigned by law.   He does not move in the executive circle, as has been

(1) 4 Cong. Debates 187–191.

said, but in that marked out by the Constitution and the law, separate, distinct from, and independent of, that of the Governor. He looks to the law for his authority and duties, and not to the Governor ; and to that, and that alone, he is responsible for their performance.

Another cogent reason in favor of the President's authority and control over the heads of department and public ministers, arises out of the confidential character of the connexion and intercourse between them and the President. Through the Secretary of State and ambassadors, all negotiations, whether of peace or war, commerce or navigation, are conducted ; and with the Secretary of War and of the Navy, the plans of campaigns, the movements of the army and navy, are arranged and settled. It must, therefore, be manifest that the communications and intercourse between these functionaries are often of a secret and highly confidential nature, and such as, if betrayed, might greatly prejudice the interest and safety of the nation. Nothing, therefore, short of the power of promptly dismissing an unfaithful or even indiscreet agent, could counteract or obviate the effects of his folly or treachery.

This reason, no more than the others, upon which the President's power of removal was allowed, applies to the present case. In no point of view does the Secretary bear the same relation to the Governor, that the secretaries or ambassadors of the United States do to the President. He is not a confidential officer of the executive, and no official intercourse of a secret or confidential character can take place between them. The Governor has no title to the opinion or confidence of the Secretary, upon any subject ; and the official information which he may require, relates to public matters which all may know ; and the object of the requisition is to make them still more public and notorious, by communicating them to the General Assembly. This is also the object of recording the official acts of the Governor. The very reverse of secrecy or confidence is contemplated by the Constitution, in requiring the performance of these duties. Neither the heads of departments of the United States, nor their clerks, can be required to give evidence of transactions in their offices of a confidential nature. But no such exemption applies to the Secretary of this State ; which shows, that no secret or confidential transactions or intercourse is contemplated between him and any other functionary of the government.

The congressional exposition of the constitutional powers of the President, in 1789, has been relied on, with much apparent confidence, as authority in favor of the Governor's claim of the same power that was conceded to the President. But, from a view of the arguments and reasons upon which the authority of the President was urged, and allowed, taken in connexion with the disparity

between the constitutional powers of the two executives, and the contrast between the character of the executive officers of the general and State governments, it is to my mind a strong authority against the exercise of the same power under the latter, that is allowed under the former. Throughout, there is rather a contrast than analogy between the circumstances of that case and the present. The office of Secretary is created by the Constitution, and all his duties are prescribed by law, agreeably to the Constitution. The President has no constitutional power to remove any officer whose office is thus created, or all of whose duties are thus prescribed. But so far as he possesses the power to remove this class of officers, it is expressly given by law. But the offices of those officers whom he may dismiss, owe their origin to the law, and not to the Constitution, and are consequently subject to repeal or modification. Their duties are, to a great extent, prescribed by the President ; and to him alone, to that extent, they are accountable for their performance. The executive power, and the control of the executive department of the government are vested, by the Constitution, in the President alone. It creates no other officer in whom any portion of this power is vested, or required to be vested, by law ; and those who are to aid him in the performance of his duties, are, by the laws of their creation, placed under his supervision and control. They bear to each other the relation of principal and agent. Hence his responsibility, and his right of removal. But mark the contrast between the constitutional delegation of power to the two executives, upon this subject. Our Constitution has not delegated to the Governor all the executive power of the government ; nor has it given him any direction or control over the Secretary, or other officers of the executive department.

By the creation of these officers, the Constitution contemplated a division of the executive power of the government ; and by requiring their duties to be prescribed by law, it negatived the idea of their being prescribed by the executive, as those of the general government are. The Governor, therefore, has no control or direction of the Secretary, and his responsibility is as limited as his authority is circumscribed.

From this comparison between the powers of the President and Governor, and between the character, duties, and accountability of the officers whom the President may remove, and the Secretary of this State, there is no similarity, so far as regards the decision of this case ; and, by an examination of the debates of 1789, it will be seen, that the concession to the President, of the power now claimed by the Governor, was made for reasons which cannot apply to it. Convenience and a supposed necessity may have had some influence, but, from the general scope and tendency of the arguments of the advocates of the President's power, there would

seem to be no doubt but the concession was made because of the general grant to him of executive power ; his entire control over, and responsibility for, the proper administration of the executive departments ; and because of his right to prescribe the duties of the officers of the departments, and supervise and control them in the manner of their execution. The same principles upon which the President's power was affirmed, was carried out and applied to the functionaries of the government by the legislation of this Congress. In organizing the judicial courts, they gave to the President and Senate the appointment of marshals, and to the marshals the appointment of their deputies ; but, because of the interest in and control over the subjects to which the deputies' duties relate, that the court must necessarily have, the right to dismiss him from office was given to the court, and not to the marshal, by whom he was appointed.

The marked disparity between the powers and responsibility of the general government and that of this State, naturally and necessarily results from the different character of the respective governments, their powers, duties, and the object of their creation.

The government of the United States is the national government of the Union. To that is delegated the attributes of national sovereignty. The duties of the executive of the national Government, are, therefore, widely extended and greatly diversified ; " Embracing all the ordinary and extraordinary arrangements of peace and war, of diplomacy and navigation, of finance, of naval and military operations, and of the execution of the laws throughout almost infinite ramifications of details, and in places at vast distances from each other." His views are not bounded even by the circuit of the whole Union, but must extend to the most remote regions to which commerce or navigation has extended, or connected our interest. So multifarious and diversified, therefore, are the functions of his office, that the limited abilities of no one man are equal to their discharge. Hence the necessity of organizing various departments, and the employment of numerous ambassadors, and other public ministers ; all of whom constitute so many aids and helps in the performance of the executive duties of the President. And as many of the duties of these officers cannot be regulated by law, because they cannot be anticipated, but arise out of the changing exigencies of time and circumstances, large discretion must, from necessity, be vested somewhere ; and it has been vested in the President as the chief executive officer of the government. From his interest in and control over all the business of the executive department, and his political responsibility for its administration, arises his right to supervise, control, and dismiss those executive officers who are his political and confidential aids in the discharge of his executive duties.

But the State governments are widely different in their objects,

powers, and duties. Compared with the general government, they may be denominated domestic governments. They act, exclusively, upon the domestic relations of life. Their regulations and sphere of action are limited to their territorial boundaries. The powers and duties of the chief executive magistrate, therefore, are proportionably limited, and such as from their nature are capable of being specifically prescribed and regulated by law; and, unlike those of the President, they may all be performed in person. He neither has, nor does he require, the aid of others in the performance of any of his duties. The duties, likewise, of all the executive officers of the State, are capable of being regulated by law; and by our Constitution, they are required to be so regulated. No discretionary authority or control over them is delegated to the Governor, by the Constitution; nor does it contemplate the delegation of such power, by law.

From the discretionary powers with which the President is clothed, there is a necessity for his possessing the power of removal, which does not exist in the case of the Governor. The heads of departments and public ministers being the political and confidential officers of the President, to execute his will, and act in cases in which he possesses a legal discretion, all their acts in this character are only politically examinable. The duties which are not enjoined by law, cannot be enforced by its process. But as the law has expressly given to the President the right to prescribe the duties of those officers, it also gives, by necessary implication, the power of removal, as a means of rendering available the authority expressly granted.

But this reason does not exist in favor of the like authority in the Governor. The rule is, that the duties of an officer that are enjoined by law, may be enforced by the mandates of the law; and as all the duties of the Secretary, and other executive officers of this State are thus enjoined, they can be enforced by the process of the law. No authority being given to the Governor to assign any of these duties, no right of removal can be implied to enforce a command which he has no right to give. This is the doctrine of the Supreme Court of the United States, in the case of Marbury *v.* Madison, although the Secretary of State of the United States is the political and confidential officer of the President, so far as he may prescribe the duties of that officer; but in the performance of duties which the law has enjoined, the Court said, the Secretary acted as the officer of the law, and not of the President. In such a case, the law, and not the will of the President, was to be his guide, and the rule to which he was to conform. Any other doctrine would place the executive above the law, and make his will, in place of the law, the rule to which its officers are amenable for the proper discharge of their duties. This would be in violation of the whole tenor and spirit of the

Constitution, which regards the law as paramount to all other authority, and as constituting the rule to which all are bound to conform, and to which all are amenable, officially and individually.

In every aspect, then, in which I can view this case, I am constrained, according to the convictions of my mind, to say, that the Governor has no power, under the Constitution, to remove from office the Secretary of State, at will and pleasure. No express grant of this power is to be found in the Constitution ; nor can it be implied from any of its provisions. It is not a power necessary, as has been shown, to the exercise of any of the powers expressly delegated, or the performance of any of the duties enjoined upon the executive. It must, also, be manifest, that he alone can have no title to the exercise of this power, as being incidental to that of appointment, inasmuch as he alone does not confer the appointment. In the performance of that act, the coöperation of a coördinate and independent branch of the government is essential. Upon the principle, therefore, that the authority that confers an office may remove the officer, the advice and consent of the Senate is as necessary to the removal of the Secretary as it is to his appointment. It has also been shown, that the practice of the President can be no precedent for the like practice of the Governor, because of the disparity between the constitutional powers conferred upon the respective executives, particularly in reference to the power of appointment to office ; and also in reference to their authority over the officers of government, as contemplated by the respective Constitutions, and as delegated by law.

The doctrine, that the power of removal from office at will must necessarily be lodged in some department of every government, is abundantly refuted by the practice and experience of our own government, for upwards of twenty years ; and likewise by other State governments of the Union, for half a century ; in none of which has the want of the power been complained of as an evil, or even a defect. But, although this Court cannot be governed by considerations of expediency, yet I do believe that the conclusion to which I have arrived, by the application of the legal rules of interpretation, is in accordance not only with the language and spirit of the Constitution, but with sound policy, and the best interests of community.

According to my construction of the Constitution, the power of removing from office the Secretary, Auditor, and Attorney General, is lodged in the hands of the representatives of the people. They may not only give these officers whatever tenure they please, but they may, by law, confer upon the executive the power of removal, under such regulations as the interest of the public may require. By those who hold the opposite doctrine, it is contended, that the power of removal belongs, unconditionally, to the Governor, not by any specific grant of the Constitution, but by construc-

tion.   The question, then, so far as power is concerned, is one between the executive and the legislative departments of the government.   Which of these departments can be most safely trusted with, or would be most likely to abuse, this trust ?   The lessons of political experience answer, that power is much safer when operating and regulated by a law made by the representatives of the people, than when its exercise depends upon the uncontrolled and arbitrary will of one individual, however exalted may be his station.

SMITH, Justice, dissenting :
The record in this case exhibits the following facts.   At the April term, 1839, of the Fayette Circuit Court, the Attorney General filed a motion, in the nature of a *quo warranto*, setting forth that the appellant, without legal grant, right, or warrant whatsoever, had for a long time, then past, unlawfully held and exercised the office of Secretary of State of Illinois ; and without any such authority still did unlawfully hold and exercise said office, and claim to be Secretary of State, and to keep the Seal of the said State.

To this information the appellant filed a plea, alleging that he was lawfully entitled to hold and exercise the office of Secretary of State, by virtue of an appointment from the Governor of the State of Illinois, by and with the advice and consent of the Senate of said State, on the 23d day of February, 1829 ; and that by virtue of said warrant of appointment he had held, and continued to hold, the office of Secretary, as he lawfully might do.   To this plea the appellees replied, admitting that the said appellant was appointed Secretary of State, as alleged ; but that Thomas Carlin, Governor of the said State of Illinois, by virtue of his authority as Governor, did, on the 5th day of April, 1839, remove the said appellant from the said office of Secretary of State, and did direct him to deliver up to the said John A. McClernand the said office, and all the records and papers appertaining to the same, together with the Seal of State ; and did by virtue of his authority as Governor, afterwards, on the said 5th day of April, 1839, appoint the said John A. McClernand Secretary of State of the State of Illinois, and authorized him to enter into said office, and to exercise the duties of the same, which appointment the said John A. McClernand accepted ; and the said McClernand requested the said appellant to deliver up to him the said office of Secretary of State, with the records and papers belonging to the same, and the Seal of State, which the appellant refused to do, but continued to hold the same office notwithstanding.

To this replication the appellant demurred, and the Circuit Court gave judgment for the appellee.   It was, thereupon, agreed that an appeal from said judgment might be prosecuted to the Supreme Court, without giving bond.   The assignment of errors

questions the decision of the Circuit Court on the demurrer, and it is now contended that the judgment was erroneous, because, —

1. The Governor had no power or authority to remove the appellant from the office of Secretary of State.

2. The appellant was not legally removed from, or the said McClernand legally appointed to, the said office of Secretary of State.

In approaching a question of magnitude, not only involving the interests of individuals, but grave and abiding considerations of the highest possible importance to the public weal, requiring a decision, on the exercise of a portion of the executive functions of the chief magistrate of this State, I might well express my regret, that what participation it has been my lot to have in it, had not been confided to abler hands. The delicacy of deciding on the acts of a coördinate and co-equal department of the government, in which it must be presumed that department, in its action, has been alone governed by a sense of duty and of right, may well be imagined ; and though it is true, that occasions, which have called for a review of those acts, in cases similar to the one under consideration, are scarcely known to the history of judicial proceedings in the United States, it will, nevertheless, be proper to consider the case upon its intrinsic merits, without reference to the effect it may have on the parties to the contest, or the opinions and acts of that department of the government, which are to be reëxamined. The ability with which the principles involved were discussed and illustrated, by the counsel, who respectively advanced and combated the several positions assumed, doubtless exhausted the arguments on the points presented ; and had the case itself admitted of an abstinence from the political aspect and shades which were, perhaps, in some measure necessarily given to and mingled in the discussion, I should, as a member of the Court, have felt it unnecessary to say, that I am utterly unconscious of their influence over the views which I feel it my duty to express. And while I conscientiously assert this, it is but just to admit the same exemption in favor of those from whom I am, by a sense of duty, compelled to differ.

I am not unaware of the excited state of public feeling in regard to the question submitted for our decision, and have therefore felt the importance of bestowing on it the most thorough and deliberate consideration, uninfluenced by any motive save the desire to arrive at such conclusions as strictly comport with the immutable principles of right and justice.

A correct decision of the questions presented, seems to me of necessity to involve a critical enquiry into the nature and structure of the government of the United States, and of this State, and the fundamental principles upon which they are confessedly founded. Practical expositions, and decisions under these forms, and

the acquiescence of the people in them, it will be proper to resort to, as guides and beacons to conduct us to just results.  Commentators on the forms of government adopted by the United States, and the several States, lay it down as undeniable, that to avoid the inconveniences necessarily resulting from the administration of a government, under traditionary forms, and the acts and proceedings of the government itself, of which, it would be apparent, imperfect remembrances would remain, constitutions in writing have ' been adopted ; and the form which the people of the United States have chosen to adopt, is that which, by its division of powers, and union of three simple forms, each being able to sustain itself in the exercise of its appropriate functions, shall, by its coöperation and harmony with the others, be rendered the most perfect ; securing to the people the great object of all governments, life, liberty, and the pursuit of happiness.

This division has been effected by the relative distribution of the powers of the government amongst the several branches ; each representing a portion of its sovereignty, and being coördinate and co-equal in its respective departments.  These powers are divided into legislative, executive, and judicial.

To the first is committed the power of making laws, or prescribing rules by which the community shall be governed ; to the second that of executing them ; and to the third that of expounding them, and causing them to be applied and carried into operation against individuals.

These three powers of the government could not, with due regard to the safety and liberties of the people, be wholly united or improperly blended in the same department to any considerable extent ; because, whether the same powers were given to one magistrate or to numerous ones, the danger to be apprehended to the security of public freedom would be the same.

In accordance with these general principles, and the fundamental one of taxation and representation, the Constitution of the United States and of the several States of the Union were framed and adopted.    There have been, in some instances, partial exceptions to the exclusive adoption of the rule, which do not, however, impair the general principles.

If we then bear in mind the objects to be obtained by this form of government, and the checks and balances which have been so wisely adopted, and a permissive participation in some particular instances, to a limited extent, in each other's power, we find that a supposed violation of a cardinal principle has contributed to the means of its preservation.

Adopting then these brief and general views in relation to the form and structure of the general and State governments, in which all commentators on their conformation agree, and whose views and opinions are but reiterated here, I propose to enquire

what has been the practice under the general government in relation to the exercise of the executive power of appointment to and removal from office. Although it will be remembered, that at the adoption of the Constitution of the United States, two great political parties came into existence, which divided the country for many years, as has been abundantly shown by dissensions in the halls of legislation and elsewhere, on the different opinions entertained in regard to its construction, as the principles of its interpretation applicable to it, it is believed that so far as the question in relation to appointments and removals from office by the President of the United States is concerned, the most prominent members of those divisions readily agreed in the opinion, that the President possessed the power.

Under the Constitution of the United States it is provided, that the President "shall nominate, and, by and with the advice and consent of the Senate, appoint ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law; but Congress may, by law, vest the appointment of such inferior officers as they may think proper, in the President alone, in the courts of law, or in the heads of departments."

This section of the United States Constitution received a contemporaneous exposition in 1789, by the first Congress which assembled under that Constitution. On a debate which arose in that Congress in relation to the organization of the departments of State, War, and Treasury, a provision was inserted in a bill for the appointment of a subordinate officer, who should have charge and custody of the archives of the office when the heads of the department should be removed from the office by the President of the United States. The question of the power of the President to remove was debated at large, and settled, after an animated contest, by the passage of the bill in favor of the existence of the power in the President. It was on that occasion strenuously contended, that the President, conjointly with the Senate, only possessed the power of removal; but this was not only expressly denied in argument, but decided to the contrary by the adoption of the proviso in the bill.

The argument of those who contended for this conjoint action, necessarily admitted the power of removal to be incident to the power of appointment, and merely disputed who should exercise it. They contended, that the power being vested in the Senate, to advise and consent to the appointment, the same power, in connexion with the President, should be exerted in the removal. Thus admitting that the office was held subject to removal, but differing as to the possession of the right. Mr. Madison on that occasion remarked:

"But let us not consider the question on our side only; there

are dangers to be contemplated on the other.   Vest the power in the Senate jointly with the President, and you abolish at once the great principle of unity and responsibility in the executive department, which was intended for the security of liberty and the public good.   If the President should possess alone the power of removal from office, those who are employed in the execution of the law, will be in their proper situation, and the chain of dependence be preserved ; the lowest office, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.   The chain of dependence, therefore, terminates in the supreme body ; namely, in the people ; who will possess, besides, in aid of their original power, the decisive engine of impeachment.   Take the other supposition, that the power should be vested in the Senate, on the principle, that the power to displace is necessarily connected with the power to appoint.   It is declared by the Constitution, that we may, by law, trust the appointment of inferior officers in the heads of departments, the power of removal being incidental, as stated by some gentlemen.

" Where does this terminate ?   If you begin with the subordinate officers, they are dependent on their superior, he on the next superior, and he on whom ? on the Senate, a permanent body, by its peculiar mode of selection, in reality existing forever ; a body possessing that proportion of aristocratic power, which the Constitution, no doubt, thought wise to be established in the system, but which some have strongly excepted against ; and let me ask gentlemen, is there equal security in this case as in the other ?   Shall we trust the Senate, responsible to individual legislatures, rather than the person who is responsible to the whole community ?   It is true, the Senate do not hold their offices for life, like aristocracies recorded in the historic page ; yet the fact is, they will not possess that responsibility for the exercise of executive powers, which would render it safe for us to vest such powers in them. What an aspect will this give to the executive ?   Instead of keeping the departments of government distinct, you will make an executive out of one branch of the legislature.   You make the executive a two-headed monster, to use the expression of the gentleman from New Hampshire (Mr. Livermore) ; you destroy the great principle of responsibility, and perhaps have the creature divided in its will, defeating the very purposes for which an unit in the executive was instituted.

" These objections do not lie against such an arrangement as the bill establishes.   I conceive, that the President is sufficiently accountable to the community ; and if this power is vested in him, it will be vested where its nature requires it should be vested ; if any thing in its nature is executive, it must be that power which is employed in superintending and seeing that the laws are faithfully

executed. The laws cannot be executed but by officers appointed for that purpose, therefore, those who are over such officers naturally possess the executive power. If any other doctrine be admitted, what is the consequence? You may set the Senate at the head of the executive department ; or you may require that the officers hold their places during the pleasure of this branch of the legislature, if you cannot go so far as to say, we shall appoint them ; and by this means you link together two branches of the government, which the preservation of liberty requires to be constantly separated."

Need further argument be adduced against the adoption of a construction at war with the fundamental principles upon which we have seen the government is constructed, and the separation of the several divisions of powers, so distinctly marked out in the Constitution. No permissive assent has been yielded to the Senate, to exercise the power of removal with or without the assent of the executive ; and if it were conceded to exist, with his assent, it would be perfectly dormant, and never could be called into being or exerted except at the pleasure of the executive ; for if he made no nomination to the Senate, it never could be exercised. It seems to me impossible to adopt such a construction without a direct violation of the Constitution itself.

But we have, in addition to contemporaneous legislative exposition, a judicial construction of this executive power under this section of the Constitution, by the supreme tribunal of the nation, many years since, in an opinion delivered by one of the ablest and most eminent jurists in this country, whose decisions have shed a lustre over the pages of legal learning, and which will bear a comparison with those of any other nation.

In the case of Marbury *v.* Madison, (Mr. Madison being then Secretary of State of the United States,) which was an application for a *mandamus* to compel the delivery of a commission to a person appointed a justice of the peace, by and with the advice and consent of the Senate, under the Constitution and laws of the United States, Chief Justice Marshall, on that occasion, declared " that the Constitution and laws of the United States seemed to contemplate three distinct operations. 1. The nomination : This is the sole act of the President, and is completely voluntary. 2. The appointment : This is also the sole act of the President, and is a voluntary act, though it can only be performed by and with the advice and consent of the Senate. 3. The commission." He further made the emphatic declaration, as the opinion of the Court, " that the appointment being the sole act of the President, must be completely evidenced, when it is shown that he has done every thing to be performed by him." This decision sustains the construction given by Congress, that the President possessing the sole appointing power, the power of removal from office is an

inseparable incident to it ; and  being possessed  by the President
alone, no other department of the government could  be  joined  in
the exercise of a power possessed by one alone, unless the power
had been expressly delegated to the other.

In addition to this  authority, all writers on the .forms and  struc-
ture of  the  government  of  the  United  States  agree,  that  " the
President is the efficient power in the appointment of  the  officers
of  the  government," and  " that the  power of  appointing the  per-
son nominated are  political  powers, to be exercised  by the Presi-
dent at his discretion."    Such are the acknowledged  opinions of
Kent,  Story,  Rawle,  Duer, and Bayard.    They  further  agree,
and such has  been the settled and undisturbed  rule ever since the
formation of the government, up to the present time, that as " the
Constitution mentions no power of removal by the  executive  de-
partment, of  any  of  the officers of the United  States, and as the
tenure of office of none except those in the judicial department is
declared  to be during good  behavior, it follows, that  all others
must hold their offices during the pleasure of the President, unless
in  cases  where  Congress  has  provided  some  other  duration of
office.    That so far as  Congress constitutionally  possesses the
power  to  regulate  and  delegate the appointment  of  inferior offi-
cers, so far it  may prescribe the term of office, and the manner in
which,  and  the  persons  by whom,  the  removal,  as  well  as  the
appointment, shall  be made."    It is further  agreed, that in the
absence of  all legislation upon the subject, it is  settled, that the
power of removal is impliedly vested in the President, without
any control or coöperation on the part of the Senate ; and in re-
gard to appointments confided to him by the Constitution, it seems
to be also settled, that Gongress can give no duration of office
which is not subject to the  President's  power of  removal, as all
its legislation hitherto, in such cases, recognises the executive
power of removal.

If, however, a  possible doubt could have remained, it must
have been  dissipated by a recent decision of the  Supreme Court
of the United  States, in which the power of removal from office
was directly presented to the Court for its determination ; and in
which the Court refer to the contemporaneous expositions given to
the section of the Constitution of the United States, by Congress,
on the power of removal from office by the President of the Unit-
ed States.    The question is so analogous, in my mind, to the one
before us, and the  decision so  clear and conclusive, that I  shall
extract from the opinion of the Court, delivered by Justice Thomp-
son, such portions of it as will tend to elucidate  more clearly the
point under consideration.

In the case of  Duncan N. Hennen argued  and  decided  at the
January term of  that Court, 1839, (1) Mr. Justice Thompson said :

(1) 13 Peters.

" The Constitution is silent with respect to the power of removal from office where the tenure is not fixed. It provides that the judges of the Supreme and inferior Courts, shall hold their offices during good behavior ; but no tenure is fixed for the office of clerks. Congress has, by law, limited the term of certain offices to four years, 3 Story 1790, but expressly providing that the officers shall within that time be removable at pleasure, which of course is without requiring any cause for such removal. The clerks of Courts are not included within this law, and there is no express limitation in the Constitution or laws of Congress, upon the tenure of office.

" All offices the tenure of which is not fixed by the Constitution, or limited by law, must be held either during good behavior, or (which is the same thing in contemplation of law) during the life of the incumbent ; or must be held at the will and discretion of some department of the government, and subject to removal at pleasure.

" It cannot be for a moment admitted, that it was the intention of the Constitution, that those offices, which are denominated inferior offices, should be held during life ; and if removable, by whom is such removal to be made ? In the absence of all constitutional provision, or statutory regulation, it would seem to be a sound and necessary rule to consider the power of removal incident to the power of appointment. This power of removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained, in the early history of this government. This related, however, to the power of the President to remove officers appointed with the concurrence of the Senate ; and the great question was, whether the removal was to be by the President alone, or with the concurrence of the Senate, both constituting the appointing power. No one denied the power of the President and Senate, jointly, to remove when the tenure of the office was not fixed by the Constitution, which was a full recognition of the principle, that the power of removal was incident to the power of appointment. But it was very early decided as the practical construction of the Constitution, that the power was vested in the President alone, and such would appear to have been the legislative construction of the Constitution ; for in the organization of the three great departments of State, War, and Treasury, in the year 1789, provision is made for the appointment of a subordinate officer by the head of the department, who should have the charge and custody of the records, books, and papers appertaining to the office, when the head of the department should be removed from the office by the President of the United States. 1 Story 5, 31, 47. When the Navy department was established in the year 1798, 1 Story 498, provision was made for the charge and custody of the books, records, and documents of the department in case of vacancy in the office of Secretary, by re-

moval or otherwise.   It is not here said by removal by the Presi-
dent, as is done with respect to the heads of the other depart-
ments, and yet there can be no doubt, that he holds his office by
the same tenure as the other Secretaries, and is removable by the
President.   The change of phraseology arose probably from its
having become the settled and well understood construction of the
Constitution, that the power of removal was vested in the Presi-
dent alone in such cases, although the appointment of the office was
by the President and Senate.

   " In all these departments, power is given to the Secretary to
appoint all necessary clerks, 1 Story 48 ; and although no power
to remove is expressly given, yet there can be no doubt, that these
clerks hold their office at the will and discretion of the head of the
department.   It would be a most extraordinary construction of the
law, that all these offices were to be held during life, which must
inevitably follow, unless the incumbent was removable at the dis-
cretion of the head of the department ; the President has certainly
no power to remove.   These clerks fall under that class of inferior
officers, the appointment of which the Constitution authorizes Con-
gress to vest in the head of the department.   The same rule, as to
the power of removal, must be applied to offices where the ap-
pointment is vested in the President alone. · The nature of the
power, and the control over the officer appointed, does not at all
depend upon the source from which it emanates.   The execution
of the power depends upon the authority of law, and not upon the
agent who is to administer it, and the Constitution has authorized
Congress, in certain cases, to vest this power in the President
alone, in the courts of law, or in the heads of departments ; and
all inferior officers appointed under each, by authority of law, must
hold their office at the discretion of the appointing power.   Such
is the settled usage and practical construction of the Constitution
and laws, under which these offices are held.   The tenure of an-
cient common law offices, and the rules and principles by which
they are governed, have no application in this case.   The tenure
in those cases depends in a great measure upon ancient usage.
But, with us, there is no ancient usage, which can apply to and
govern the tenure of offices created by our Constitution and laws.

   " They are of recent origin, and must depend entirely upon a
just construction of our Constitution and laws."

   Surely, then, this decision is conclusive as to the settled doc-
trine under the Constitution and laws of the United States ; sanc-
tified by a practice of half a century, and under every and each
succeeding administration of different political tenets; and now
most solemnly declared to be the supreme law of the land, and
binding on the people as such, so far as the Constitution and laws
of Congress are applicable.

   For the purpose, then, of testing the applicability of these long

and well settled numerous and conclusive legislative, individual, and judicial expositions and determinations under the Constitution of the United States, to that of our State Government, it will not be improper to institute a comparison of many portions of each ; because, if it shall be found from a careful examination of various parts of the two instruments, that the powers delegated to the executive are not only similar, but identical with each other ; and, that in other important and prominent portions they clearly agree ; as the State Constitution was adopted in the year 1818, thirty-one years after that of the United States, it is a fair legal inference, that by that adoption, it was intended to adopt the construction given to that from which it was taken, and to which it is in so many essential parts entirely analogous. The more especially so, where the construction of the Constitution has been uniform, and had prevailed for thirty-one years after its creation, and has not been altered or revoked since. This rule, so well settled in the adoption of laws from other States, will, it is supposed, have great influence on the question under consideration.

I have, therefore, selected some of the most prominent portions of the two Constitutions, for the purpose of comparison and inference, to test their similitude, in parallel columns, and have added that also in relation to the appointment of Secretary of State.

STATE CONSTITUTION.

The executive power of the State shall be vested in a Governor.

The legislative authority of this State shall be vested in a General Assembly.

The judicial power of the State shall be vested in one Supreme Court, and such inferior Courts as the General Assembly shall from time to time ordain and establish.

The Governor shall nominate, and, by and with the advice and consent of the Senate, appoint, all officers whose offices are established by this Constitution, or shall be established by law, and whose appointments are not herein otherwise provided for : Provided, that inspectors, collectors, &c., and such inferior officers, whose jurisdiction may be confined within the limits of a county, shall be appointed in such manner as the General Assembly shall prescribe.

He [the Governor] shall from time to time give the General Assembly information of the state of the government, and recommend to their consideration such measures as he shall deem expedient.

He may require information in writ-

UNITED STATES CONSTITUTION.

The executive power shall be vested in a President of the United States.

All legislative powers herein granted shall be vested in a Congress of the United States.

The judicial power of the United States shall be vested in one Supreme Court, and such inferior Courts as the Congress may from time to time ordain and establish.

The President shall nominate, and, by and with the advice and consent of the Senate, appoint, ambassadors, &c., and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law. But the Congress may, by law, vest the appointment of such inferior officers as they think proper, in the President alone, the courts of law, or in the heads of departments.

He [the President] shall from time to time give to the Congress information of the state of the Union, and recommend to their consideration such measures as he shall judge necessary and expedient.

He may require the opinion, in writ-

ing from the officers in the executive department, upon any subject relating to the duties of their respective offices, and shall take care that the laws be faithfully executed.

He shall have power to grant reprieves and pardons, after conviction, except in cases of impeachment.

He shall be commander-in-chief of the army and navy of this State, and of the militia, except when they shall be called into the service of the United States

No ex post facto law, nor law impairing the validity of contracts, shall be made, and no conviction shall work corruption of blood or forfeiture of estate.

The people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures; and, that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described, and supported by evidence, are dangerous to liberty, and ought not to be granted.

ing, of the principal officer in each of the executive departments, upon any subject relating to the duties of their respective offices. He shall take care, that the laws be faithfully executed.

He shall have power to grant reprieves and pardons for all offences against the United States, except in cases of impeachment.

The President shall be commander-in-chief of the army and navy of the United States, and of the militia of the several States when called into the actual service of the United States.

No State shall pass any bill of attainder, ex post facto law, or law impairing the validity of contracts.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but on probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This parallel might be carried much further, particularly in the comparison between the 9th, 10th, 13th, and 14th sections of the 8th article of the State Constitution, and the 5th, 6th, and 8th articles of the amendments to the United States Constitution, and the 2d, 3d, and 4th paragraphs of the 9th section of the first article of the original Constitution. Indeed, the affinity between the two instruments might be successively traced much further, did not the prolixity admonish a forbearance.

It only remains to add the 20th section of the 3d article of the State Constitution to complete the means of comparison.

3d article, section 20. " The Governor shall nominate, and, by and with the advice and consent of the Senate, appoint a Secretary of State, who shall keep a fair register of the official acts of the Governor, and, when required, shall lay the same, and all papers, minutes, and vouchers, relative thereto, before either branch of the General Assembly, and shall perform such other duties as shall be assigned him by law."

The comparison now made, it seems to me, is striking, and carries conviction to my mind, that the Convention of the State took the Constitution of the United States as the great model, from which it drew largely in the formation of the State Constitution ; and whose features it intended to directly imitate, so far as they would be apposite for the State government. This would, in my judgment, be the clear inference from the facts, as they appear,

Field *v.* The People.

and is, I consider, undeniable. Are not the powers identical, as to the sphere in which they are to be exercised ; and the language used to express them almost literally the same, in that which relates to the executive powers and duties ? And does not that which authorizes and requires the executive to nominate and appoint a Secretary of State, expressly leave the tenure of the office undefined, and at the will of the executive ? As much so as the section of the Constitution of the United States, which gives the President the power to nominate and appoint officers for the general government. The distribution of the powers of the government is the same ; the power of appointment vested in the executive is the same ; each being equally silent as to the tenure of the office, or power of removal ; and both requiring the laws to be faithfully executed, and each authorizing the requisition for information in writing from subordinates in the executive department.

It has been asked with emphasis, in the argument, to which department of the government does the Secretary belong. And it has been replied by those who propounded the question, He truly not to the executive ! Well, it is most certain he does not belong to the judicial, nor yet to the legislative. To what class shall he be arranged, if he is not an officer of the executive ? Can those who deny his position in the executive sphere, create a new one not known to the Constitution, or the form of the government. If it were not treating the subject with levity, it might be said he is made a nondescript, or given an amphibious nature, by assigning to him a position on neither land nor water, but a portion of both ; and that his functions and office, partaking of not precisely either of the qualities assigned to either of the three departments recognised by the Constitution, there is a new department unknown to the Constitution. It can, however, admit of no doubt that he is a subordinate in the executive department, and is under its direction and control. The Auditor of Public Accounts and State Treasurer are also a portion of the executive arm, though the Constitution has, by their mode of appointment, placed them beyond removal by the Governor. Their duties are, nevertheless, executive, and cannot be properly arranged to any other branch of the government. If this be true, why shall we refuse to adopt the construction which time, experience, and the dictates of wisdom show to have been properly approved by the national and judicial powers of the country, and acquiesced in by the people ? Surely there ought to be strong, overpowering, and irresistible reasons for a refusal to adopt an exposition thus given, and so settled.

It has been argued that the Secretary is a constitutional officer, and entirely independent of the Governor, whose official acts he is required by the Constitution to register. If by the term constitutional be meant that he is appointed under a power expressed in the Constitution, I see no objection to the phrase ; but if it be

intended thereby to imply that he is above the Governor, or inde-
pendent of him, or, as has been seriously urged by one of the
counsel, is " a sentinel, or spy," over the Governor, and, there-
fore, independent of him, I am free to say, that I can never sub-
scribe to such a position.   I perceive nothing in the Constitution
to justify such an opinion, much less to ascribe to its authors an
intention to place him in a position which I should suppose, of all
others, to be the most unenviable and unnatural.   The existence
of the government, and its perpetuation, required, in my judgment,
a resort to no such discreditable aids ; and the harmony of its ac-
tion would, in my conception, have been greatly disturbed by a re-
course to such an object or instrument.

That it was the intention of the authors of the Constitution to
place the Secretary in a position of accountability to him, whose
official acts he is required to truly register, so far as that duty is to
be performed, I cannot doubt ; and being a portion of the execu-
tive arm, as I have said, that the doctrine of supervision and
amenability may be most justly applied to the incumbent, seems to
me equally clear, necessary, and proper.

Shall it be said that he, whom the Constitution has made, in ex-
press terms, an agent to record the official acts of the Governor,
in order to their perpetuation and preservation, shall be beyond
the control of him who is authorized to demand a performance of
the service ; and that the agent is greater than the principal who
requires the performance of the duty ?   That he may resist, and
is alone amenable by the slow process of impeachment ?

Can it be rightfully contended that this is the true and undenia-
ble intention of the framers of the Constitution ?   Is there any
thing in the language which prescribes his duty, that will warrant
such an inference ?   Does not the language, on the other hand, by
requiring him to register the official acts of the Governor, imply
subordination to, and supervision by the Governor in the perform-
ance of those duties ?   I confess I cannot understand it other-
wise ; nor is it to be inferentially deduced therefrom, that he is
beyond executive control.   I can well imagine a case, which
might arise, of official intercourse between the executive and a
Secretary, which it seems to me will not only show the fallacy of
the assumed position of non-accountability to the executive, and a
denial of his supervisory powers, but is, in my judgment, unan-
swerable.

The case put is for the sake of illustration, without intending
the least reflection on the incumbent.   Suppose in time of war,
an adjacent State is invaded by the common enemy, of which the
Governor is advised by a confidential express, and of the secret
intentions of the enemy.   That with a view to counteract and de-
feat that object, it becomes necessary to assemble troops at a par-
ticular point, and for that purpose, secret and confidential despatch-

es are sent. These despatches being an official act of the Governor, are required by law to be registered; and the Governor having delivered them to the Secretary for such purpose, with an injunction of secrecy for the time being, as a proper and indispensable precaution, the Secretary, from want of discretion, does not observe the directions of the Governor, by means of which, the enemy obtain a knowledge of the intentions of the executive, and defeat the measures he had in view for the preservation of the country. Will any one contend that a Secretary, thus circumstanced, is to be continued in office; and that the country is to be exposed to ·the hazard of conquest, and devastation, by the indiscretions of one man, because he may be liable to impeachment for gross malconduct and wilful corruption ? He could not even be reached in the supposed case; for it is only an indiscretion without a bad motive, and involves no criminality. Yet the injury arising from it may be beyond remedy. It may be also said, this is a military act of the Governor. It is conceded, it is *ex-officio* so, but still it is executive, and a duty devolved on him by the Constitution. The case thus hypothetically put, is not to be met by an assertion, that it is not only improbable, but impossible. It is not only possible, but might readily happen with a weak mind, and one void of common circumspection; and because cases of much greater indiscretion have actually transpired. This illustration, then, shows the extent of the tendency of the arguments of those, who contend that the Secretary is not responsible to, but wholly independent of, the Governor.

In the further examination of the case, it may be well to recur to the decisions of other States, on the power of removal of officers, whose term of service is undefined, and fall within those decided to be within the executive discretion. By the Constitution of the State of Pennsylvania, of 1790, it is provided, " that the Governor shall appoint all officers whose office is established by the Constitution, or shall be established by law, and whose appointments are not otherwise provided for."

In the case of Leghman *v.* Sutherland, (1) the question being on the construction of the Constitution and laws of Pennsylvania, the Supreme Court of that State said, " The Constitution is silent as to the removal of officers, yet it has been generally supposed, that the power of removal vested with the Governor, except in those cases where the tenure was during good behavior." In the case of the Commonwealth, *ex relatione* Reynolds, *v.* Bussier, (2) in the same Court, Chief Justice Tilghman said, " Every argument in favor of the President's power of removal applies *a fortiori* to the Governor of Pennsylvania, because he appoints without the control of the Senate; and in him is also vested the supreme ex-

(1) 3 Serg. and Rawle 145.　　(2) 4 Serg. and Rawle 451.

ecutive power.   There is no other power at whose pleasure the officer can hold, and therefore he must either be removable at the pleasure of the Governor, or hold during good behavior, a tenure extremely injurious to the country, and contrary to all our habits, customs, and manner of thinking.

  " Our ancestors brought no such law with them from the country from which they emigrated ; nor did they see cause for adopting it afterwards ; for never was it supposed in Pennsylvania, either before or since the Revolution, that it was proper for ministerial officers to hold by any stronger tenure than the pleasure of the persons from whom they received their appointment, except in special cases, where by law it was provided otherwise.   This long-continued custom is powerful evidence of the law, particularly in the United States, where every freeman stands on the same proud footing, where offices are sought with avidity, and where there is neither inclination to submit to executive oppression, nor danger in resisting it."

  In these cases, the principle that the power of removal was incident to the power of appointment, in the absence of constitutional or legislative provision on the subject, is manifestly recognised. Whether the Senate has an advisory power or not, can, then, make no difference.   The principle, it is seen, is the same.   For under the power of the President to appoint, the advisory power of the Senate exists ; and in the Pennsylvania cases it does not, the Governor possessing the sole power ; yet the right of removal has been adjudged to both the President and the Governor.   The same Court has also decided, that this power of removal, as incident to that of appointment, has not been held to exist beyond the executive department ; and does not extend to officers concerned in the administration of justice. (1)   This decision will be adverted to more at large, when another portion of the case shall be considered. Parsons, Chief Justice of the Supreme Court of Massachusetts, in the case of Avery *v.* The Inhabitants of Tryingham, laid it down " as a general rule, that an office is holden at the will of either party, unless a different tenure be expressed in the appointment, or is implied by the nature of the office, or results from ancient usage."   Under this exposition of the rule, it is to be presumed that the Secretary would have the right to resign the office, and it cannot be denied.   It follows, then, as a corollary, that the Governor has an equal right to terminate the term of his service by removal.

  This would be but an equality of right between the appointing power and the appointee.   It has also been adjudged by the courts of Pennsylvania, " that a removal from office may be either express, that is, by notification, by order of the government, that

(1) 5 Rawle 203.

an officer is removed, or implied, by the appointment of another person to the same office." (1)

I now proceed to make the enquiry, What has been the practice under our State government, in regard to cases, which are supposed to be analogous, if not identical, with the present; and what have been the various expositions given to the executive power, as exercised by the legislature ?

It will be perceived, that one portion of the fundamental principles, adopted in the formation of the Constitution of the United States, and expressly declared in our own, has, nevertheless, in the formation of our own, been departed from, and a portion of the executive power delegated to the legislature, notwithstanding the declaration, that the executive power shall be vested in a Governor, in the first article, which concerns the distribution of the powers of the government; and so far has the simplicity and symmetry of the system been trenched on. In the first article, it is declared, " that the powers of the government of the State of Illinois shall be divided into three distinct departments, and each of them confided to a separate body of magistracy, to wit, those which are legislative to one, those which are executive to another, and those which are judiciary to another," and that " no person or collection of persons, being one of those departments, shall exercise any power properly belonging to either of the others, except as is hereinafter expressly directed or permitted."

This discretion and permission to exercise a portion of the executive power, if it be conceded that appointment to office is an executive function, as distinctly asserted by Mr. Jefferson, in his letter to Mr. Kercheval of Virginia, is contained in the 4th section of the 6th article of the Constitution of the State, and is as follows :

" The justices of the Supreme Court, and the judges of the inferior courts, shall be appointed by ballot of both branches of the General Assembly." The tenure of their office is during good behavior.

In the year 1825, the legislature created the office of circuit judges to the number of five, and elected five persons to fill these offices. In 1827, the legislature repealed the law creating the courts of which these incumbents were judges ; and it was said to be determined thereby, that this repeal virtually abrogated the office, notwithstanding the declaration contained in the first section of the sixth article of the Constitution, " that the judicial power shall be vested in one Supreme Court, and such inferior courts as the General Assembly shall from time to time ordain and establish." The tenure of the office was during good behavior, beyond all question. I could never view the construction right, which was said to abrogate the office, though it was placed on the ground of precedent, and extemporaneous exposition of a similar case,

(1) Wallace 125.

which occurred at the close of the official term of the elder Adams' Presidency, and the next session of Congress thereafter.

I have since that time had occasion to express the opinion, in a case in this Court, that " I considered the shield of the Constitution was placed between the officer and the act of destruction ; and if it failed to afford the protection guarantied by its broad and comprehensive declaration of his right, it doubtless was because he neglected to seek the shelter it afforded." (1)    I could not then, nor do I now, conceive, that the officer chosen in such a case, under the Constitution, could be involved in the act of destruction.    The destruction of the court could not destroy the office brought into being under the Constitution.    They are necessarily separate and distinct.    The power to create could not mean an equal power to destroy.    The tenure of the office limited the power over the officer.    The case is, however, now only alluded to for the purpose of showing, that here was the exercise of an executive function ; and the removal of the five judges by the legislative department, was conceded to be the exercise of a power incidental to, and growing out of, the power of appointment.    It will not do to say they were removed by a legislative act, which merely repealed the courts and the duties of the office.    That removal could alone have been done by an impeachment, or by an address, as provided by the Constitution.

If they were not removed by virtue of an executive function, exercised by the General Assembly, then they have never been removed at all, unless by death.

Instances of a similar character have occurred in the frequent changes, which the legislative department has made in the office and laws relative to judges of probate ; and the exercise of their powers, in that respect, have been precisely parallel.

I shall now notice other cases, which I consider of similar aspect and import.    They are conceived to be expositions, which entitle them to much consideration.

It appears from the legislative journals of this State, that an act passed the legislature, in 1827, which, it will be perceived, was the same session when the circuit courts were abrogated ; and a similar act, in 1835, providing for the election of State's attorneys by the General Assembly, thereby removing, in effect, as was supposed, those attorneys who had been previously nominated and appointed by the Governor, by and with the advice and consent of the Senate.    These acts the Council of Revision returned to the legislature, with their objections, as unconstitutional.    These objections are contained in the extract herewith made.

1st.  " The Council conceived, that the first section of the bill, which requires, ' that there shall be elected by the General Assembly, on joint vote, at the present session, and every two years

(1) The People *v.* Mobley, 1 Scam. 227.

thereafter, one State's attorney for each judicial circuit, now or hereafter to be created in this State,' was a violation of the Constitution of this State. A bill, containing similar provisions, was presented to the Council of Revision on the 17th day of February, 1827, which was returned by the Council with their objections ; and as the Council believe, that the objections then made to the passage of that bill have lost none of their force by time, they respectfully recommend them to the consideration of the General Assembly, as applying to the first section of the bill under revision. The objections were as follows, to wit, 1st. Because, in their opinion, no evil has resulted to the people under the manner of appointing circuit or State's attorneys, as the same has prevailed ever since the adoption of the Constitution of this State. The Senate are considered, by the Council, as a sufficient check upon improper nominations by the executive. 2d. Because they believe the appointment of the officers mentioned in the said third section is an executive function, and that it ought not to be exercised by the two houses of the General Assembly, unless the power is expressly given to them by the Constitution. The first article of that instrument is as follows :

" ' The powers of the government of the State of Illinois shall be divided into three distinct departments, and each of them confided to a separate body of magistracy, to wit : those which are legislative to one, those which are executive to another, and those which are judiciary to another. No person, or collection of persons, being one of these departments, shall exercise any powers, properly belonging to either of the others, except as hereinafterwards expressly directed and permitted.'

" The Council, after a careful perusal of the Constitution, have been unable to find any article or section, which expressly directs or permits the two houses of the General Assembly to make the appointments contemplated by this act. That nomination to office is exclusively an executive function, the Council beg leave to quote an extract of a letter from that great apostle of liberty, and the immortal author of the Declaration of Independence, the late Thomas Jefferson. The letter was written the 21st November, 1816, to S. Kercheval, Esq., of Virginia. The extract is as follows, to wit :

" ' Nomination to office is an executive function : to give it to the legislature, as we do, is a violation of the principle of the separation of powers ; it swerves members from correctness, by temptation to intrigue for office for themselves, and to a corrupt barter for votes, and destroys responsibility by dividing it among a multitude. By leaving nomination in its proper place, among executive functions, the principle of the distribution of powers is preserved, and responsibility weighs with its heaviest force upon a single head.'

" That upright, able, and popular chief magistrate, Governor Morris, in his valedictory address as the Governor of Ohio, raises his warning voice against confounding the different functions of the government, as had been too much practised in that State.    It is his opinion, that, to keep the different departments of the government in a healthy action, it is necessary that each should carefully abstain from the performance of acts properly belonging to another.

" 3d.  The Council object to the third section of the bill, because they entertain strong doubts whether its passage will not be a direct violation of the 22d section of the 3d article of the Constitution.    The section is as follows :

" ' The Governor shall nominate, and, by and with the advice and consent of the Senate, appoint all officers, whose offices are established by this Constitution, or shall be established by law, and whose appointments are not herein otherwise provided for : Provided, however, That inspectors, collectors, and their deputies, surveyors of highways, constables, jailers, and such inferior officers, whose jurisdiction shall be confined within the limits of a county, shall be appointed in such manner as the General Assembly may prescribe.'

" State's attorneys, then, are not officers whose jurisdictions are confined with the limits of a county, so as to bring them within the proviso of this section.    Where there is no other provision in the Constitution than those above quoted, no one could, for a moment, entertain a doubt, that this bill would be a palpable violation of that instrument.    The Council are, however, aware, that in the first section of the schedule, language is used, which, by a very broad and extended construction, might authorize the General Assembly to exercise the power of appointing, not only circuit or State's attorneys, but every other officer (except they be elected) to be commissioned under the government ; and thus, by one fell swoop, entirely to obliterate from that sacred instrument some of its most important and valuable features.    The section is as follows :

" ' An Auditor of Public Accounts, an Attorney General, and such other officers of the State as may be necessary, may be appointed by the General Assembly, whose duties may be regulated by law.'

" It is a well settled and sound rule of construction, that the context should be regarded, as well in construing Constitutions as other instruments and laws ; and that every section ought to be so interpreted, as to permit every other article to stand and be operative.    If, however, this broad construction is to prevail, that the legislature may appoint these officers, the first article, and the 22d section of the third article will, in a great degree, become a dead letter.    The distinction between the legislative and executive functions, so far as regards appointments to office, will be abol-

ished, and the Governor and Senate will be stripped of all the appointing power conferred on them by the Constitution.

" The Council cannot accede to a construction of that instrument, which will obliterate such important portions of it. The Council greatly regret that a bill, out of which will grow such grave and important questions, should be presented to them on the last day of the session of the General Assembly ; but, as they have no desire to interfere with the constitutional exercise of any power, properly belonging to the legislative department, they have, in a very hasty and crude manner, thrown together their ideas on this interesting and highly important subject, and transmit them, without delay, to the legislature."

" When the above objections were presented to the House of Representatives, that body, by a vote of 25 to 8, and the Senate without division, concurred in the views of the Council.

" 2d. The Council object to the bill, because the office of State's attorney, is a local office, and five sixths of the legislature are not responsible to the people, whose interests are principally to be affected by the appointment. Hence it follows, that a majority of the legislature may impose an officer upon the circuit, although he may be obnoxious not only to all the members from that circuit, but also to the people residing within its bounds ; and yet that majority will not be responsible to the people, whose wishes and interests may be thus disregarded. This, it is conceived, is not consistent with the principles of a republican government, and ought never to be adopted as the basis of legislation, unless the Constitution expressly required it.

" 3d. The bill violates a salutary principle of free government, by vesting in the same department the power of creating and filling the same office. This principle may lead to the creation of unnecessary offices, for the sake of filling them with favorites ; but, leave the appointment of officers to the executive and Senate, or to the people, and no such temptation will exist."

The act of 1835, having repassed the legislature by a constitutional majority, notwithstanding the objections of the Council of Revision, the General Assembly proceeded to elect the officers named in the act ; and, they having entered on their duties, necessarily superseded the persons who had been previously appointed to the office of circuit attorneys. The question is now propounded, by whom, and by virtue of the exercise of what power or function, were the former circuit attorneys removed from office ?

The Council say, distinctly, that the legislature are about to proceed to the exercise of an executive function, and to strip the executive of a portion of the executive attributes. It is conceded they did so ; and, by the exercise of the implied powers of appointment, virtually removed the former incumbents from office, the name of which was changed, but the duties remained the same.

The legislative department insisted on its power to do the act,

and justified it under the provision referred to by the Council, contained in the schedule to the Constitution.

Here, then, was another instance of the exercise of executive functions by the legislature, and the implied power to remove from office, by virtue of a new appointment. It may be said, it was done in an indirect manner. If so, it was a still more extended exercise of the power, and an extension never before claimed.

Another instance, of a similar character, will be recited. By the 8th section of the *Act for the Construction of the Illinois and Michigan Canal,* approved 10th February, 1835, the Governor was required, by and with the advice and consent of the Senate, to appoint five practical and skilful persons, to constitute " The Board of Commissioners of the Illinois and Michigan Canal." And had there not been a special session of the legislature, the persons appointed would have held their offices for at least two consecutive years, or nearly so, even if the legislature had, at its regular biennial session, repealed the law under which they were appointed. The special session, however, having been held on the 9th of January, 1836, a law was passed and approved, repealing the act of the 10th of February, 1835, and declaring, in these words, " that any Canal Commissioner, heretofore appointed under any law of this State, be, and the same is hereby declared to be out of office, from and after the passage of this act, any law to the contrary notwithstanding."(1)

Here, then, was another removal from office of five persons, whose term of service in office was undefined ; and not by the power that gave them their official existence, for they were appointed by the Governor, with the advice and consent of the Senate, but by a portion of one part of the power, and another an entire stranger to it, the House of Representatives never having had any participation in the act of appointment. It concurred in this act, with the Senate, on the broad declaration of removal. Was this declaration an executive or a legislative act ? Its form is legislative, while its effect is clearly executive, because it is a declaratory act of removal from office ; and, as such, should be considered in its nature executive.

In further illustration of the practical exposition, which the legislative department of the State government has placed on the power of removal, by the joint action of the two branches thereof, another case will be referred to. By the first section of *An Act to amend An Act to regulate the Penitentiary,* (2) approved 9th February, 1835, it is provided, " That there shall be elected by joint vote of the two houses of the General Assembly, at its (then) session, and at every succeeding session thereafter, a warden of the penitentiary, who should be commissioned by the Governor, and continue in office for the term of two years, and until his successor

(1) Acts of 1836, 154; Gale's Stat. 123.          (2) Acts of 1835, 52.

should be appointed and qualified." Under this act, one Benjamin Enloe was elected to the office of warden, on the 10th day of February, 1837, duly commissioned and qualified to office, and, under this act, was entitled to hold it for the term of two years. He entered on the duties of the office, and continued therein until the 21st day of July, 1837, when, at a special session of the General Assembly, on the said 21st day of July, the office was abolished by an act of the General Assembly.(1)

Enloe, conceiving that he had a vested interest or estate in the office, for the whole term for which he had been elected by the General Assembly, demanded payment of his salary for the two years ; and, on being refused payment by the officers of State, obtained from this Court a rule against the Auditor, to show cause why a *mandamus* should not issue against him, to compel him to issue a warrant in favor of Enloe, on the State Treasurer, for the salary alleged to be due, beyond the day of removal.(2)

The case was argued at length, by able counsel, and the rule refused. This Court, on that occasion, decided, that the principle of an individual having an estate in an office in this country, was not to be recognised. That whatever was the ancient common law doctrine, as to appointments to office, and the tenure by which they are held, under our Constitution and laws these rules could not apply, offices being created for the benefit of the people, and the public interest being the sole object of their creation, and not the advantage of the incumbent. That, while in England, an office, in many cases, was considered an incorporeal hereditament, as is the rule in the case of a right of way, and unless the statute which creates the office limits its tenure, it is an office for life, as at common law, no such rule could prevail in the United States ; that those rules and principles were exploded among us, at the adoption of our form of government, and were utterly incompatible with our free institutions, and would be, if adopted, subversive of the fundamental principles of the government itself.

Such must have been, also, the opinion of the General Assembly, on the exercise of the power to remove the incumbent, in this case, who had been appointed to an office of high trust, and of profit to himself, by the mode of repealing the law, and transferring the duties of the office to another person.

They doubtless did not do the act without some great necessity for it, and with which the public interest was immediately connected ; and which, if not done, might be materially injured. The source of his appointment having been from their action, they properly considered they possessed equally the power of removal, and I think justly so.

(1) Acts of July, 1837, 47; Gale's Stat. 521.      (2) 1 Scam. 537.

It may be said, however, in this case, as in others, that the act of repeal was a legislative act, and, therefore, was strictly not a removal from office.

To repudiate such an idea, it may be emphatically asked, whether the election of the warden to office was not the exercise of an executive function ? It, I conceive, most certainly was. As, however, his term of service had been defined, and limited to two years, and as he could not be removed before, but for cause, the short process of repeal was resorted to, by which the office was taken from the incumbent, being tantamount to a removal.

This last class of cases shows that the power of removal, by appointment of other persons to fill the station of their predecessors by the General Assembly, has ever been considered by it as an inherent power, by virtue of its general power to appoint to office, and as purely incidental thereto. It has been considered by it, as a continuing power always in vigor, and never expended. It cannot be justified in my conception, on any other ground.

No argument is to be drawn from the possible abuse of the exercise of the power by the executive, because he has been completely stripped of nearly all and every grade of patronage of appointment to office, having nothing left of the executive function in that particular, but the appointment of public administrators, notaries public, and some other unimportant minor officers, including the appointment in question, of which it is now contended he has also been shorn. Whether this has been wisely done, it is not for me to say, or determine. The responsibility, which should always rest on the appointing power, has been lost by its division among a numerous body, and the sense of accountability under which it should act so divided as to be entirely unseen and unfelt. No reasoning, then, can be justly urged on the ground of apprehension that the executive might causelessly remove worthy men from office ; nor is it any evidence why a power should not exist, because in its exercise there might be a possible abuse.

The counsel for the appellant have insisted, that a decision of this Court, pronounced in the case of the People, on the relation of Matheny, *v*. Mobley, in December term, 1835, has decided the case at bar ; and that the question in that case, and the one before the Court, is precisely parallel. If this be so, and that decision be correct, then the same results should certainly follow. Let us, however, attentively consider that case, as compared with the present. One of the questions decided in that case, was, that the power of appointment was not a personal trust, (in other words, a ministerial act,) but a judicial one, exercised by virtue of powers conferred by the Constitution.

It was contended on the argument in that case, as will be seen in the opinion of the Chief Justice, and a statement of the case, that the main question presented, was, whether the newly appointed

judge had the authority to make the appointment of Mobley, by virtue of his office of judge.

The question is stated in the opinion of the Chief Justice, thus, " The pleadings in this case show, that Matheny was clerk of the Circuit Court of Sangamon county, on the 3d day of May, 1835 ; and that, in pursuance of an act of the legislature, entitled ' *An act to establish an uniform mode of holding Circuit Courts,*' (1) passed on the 7th of January, 1834, S. T. Logan was elected judge of the Circuit Court of Sangamon county, and, in virtue of said office, appointed M. Mobley clerk of the Circuit Court of said county." (2)

The question went to the power of the new incumbent in the judicial office, to displace the old clerk, and was predicated on the act of the 7th January, 1835, which transferred the duties of the Supreme Judges, who then held the Circuit Courts, to the Circuit Judges, who were appointed under the new act.

In the general opinion of the Court I concurred. But because of a difference of opinion, and, as I then stated, in my separate opinion, " entertaining some views not entirely in accordance with the opinion on which the judgment of the Court may be predicated," I proposed (then) to state briefly the grounds on which they were founded. I proceeded to say, " many and different opinions have been entertained as to the power of the Circuit Courts, and the judges to appoint the clerks of those Courts ; some supposing it a power which the Court alone could exercise, and others viewing it also as a personal power attaching to the officer as distinct from the Court.

" The 6th section of the 4th article of the Constitution, which gives the power of appointment, is couched in a phraseology very peculiar ; and if it be interpreted literally would seem to admit of no doubt, that the power attached to the person of the officer as the Court itself.

" This section is as follows : ' The Supreme Court, or a majority of the justices thereof, the Circuit Courts, or the justices thereof, shall respectively appoint their own clerks.'

" It is manifest from this language, that, in asserting under it the personal right of appointment, no violence would be done to the plain and literal signification of the language used ; and I am free to confess, that, from a casual examination of the section, I have been inclined to so consider it. I believe I have not been singular in such opinion, the same opinion having been entertained, I am informed, by many highly intelligent legal men ; and if I am not greatly mistaken, it has been practised on, and appointments are understood to have been made under such a view of the power, considering it both warranted and proper ; but more mature consideration, and the possible injurious consequences which might flow from such an interpretation, have induced me to conclude, that the

(1) Acts of 1835, 150; Gale's Stat., 182.　　　(2) 1 Scam. 221.

more sound construction is, that it is not a power attaching to the person of the officer, but that the power can alone be exercised by him as the organ of the Court ; and that when the power is once exercised, and the office filled by an appointment, whether in vacation or term time, the incumbent cannot be displaced except in the manner, and for the causes, provided by law." " The office is created under and by virtue of this section of the Constitution ; but it will be remarked, while thus created, its duration is left undefined, and, being so, unless its tenure was defined by law, it would, we should apprehend, be of indefinite duration ; whether of life or good behavior might also admit of much doubt. (1)

" That tenure has, by the 23d section of the act of 1829, regulating the Supreme and Circuit Courts, and various other acts of the legislature, been in some measure defined ; and made to depend on various contingencies, and the performances of certain acts, — such as renewing official bonds ; keeping his office at the county seat ; and they have also provided for the manner of removal for acts of malfeasance. Considering that the power of appointment under the Constitution is committed to the judges of the Court, as the organs thereof, and is not a mere personal authority to be exercised by every new incumbent ; and that the tenure of the office of clerk is limited and defined by law ; that the causes for which the clerk shall be removed have also been defined, and the modes of proceeding prescribed ; and that the regularity of the proceedings and records of the courts, and duties which appertain to the office, will be greatly promoted by uniformity, and the stability of the tenure under which the incumbents hold their offices, I feel constrained, from a sense of what I am convinced, upon mature reflection of the points made, is the just and rational interpretation, and the laws relative thereto, to concur in the judgment of the Court, in favor of the relator." (2)

It will thus be perceived, that the constitutional power of the legislature to limit the tenure of the office of clerk was never before this Court ; nor was the power questioned in any way whatever. That my concurrence in the opinion was founded on the express ground, that the tenure of the office had been virtually if not actually defined by legislative enactments, which, while they were in force, were obligatory on the judges of the Courts ; and that I expressly said, while the tenure was left undefined by the Constitution, the office would be of indefinite duration, unless defined by law, but whether for life or good behavior, which is the same thing, might also admit of great doubt.

It will also be perceived, that the former practice in reference to appointments is stated, and the different opinions entertained in relation thereto are also noticed. I think a very clear distinction, however, can be drawn between the two cases.

(1) 1 Scam. 226–7.                    (2) 1 Scam. 229.

The Governor may have occasion, as I have shown, to exert the power of removal in a summary manner, in a case of great emergency, like the one I have supposed, of great public danger, and to avoid similar acts of indiscretion, of the character stated. The causes of the disclosure might, before he acted, produce a repetition of the evils he intended to avoid by the act of removal.

The exercise of the power, at the moment, might be of infinite importance, and delay might produce great danger. Not so with the clerk; the Court may stop him in his acts of misconduct; may enforce obedience to its orders; may punish him for his contempts by fine; and may remove him, for cause, from office. The clerk cannot be considered as the agent of the Court. The doctrine of accountability in the Court for his acts, does not apply. The responsibility does not rest on it. The clerk, besides, takes an oath of office, and gives bond and security for the faithful performance of his duties; not so with the Secretary, who gives no bond or security for the faithful discharge of his duties.

In 1 Hawkins 412, it is laid down, that the clerk may be adjudged, on principles of the common law, to forfeit his office by a breach of the condition annexed to it; so also by misfeasance or non-feasance.

The existence and possession of this comprehensive judicial control would seem to exclude the reason for adopting the idea, that a clerk can be removed at the will of a judge; as he can remove him for cause, when facts are judicially ascertained, there is no ground on which to base the presumption, that he can obtain a power by implication to remove without cause. An officer who is unfaithful, incompetent, grossly negligent, or who abuses the trust reposed in him, may be deprived of his office by law.

This dispenses with the necessity for a resort to remove by the power derived from implication. It has been aptly said, "that powers are implied from necessity. If no cogent reason exists, why should that, which is not in express terms granted, pass by implication? Such a construction is not to be favored." It is certainly true, that this authority is not conferred upon the judge in any larger grant than in the case of the Governor, and that the same reasons and causes which render it proper and highly expedient for the Governor to exercise the power, do not and cannot exist in the case of the clerk. It will not be denied, that the superintending power of the Court will always be sufficient, under its ordinary rules, for every proper purpose, and commensurate to any exigency which may arise. I therefore conclude, that there is no analogy in the two cases, under the principles of our institutions, between the department of the judiciary, and that of the executive. These ideas are in no wise original. They are the results of the reflections of all practical men on these subjects; approved by time, and fortified by past experience. It is for these reasons, I apprehend, that the Su-

preme Court of Pennsylvania has adjudged, "that the power of removal, as an incident to that of appointment, has never been held to exist beyond the executive department; and does not extend to officers concerned in the administration of justice."

For these reasons I cannot perceive the affinity, which it is said exists in the case of The People *v.* Mobley, and the present one. The marks of dissimilarity, and the cogent reasons for the application of different principles, seem to me most apparent, and to my mind make the distinction most manifest.

If, however, the rule laid down by the Supreme Court of the United States, in the case of Hennen, referred to in this opinion, is to prevail, and shall be considered directly applicable to our Courts, in reference to the appointment of clerks, I trust no false pride of opinion will deter me from adopting that rule, which shall be most in consonance with the true interpretation of the Constitution, and the principles best calculated to subserve the ends of justice.

Where error is made apparent, and conviction reaches the human breast, it were but a double sin to persist in wrong.

I have deemed it unnecessary to advert to the action in either branch of the General Assembly, on the power of the Governor to remove the Secretary, because of the conflict in the opinions which have at different times been expressed by each, and considering, moreover, that no decisive conclusions are to be deduced therefrom.

Upon the whole case, from the best examination and reflection I have been enabled to bestow upon it, and with the most sincere desire to arrive at just results, I have come to the following conclusions :

1. That the power of the Governor to remove the incumbent from the office of Secretary of State, is a power incidental to the power of appointment conferred on him by the Constitution, the office of Secretary being created by the Constitution, and the tenure of the office being also left undefined and unlimited ; and that therefore the incumbent holds his office at the will of the executive.

2. That the Secretary is to be considered a subordinate in the executive department of the Government, subject to the control and supervision, and accountable to the head, of that department for the faithful execution of the duties of the office, and removable at its pleasure.

3. That this power of removal is a continuing one, always in vigor; and that the appointment of another person to the office produces the removal or displacement of the incumbent.

I, therefore, concur in the judgment of the Circuit Court, and think it should be affirmed.

LOCKWOOD, Justice, concurring with the Chief Justice :

The record in this cause exhibits the following facts. "At the April term, 1839, of the Fayette Circuit Court, Wickliffe Kitchell, Esq., the Attorney General, on behalf of the people of the

State of Illinois, on the relation of John A. McClernand, filed in said Court an information in the nature of a *quo warranto*, setting forth that Alexander P. Field, without legal grant, right, or warrant whatsoever, had, for a long space of time then last past, to wit, for the space of ten days last past, unlawfully held and exercised the office of Secretary of State of the State of Illinois, and, without any legal right, warrant, or grant whatsoever, still does unlawfully hold and exercise the said office ; and that he, for and during all the time last above mentioned, without any legal right, warrant, or grant whatsoever, has claimed, and still does claim, to be Secretary of State, and to hold and exercise the said office, and to keep the Seal of the State aforesaid, without any lawful warrant, grant, or right so to do ; against the peace and dignity of the people of the State of Illinois."

To this information the said Field filed the following plea, to wit : " The said Field, to the office, duties, and emoluments of Secretary of State, says, he is lawfully entitled, by appointment from the Governor of the State of Illinois, by and with the consent of the Senate of said State, on the 23d day of January, 1829; which said appointment was followed by a commission issued in the usual form, under the Great Seal of State, (and which is set forth in full in the plea,) and by this warrant the said Field has used during all the time in the said information mentioned, all the powers and duties of said office, and received the emoluments appertaining thereto, as he well might, and still may. Without this, that the said Field has unlawfully held and exercised the said office in manner and form as is by the said information supposed ; all of which he is ready to verify," &c.

To this plea the people, by their Attorney General, replied, admitting the appointment, by Ninian Edwards, then Governor of the State, of the said Field, at the time stated in the plea ; and that, in pursuance of said appointment, he lawfully entered upon the discharge of the duties of the office, and continued to discharge them from the time of his appointment until the time of his removal as afterwards mentioned. That long after the appointment as aforesaid, to wit, on the first Monday in August, 1838, Thomas Carlin was elected Governor of the State of Illinois, and lawfully entered upon the discharge of the duties of said office, and still continues to exercise and discharge them ; and that on the fifth day of April, 1839, he, being Governor of the State, did, at the county aforesaid, by virtue of his authority as Governor, order and direct in writing, under his hand as Governor, the said Field to remove from, and out of, said office of Secretary of State, and to desist from further exercising the duties of said office, or from enjoying the privileges and immunities, or from taking the emoluments thereof ; and did then and there remove the said Field from said office ; and did further direct, at the same time and place, by

virtue of his authority as Governor, the said Field to deliver up to the said McClernand, the said office, and all the records and papers appertaining to the same, together with the Seal of State. And the said Attorney General, further averred, that Thomas Carlin, then being Governor, did, by virtue of his authority as Governor, afterwards, to wit, on the fifth day of April, 1839, appoint John A. McClernand, the relator, Secretary of State, and did then and there authorize the said McClernand to enter into said office, and to exercise the duties of the same ; and which appointment was then and there accepted by said McClernand ; and afterwards, on the same day and year aforesaid, the said McClernand, so authorized as aforesaid, did then and there call upon the said Field, and request him then and there to deliver up to him said office, with all the records and papers belonging thereto, and also the Seal of State ; which said Field refused to do, and still refuses to do, and refuses to move out of and from said office, and still continues to exercise the functions thereof ; with a replication and prayer of judgment.

To this replication there was a demurrer by Field, and a joinder by the Attorney General.

After argument heard, the Court below gave judgment on the demurrer in favor of plaintiffs below, that Field, the defendant below, be amoved from said office of Secretary of State.   To reverse this judgment, an appeal has been taken to this Court.

The highly important question arising in this cause, was argued at great length, and with zeal and ability, at the last July term of this Court ; and it is much to be regretted that circumstances existed in the case, that required an immediate decision.   It was the desire of the Court to have taken time to examine the question with more thoroughness and deliberation than the press of other business, and the shortness of the time, would allow.   But the relator and the appellant were both exercising the duties of the office, and in a few days important elections were to take place in the State ; and, unless a decision was made, great uncertainty would exist in the public mind as to the person to whom returns should be made, and probably much public mischief would ensue.

The Court, in view of the necessity of the case, came to the conclusion, (although they were unable to accompany their decision with their reasons,) that a decision was absolutely necessary to be made.   In making the decision, without giving the reasoning on which it was based, the majority of the Court were fully aware that they were exposing themselves to much misconstruction and misrepresentation ; but considerations of duty to the public, overweighed any feelings of repugnance that they possessed to be thus subjected to misconstruction and abuse.   The question presented by the record, is, Does the Constitution confer on the Governor of this State the power, at his will and pleasure, to remove the Secretary

of State without any official misconduct on the part of the Secretary ?

In being thus called on to decide this question, the majority of the Court did not feel that they were required to decide a new and controverted point. Two former decisions of this Court had, in our estimation, settled the question.

The Constitution of this State says, that " The Governor shall nominate, and by and with the advice and consent of the Senate, appoint a Secretary of State." It also says, " The Supreme Court, or a majority of the justices thereof ; the Circuit Courts or the justices thereof, shall respectively appoint their own clerks." By an act of the legislature, passed in 1819, the County Commissioners' Courts were authorized to appoint their clerks. Now if the Governor has by implication the power of removing the Secretary of State, then the same language used in relation to the Courts in the Constitution and law of 1819, must also, by implication, have conferred the power of removal on the Courts ; yet this Court in 1822, in the case of Street against the County Commissioners of Gallatin County, (1) decided " that the County Commissioners' Court had no power to remove Street and appoint another clerk to said Court ; " and awarded a *mandamus* to restore Street. This decision received the unanimous sanction of the Court.

In the case of the People, on the relation of Matheny, against .Mobley, (2) (decided in this Court at the December term, 1835,) the judge of the Circuit Court of Sangamon County had removed Matheny from the office of clerk of the Court, and appointed Mobley to be his successor. Matheny filed his information, and, upon the case coming into this Court, it was decided, by the concurrence of all the justices, that the judge of the Circuit Court of Sangamon County had no power, at his discretion, to remove the clerk of said Court, and required that Matheny should be restored to his office. These cases are considered as directly in point, and as deciding the doctrine, that the appointing power has not, under the Constitution, the power of removal from office.

The case of The People *v.* Mobley was ably argued, and at a time when no party excitement mingled in the discussion. Matheny had been removed by a judge who was highly esteemed, both by the public and the members of this Court, for his sound learning, and the purity of his administration of justice. The decision was made on great deliberation, and has been universally acquiesced in, both by the profession and the public. The decision conforms to a previous decision of this Court, made at an early period of our judicial history, and is also in perfect conformity with the repeated action of the legislature in relation to removal from office.

(1) Breese 25.            (2) 1 Scam. 215.

No good  grounds were  shown in the  argument of  this cause, as
we believed, why these cases should be overruled, and consequent-
ly we feel ourselves  bound by  them.    These clerks had a  more
intimate official  relation to their  respective Courts, than the Sec-
retary has to the Governor.    It is also to be observed, that in each
of these cases  the whole of  the appointing power had concurred
in the removal; whereas, in this case, the Secretary had been re-
moved by the  Governor alone, who is  only a part of the appoint-
ing power.    This circumstance, in our view, made the case  much
stronger against the  right of the relator to the office.    In addition
to the decisions above  referred to; the  Governor, during the late
session of the legislature, had  nominated the relator to the  Senate,
to fill the office of Secretary of State; which body rejected the
nomination, and,  by a vote of  twenty-two to eighteen,  passed the
following  resolution, to wit :  " That the executive does not possess
the  power to nominate to  the Senate a Secretary of State, except
in case of a  vacancy in that  office, and that, inasmuch as the  Sen-
ate has not been advised of any vacancy in that office, the nom-
ination of John A. McClernand be not  advised and  consented to
by the  Senate."

By this resolution of  the Senate, we understand that body  to
have  decided, that the Governor  had no power to remove the Sec-
retary.

The Senate, equally with the Governor, are  elected by the peo-
ple.   The opinions of the Senators, consequently, are  entitled to
respectful consideration.

These decisions of the Supreme Court, the repeated acts of the
legislature in relation to the  power of removal, and this  decision of
the Senate, required the  Court, as it seemed to  us, to decide, that
the Governor had not, by the Constitution of this State, the power,
at his will and pleasure, to remove the Secretary of State ; and
consequently judgment was  rendered at the last term, that the
judgment of the Circuit Court should be  reversed, with costs, to
be paid by the relator.

If, in making this decision, an error has  been committed by the
majority of the Court, it is committed on the  safe side of the ques-
tion.   Had we decided  that the Governor possessed the power of
removal, the Court would, by construction, have declared the ex-
istence of a power in the  Governor, which, if erroneously decided,
or if the power, in the judgment of the public, should be abused,
could only have  been remedied by the expensive, exciting, and te-
dious  process of  calling a  convention, and  altering the Constitution.
But as  the decision was made, the legislature can, at any time, if
they deem it wise, confer the  power of removal on the Governor;
and then, if injurious consequences should result, the legislature
can repeal the law, and remedy  the evil.

Having thus summarily given the reasons  that governed the

majority of this Court in making their decision at the last term, I will now proceed to enquire more at large into the correctness of that decision.

On the argument of this cause, it was contended, that if the Court decided that the Governor had no power to remove the Secretary, then he would hold his office for life.

If this consequence flows from the decision, the Court is not responsible for it. But I cannot yield my assent to the correctness of the conclusion. What is a life office? I understand by a life office, an office held during the life of the incumbent, irrespective of qualifications or moral character. He holds the office, whether he discharges its duties or neglects them, and whether he acts honestly or corruptly.

At common law, a life office is an incorporeal hereditament, and the officer has an estate in the office, of which he cannot be deprived, however useless the office may be to the public. If this is a correct description of a life office, it is not entitled to favor from any quarter, and receives none from me. I am, however, satisfied, that no such office can exist under our Constitution. The judges, whose terms of office are the most durable of any in our government, hold only during good behavior, and no officer can hold by a more stable tenure. By the Constitution, every civil officer is liable to impeachment for any misdemeanor in office, and, on conviction, is removed. This provision at once puts an end to the idea of a life office, under our Constitution. Where the Constitution creates an office, and leaves the tenure undefined and unlimited, the officer holds during good behavior, until the legislature by law limits the tenure to a term of years, or authorizes some functionary of the government to remove the officer at will, or for good cause. This power the legislature have an undoubted right to confer.

The offices of Auditor of Public Accounts and Attorney General are both created by the Constitution, and the tenures of these officers, like that of Secretary of State, are unlimited. The legislature, however, by law, have limited the tenure of the offices of Auditor and Attorney General to a period of years.

Holding office during good behavior has also been the subject of much declamation, and is by many repudiated. Whether any office should be held by this tenure is entirely a question of expediency, and to be settled by the framers of the Constitution. Before, however, this principle, introduced into the Constitution of the United States, and most of the Constitutions of the original States, by the venerated patriots of the Revolution, is wholly rejected as anti-republican, perhaps a few suggestions and enquiries may not be inappropriate.

What is a public office? Is it not a public trust, created for the purpose of promoting the public good? What qualities in the

officer are requisite to enable him properly to discharge his official duties? Are not intelligence, integrity, faithfulness, and experience essential? In whom are these combined qualities most likely to be found, — in the novice, or in the man of experience? in the man just come into office, or the man who has been long enough in office to have gained a thorough knowledge of its duties? Will, then, the public gain by clothing the executive with power to remove its officers at his will and caprice? By frequent changes, is not the probability increased of getting not only incompetent, but dishonest men in office? If the officer is honest, faithful, and capable, are not all the objects effected that were intended to be accomplished by the creation of the office? What public good can be effected by the change of such an officer? What greater inducement can there be to the faithful discharge of official duties, than the knowledge that the incumbent can only lose his office by negligently or corruptly discharging his duties?

Perhaps it would not be unwise to enquire why, in the early history of our country, when executive removals were less frequent than at present, we find the duties of office more diligently and honestly discharged? And why so rarely defalcations occurred? And why, since offices have been held at the caprice of some functionary of the government, such wide-spread corruption should have become so prevalent among public officers, as nearly to bankrupt the treasury of the nation?

It would be well, also, to enquire whether, when the tenure of office is very short, or it is at the will and caprice of another, men of competent talents, independence, and integrity are likely to accept office? Whether the officer ought to hold his living upon the tenure of sacrificing his principles and opinions at the nod of another person? And whether this would not be making our public officers the sycophantic and corrupt tools of power, rather than the faithful and useful servants of the people?

Would not, then, the public interests be best promoted by continuing faithful public servants in office, and by providing, at the same time, by judicious legal enactments, for the punishment and removal of the unfaithful and corrupt? It is not the province of the judge to answer these questions; but they are commended to the serious consideration of those whose duty it is to devise wise measures to promote the public prosperity and happiness. Should it be said, that holding office during good behavior, is essentially holding office for life, I answer, that this result can only take place on condition that the officer faithfully and honestly performs his duty; and if the duties of the office are well performed, who is injured? Does the public service sustain any detriment? But, if it is wrong on principle, to hold office during good behavior, on whom does the blame rest? Surely not on the Court, whose only province is, to declare what the Constitu-

tion or law is, without the power to make either, or declare what either should be.

The Constitution, by leaving the offices of Secretary, Auditor and Attorney General, without limiting their tenure, has left it a question of expediency for the legislature to determine by law, for what length of time these officers shall continue in office ; for what misconduct, during their continuance in office, they shall forfeit their offices ; and what officers or tribunal shall determine when the forfeiture has occurred. On this principle, the first legislature passed laws, declaring that justices of the peace and notaries public should hold their offices during good behavior, and the latter officers still hold by that tenure.

By one of these statutes, justices of the peace could only be removed by impeachment before the Senate. But to return to the question before the Court, whether the Constitution of this State confers on the Governor the power of removing the Secretary of State at his will and pleasure. If this power exists, it must be found in one of the following clauses of the Constitution, to wit : " The executive power of this State shall be vested in a Governor." " He may require information in writing from the officers in the executive department, upon any subject relating to the duties of their respective offices, and shall take care that the laws be faithfully executed." " The Governor shall nominate, and, by and with the advice and consent of the Senate, appoint a Secretary of State, who shall keep a fair register of the official acts of the Governor, and, when required, shall lay the same, and all papers, minutes, and vouchers relative thereto, before either branch of the General Assembly ; and shall perform such other duties as shall be assigned him by law." It will be readily conceded by all, that in none of these provisions of the Constitution is the power of removal expressly conferred on the Governor. I will, therefore, examine each of these clauses of the Constitution separately, to ascertain, if, by any fair construction, the power of removal can be inferred from any of them.

And, first, Is the power of removal conferred on the Governor, by the clause vesting the executive power in the Governor ? It was insisted, on the argument, that appointment to office, and removal from office, were executive functions ; and that the power of removal was conferred, by this provision, on the Governor. Before, however, any such construction can be given to this clause, it will be necessary to look further into the Constitution, and ascertain what other principles it contains, that may be affected by the construction. The Constitution authorizes the Supreme and inferior Courts, to appoint their own clerks ; and authorizes the two houses of the General Assembly to appoint the judges of the Supreme and inferior Courts; the Treasurer, Auditor of Public Accounts, Attorney General, public printer, and

such other officers for the State as may be necessary. The legislature, under this clause, authorizing them to appoint "such other officers for the State as may be necessary," have passed from time to time laws authorizing the two houses of the General Assembly, to appoint State's Attorneys, Commissioners to construct the Illinois and Michigan Canal, Fund Commissioners, Commissioners for Internal Improvements, and a great variety of other commissioners for temporary and local purposes. The legislature, also, by giving a broad construction to the latter clause of the twenty-second section of the third article, which is as follows : " Inspectors, collectors, and their deputies, surveyors of the highways, constables, jailers, and such inferior officers whose jurisdiction may be confined within the limits of the county, shall be appointed in such manner as the General Assembly shall prescribe," have passed laws, authorizing the people periodically to elect County Commissioners, Clerks, Recorders, Surveyors, Treasurers of counties, and Probate Justices. Within the last six years, the Governor has been stripped of the whole appointing power, with the exception of Secretary of State, Notaries Public, and perhaps a few other officers, of little or no importance.

The Constitution also authorizes the people, periodically, to elect Sheriffs, Coroners, and County Commissioners. Now, while I willingly agree, that appointment to office is, in its nature, an executive, rather than a legislative or judicial function, and it perhaps would have been wise, had the Convention so considered the subject, and conferred the whole appointing power upon the executive, with the advice and consent of the Senate, yet a careful examination of the various provisions of the Constitution, in relation to the power of appointing the officers of government, must lead to any other conclusion, than that the Convention considered the appointing power an executive function.

The Constitution gives the appointment of the most important of the local officers to the people ; and the legislature, to carry out what they believed the intention of the framers of the Constitution, have passed laws giving the appointment of nearly all the inferior officers either to the people, or to the two houses of the General Assembly. On two occasions, the Council of Revision attempted to sustain the doctrine, that appointment to office was an executive function, and ought not to be exercised by the two houses ; but the views of the Council were not finally concurred in by the legislature ; and the Council have, since, repeatedly given their sanction to the passage of laws authorizing the two branches of the legislature, and the people, to appoint public officers. After the Governor and judges of the Supreme Court, as members of the Council of Revision, and the legislative body have frequently, and at different sessions, passed laws in conflict with the doctrine, that the appointing to office is an executive function, it would be ab-

surd, whatever our theoretical opinions may be, any longer to consider, under our Constitution, and the legislation under it, that appointment to office, is, in practice, an executive function.

But were I still disposed to insist that appointment to office is an executive function, it by no means follows, that, under our Constitution, removal from office is also an executive function. Although the power of the President to remove from office, under the Constitution of the United States, has been the generally received doctrine, yet I might cite distinguished names in favor of the doctrine, that removal from office, during the period for which the officer was appointed, can only take place in pursuance of authority conferred by law. Whether this doctrine be correct or not, it is not my present purpose to enquire ; but I shall attempt to show, that removal from office is not, under the Constitution and laws of this State, an executive function. If it be an executive function, it follows, that the Governor, at his will and caprice, and without any official delinquency on the part of the officer, has the power to remove every officer in the government, except judges, from Secretary of State down to constable. It must be here recollected, that this power is nowhere expressly given to the Governor, and, that if it exists, it is only by inferring that the Convention intended to vest it in him, by conferring on him the executive power. Can it, then, for a moment be supposed, that the Convention intended to vest in the Governor a power, which, if exercised, would completely enable him to defeat the will of the legislature and of the people, in the appointment of nearly all the officers of the government ? To suppose that the Convention could be guilty of so great a piece of folly, is to accuse that body of a want of discernment. I am not willing to admit that it deserves such an accusation. It certainly could not have been the intention of its members to clothe the Governor with power to defeat the constitutional authority of the legislature and the people, in making appointments to office. It was urged, on the argument, that the Convention did not indulge, in any manner, a jealousy that the Governor would abuse the power conferred on him, but that its members reposed a liberal confidence in him, and were willing to see him vested with all the ordinary executive functions.

This argument, however, does not accord with the fact, that nearly all the appointing power is conferred either on the people, or on other departments of the government.

Executive powers and prerogatives have for ages been viewed with distrust, and, in most of the State Constitutions, as few powers are conferred on the Governors of the several States, as the nature of the executive office would permit. From these considerations I have come to the conclusion, that the Governor does not possess the power to remove the Secretary of State, under the grant of executive power.

Secondly. Does the Governor possess the power of removal under that clause of the Constitution authorizing him to call " on the officers in the executive department for information in writing upon any subject relating to the duties of their respective offices " ? The Constitution does not designate what officers belong to the executive department, but the general understanding is, that the Secretary of State, Auditor of Public Accounts, Treasurer, and Attorney General are the officers contemplated.

The same objection exists to the power of removal, as one incident to the right to call for information, as lies in the case of claiming the power under the clause giving the executive authority to the Governor. The power to remove would cover too much ground. It would enable the Governor to defeat, at his will, several appointments made by the General Assembly. Nor is it necessary, as the former action of the government proves, that the Governor should possess this power in order to compel these officers to perform this duty. Should either of these officers refuse to furnish the Governor with any information that he may desire, and which it is their duty to give, he may be impeached, and, should future experience prove that this fear of impeachment is inadequate to produce a compliance on their part, the legislature can always be invoked to provide such additional remedies as shall produce the requisite fidelity.

Thirdly. Does that provision of the Constitution, which requires, that the Governor " shall take care that the laws be faithfully executed," empower him to remove the Secretary, or any other officer, at his will and pleasure? If, as has been shown before, the Governor possesses the power of removal under this provision, then he may, not only remove the Secretary of State, but every other officer in the State, except judges. For the reasons heretofore given, no such power can be implied in this case. Nor is it necessary that the Governor should have this power, in order to enable him to comply with this injunction of the Constitution. All that the Constitution contemplates is, that the Governor shall exercise a general oversight over the operations of the laws, and use such means, as the laws have placed in his hands, to overcome opposition, and remove obstacles to their due enforcement. If the laws be defective, or inefficient, it would doubtless be his duty to inform the legislature of such defects, and point out proper remedies. If the laws be opposed by force, it would be his duty, as the chief executive of the State, to call out the militia to aid the civil officer to put down such opposition. If a crime be committed, and the perpetrator escape into another State or country, it would be his duty to demand of the executive of the State where the fugitive had fled, that he be delivered up to the courts of this State for trial. Should a flagrant crime be secretly committed, he may, by proclamation, give notice of the fact, and

offer a reward for the discovery of the perpetrator, and for his apprehension. In these and similar ways, I think the Governor will find full scope for his vigilance, in taking " care that the laws be faithfully executed." Should the Secretary, or any other officer, neglect or refuse to perform his duty, the laws possess sufficient energy to compel compliance, without resorting to the power of removal. If the Secretary refuses, or neglects, to perform any official duty, he may be impeached. He may also be compelled to perform the duty, by *mandamus.* If he, or any other officer, act partially or oppressively, from a malicious or corrupt motive, it is a fundamental principle of our government, that he may be punished, by a criminal prosecution. (1) The sheriffs of the different counties have more duties to perform, in relation to the execution of the laws, than all the other officers in the State ; yet, the present laws are abundantly sufficient to coerce these officers to a faithful discharge of their duties. For malfeasance, oppression, partiality in the discharge of their duties, or for any palpable omission of duty, they are liable to be indicted, and on conviction, to be removed from office. In addition to this, a party injured has a civil action, and for many neglects of duty, the courts of record have power to imprison them for contempt. I therefore conclude that it is not necessary, to enable the Governor to take care that the laws be faithfully executed, that he should possess the royal prerogative to remove the Secretary, or any other officer. If, however, as I have before observed, the present laws are inefficient, it will be within the scope of legislative competency, to provide other means to secure the faithful performance of official duties. Should the legislature deem it wise to vest this power in the Governor, they have the right so to do ; and if the Governor is to have this power, it is much better that it should be by legislative grant, than by the Constitution.

Fourthly. Does the Governor possess the power to remove the Secretary, in virtue of the clause of the Constitution which gives him, by and with the advice and consent of the Senate, power to appoint a Secretary of State ? If the power exists, I am willing to admit, that in this clause it is found. Yet, upon a much more mature consideration of the subject, than I was able to bestow upon the question, when the decision was made, I continue of opinion, that the Governor, according to the settled usage and practical construction of our Constitution, does not possess the power of removal under this provision of the Constitution. A question in relation to the power of the President, to remove from office, was elaborately discussed, in the first Congress that was held after the adoption of the Constitution of the United States, and a great variety of conflicting opinions was advanced,

(1) 15 Wend. 278.

by the sages and patriots who composed that body. The debate arose on a bill "for establishing an executive department, to be denominated the 'department of foreign affairs.' " (1) That act, among other things, provides, that the Secretary, to be appointed under it, " shall perform and execute such duties, as shall, from time to time, be enjoined on, or intrusted to him, by the President of the United States, agreeable to the Constitution, relative to correspondencies, commissions or instructions to, or with, public ministers or consuls from the United States ; or to negotiations with public ministers from foreign States or princes ; or, to memorials, or other applications, from foreign public ministers, or other foreigners ; or to such other matters respecting foreign affairs, as the President of the United States shall assign to said department ; and furthermore, that said principal officer shall conduct the business of the said department, in such manner as the President of the United States shall, from time to time, order or instruct." By the second section of this act, a chief clerk is to be appointed, " who, whenever the said principal officer shall be removed from office, by the President of the United States," shall have charge of the office, &c.

It is apparent, from this law, that the officer created by it was the mere instrument or agent of the President, and to perform whatever duties the President directed, in relation to our foreign affairs. The Secretary was, as one of the leading members of that Congress expressed it, " as much an instrument in the hands of the President, as the pen is the instrument of the Secretary, in corresponding with foreign courts." Notwithstanding the officer created by this act, was made the agent of the President, and had no duties assigned him, either in the Constitution or law, except to obey the will of the President, yet a protracted debate ensued upon the question, whether the President had the power, by the Constitution, to remove this officer, whose whole duties he controlled, and for whose fidelity he was responsible to the country.

After an attentive perusal of that debate, my mind is left in doubt, whether a majority of the House of Representatives were of opinion, that the President possessed the power of removal, under the Constitution, or whether, as the power of removal was not expressly granted by the Constitution, it was not a power depending on the will of Congress, whether it should be granted or not.

Mr. Sedgwick, a distinguished member from Massachusetts, and who voted for the passage of the bill, says, " If I understand the subject rightly, there seems to be two opinions dividing the majority of this house. Some of these gentlemen seem to suppose, that by the Constitution, and by implication, and certain

(1) 1 Story's Laws 5.

deduction from the principles of the Constitution, the power vests in the President. Others think, that it is a matter of legislative determination, and that they must give it to the President, on the principles of the Constitution." (1) Mr. Sedgwick further said, " he believed there were a thousand circumstances, which would demand a removal from office, of which the President alone could be the proper judge ; therefore, the President alone ought to possess the power. He excluded cases of impeachment ; but he thought it was in the discretion of the legislature to authorize the exercise of it, because they had complete power over the officers they created. Hence, he deemed it necessary to make an express grant of the power of removal ; but strike out these words, and there is no express grant in the bill. Now if he was right in his construction, it became necessary to retain the words ; they could do no harm, for reasons before mentioned, and they stand very well with the amendment already agreed to, to wit, 'whenever the said principal officer shall be removed from office by the President of the United States.' If he erred in judgment, no injury could arise from the error. But if other gentlemen err in their construction, we have a weak, decrepid explanation, which the President may not easily understand. For if he supposes the Constitution totally silent, he can hardly draw authority from your law ; and he will be reduced to the dilemma of acting in the manner related of the late Governor of Virginia, by an honorable gentleman from that State, (Mr. White,) which is by no means to be wished." These remarks of Mr. Sedgwick were made in opposition to a motion to strike out the words, " to be removable by the President," which were contained in the bill, as originally presented to the house. The motion to strike out, however, prevailed. Mr. Hartly, who also voted for the bill, as it finally passed, says, that he " was against striking out, and so would every gentleman be, he trusted, who was not fully convinced that the power of removal vested, by the Constitution, in the President. He owned, he had some doubts on that head, himself ; perhaps some others might be in the same predicament ; but he had none, with respect to the propriety of the President's exercising that prerogative, and therefore should readily consent to granting it ; this might be done by retaining the words, and without going beyond the avowed limits of the legislative authority." (2)

Mr. Lawrence, who also voted for the bill, on its passage, and took an active part in the debate, concluded his speech, in these words : " In the case of removal, the Constitution is silent ; the wisdom of the legislature should, therefore, declare in what place the power resides." (3)

Mr. Baldwin, of Georgia, says, " I say it is not a natural con-

(1) 2 Lloyd's Cong. Reg. 5, 9.   (2) *Ibid.* 12.   (3) 4 Elliott's Debates 168.

sequence, that the power which appoints, should have the power of removal." (1)    Thus we find, that several members of distinction, expressed, in debate, strong doubts, whether the President had, under the Constitution, power to remove an officer, whose duties were to be assigned and regulated by the President himself; and yet several of these same members voted for the passage of a law implying, that the President, by the Constitution, had the power of removal.    This act passed the House of Representatives, by a vote of twenty-nine in the affirmative, and twenty-two in the negative; and it passed the Senate by an equal division of that body, the elder Adams, then being Vice-President, giving the casting vote in its favor.    This decision of Congress has been strongly urged upon this Court, as settling, not only the construction of the Constitution of the United States, but of this State. This position I cannot assent to.    Legislative construction, although entitled to great respect, is not binding upon courts.    No doubt this decision of Congress, followed by the practice of the federal government, for a long time, in unison with it, would furnish, to the courts of the Union, strong reasons for adopting it as the correct construction of the Constitution of the United States; but when this Court is asked to adopt the same decision, as a correct construction of the Constitution of this State, it becomes the duty of this Court to enquire, whether the reasons for that decision were sufficiently comprehensive to include the case on which we are called to decide.    The debate that arose, while that bill was pending before Congress, furnishes the reasons and opinions of the members; and, from that debate, I think great uncertainty exists, whether a majority of Congress entertained the opinion, that the President possesses the power of removal, under the Constitution; and hence, I conclude, it is not a precedent that ought to govern this Court.    But, had this Court come to the conclusion, that the passage of this act of Congress was a strong precedent in favor of the doctrine, that the Constitution of the United States confers on the President the power of removal, it would still be our duty to decide, whether the Governor has that same power, and if so, in what clause of the Constitution this power is contained.

On this point, the debates in Congress, in 1789, and the opinions of distinguished commentators, would be a very uncertain guide, as I shall now proceed to show.

The Federalist is a work universally recognised as a production of great merit, and much relied on, both by legislators and judges, to settle the true construction of the Constitution of the United States.    It was written by Madison, Hamilton, and Jay, for the express purpose of inducing the people of the United

(1) 4 Elliott's Debates 205.

States to adopt the Constitution. In the 77th number of that work, the author says, that " It has been mentioned, as one of the advantages to be expected from the coöperation of the Senate in the business of appointments, that it would contribute to the stability of the administration. The consent of that body would be necessary to displace, as well as to appoint. A change of the chief magistrate, therefore, would not occasion so violent or so great a revolution, in the offices of the government, as might be expected, if he were the sole disposer of offices. Where a man, in any station, had given satisfactory evidence of his fitness for it, a new President would be restrained from attempting a change in favor of a person more agreeable to him, by the apprehension that the discountenance of the Senate might frustrate the attempt, and bring some degree of discredit on himself. Those who can best estimate the value of a steady administration, will be most disposed to prize a provision, which connects the official existence of public men with the approbation or disapprobation of that body, which, from the greater permanency of its own composition, will, in all probability, be less subject to inconstancy, than any other member of the government."

The number of the Federalist, from which the above extract is taken, is generally supposed to have been written by General Hamilton.

This great statesman, it is well known, was in favor of a strong national government, and his political opponents have gone so far as to charge him with being a great admirer of monarchy, with all its attendant trappings and prerogatives. Yet, desirous as he undoubtedly was, of an efficient and powerful chief magistrate, he was clearly and decidedly of opinion, that the President did not possess the royal prerogative of removal from office.

This statesman well knew, if the American people should believe, that the Constitution conferred this enormous power on the President — a power, which, in Great Britian, enables the monarch to control the Parliament of that immense empire at his will — that they would reject the Constitution proposed for their adoption. The opinion, therefore, expressed in the Federalist, that the President alone does not possess the power of removal, is entitled to the more weight, coming as it does, from General Hamilton ; who, I have no doubt, was not only a sincere patriot, but an eminent statesman, and a profound lawyer.

Judge Story, in his abridged " Commentaries on the Constitution,"(1) asks these questions, " To whom, in the absence of legislation, does the power of removal belong ? To the appointing power, or to the executive ? To the President and Senate, who

(1) p. 568. See also, 3 Story's Com. 388 and following pages, where the same subject is discussed more at large, and from which I have also taken a short extract.

have concurred in the appointment, or in the President alone ?"
In answering these questions, he has discussed both sides, with
great power and ability. In order that no injustice may be done
this able and enlightened judge, I shall quote all he says on the
subject, in his abridged work. " This subject," he says, " is a
vastly important practical question, and, in an early stage of the
government, underwent a most elaborate discussion. The lan-
guage of the Constitution is, that the President ' shall nominate, and,
by and with the advice and consent of the Senate, appoint, &c.'
The power to nominate does not naturally or necessarily include the
power to remove ; and, if the power to appoint does include it, then
the latter belongs conjointly to the executive and the Senate. In
short, under such circumstances, the removal takes place in virtue
of the new appointment, by mere operation of law. It results,
and is not separable, from the appointment itself." " This
was the doctrine maintained with great earnestness by the Feder-
alist ; and it had a most material tendency to quiet the just alarms
of the overwhelming influence, and arbitrary exercise, of this pre-
rogative of the executive, which might prove fatal to the personal
independence and freedom of opinion of public officers, as well
as to the public liberties of the country. Indeed, it is utterly im-
possible not to feel, that, if this unlimited power of removal does
exist, it may be made, in the hands of a bold and designing man,
of high ambition and feeble principles, an instrument of the worst
oppression and most vindictive vengeance. Even in monarchies,
while the councils of State are subject to perpetual fluctuations
and changes, the ordinary officers of the government, are permit-
ted to remain in the silent possession of their offices, undisturbed
by the policy or the passions of the favorites of the court. But,
in a republic, where freedom of opinion and action are guarantied
by the very first principles of the government, if a successful par-
ty may first elevate their candidate to office, and then make him
the instrument of their resentments, or their mercenary bargains ;
if men may be made spies upon the actions of their neighbors, to
displace them from office ; or, if fawning sycophants upon the
popular leader of the day, may gain his patronage, to the exclusion
of worthier and abler men, it is most manifest, that the elections will
be corrupted at the very source, and those who seek office will have
every motive to delude and deceive the people. It was not, there-
fore, without reason, that in the animated discussion already allu-
ded to, it was urged, that the power of removal was incident to
the power of appointment ; that it would be a most unjustifiable
construction of the Constitution, and of its implied powers, to
hold otherwise. That such a prerogative, in the executive, was,
in its own nature, monarchical and arbitrary, and eminently danger-
ous to the best interests as well as to the liberties of the country.
It would convert all the officers in the country into the mere tools

and creatures of the President. A dependence so servile, on one individual, would deter men of high and honorable minds from engaging in the public service. And if, contrary to expectation, such men should be brought into office, they would be reduced to the necessity of sacrificing every principle of independence to the will of the chief magistrate, or of exposing themselves to the disgrace of being removed from office ; and that, too, at a time when it might no longer be in their power to engage in other pursuits.

" On the other hand, those who, after the adoption of the Constitution, held the doctrine, (for before that period, it never appears to have been avowed by any of its friends, although it was urged by its opponents, as a reason for rejecting it,) that the power of removal belonged to the President, argued, that it resulted from the nature of the power, and the convenience, and even necessity, of its exercise.

" It was clearly in its nature a part of the executive power, and was indispensable for a due execution of the laws, and a regular administration of the public affairs. What would become of the public interests, if, during the recess of the Senate, the President could not remove an unfaithful public officer ? If he could not displace a corrupt ambassador or head of department, or other officer engaged in the finances or expenditures of the government ? If the executive, to prevent a non-execution of the laws, or a non-performance of his own proper functions, had a right to suspend an unworthy officer from office, this power was in no respect distinguishable from a power of removal. In fact, it is an exercise, though in a more moderate form, of the same power. Besides, it was urged, that the danger that the President would remove good men from office was wholly imaginary. It was not by the splendor attached to the character of a particular President, like Washington, that such an opinion was to be maintained. It was founded on the structure of the office. The man in whose favor a majority of the people of the United States would unite to elect to such an office, had every probability, at least, in favor of his principles. He must be presumed to possess integrity, independence, and high talents. It would be impossible that he should abuse the patronage of the government, or his power of removal, to the base purposes of gratifying a party, or of ministering to his own resentments, or of displacing upright and excellent officers, for a mere difference of opinion. The public odium, which would inevitably attach to such conduct, would be a perfect security against it. And, in truth, removals made from such motives, or with a view to bestow the offices upon dependents or favorites, would be an impeachable offence." " That the final decision of this question, in favor of the executive power of removal, was greatly influenced by the exalted character of the President then in office,

was asserted at the time, and has always been believed.    Yet, the doctrine was opposed, as well as supported, by the highest talents and patriotism of the country.    The public, however, acquiesced in this decision ; and it constitutes, perhaps, the most extraordinary case in the history of the government, of a power conferred by implication on the executive, by the assent of a  bare  majority of Congress, which has not been  questioned on many  other occasions.    Even the most jealous advocates of State rights, seem to have slumbered over this vast reach of authority, and  have left it untouched, as the neutral ground of controversy in which they desired to  reap no harvest, and from which they  retired without leaving any protestations of title or contest."    "Nor is this general acquiescence and  silence without a satisfactory  explanation. Until a very recent period, the power had  been exercised in  few cases,  and  generally  in such  as led to their  own vindication. During the administration of President Washington few removals were made, and none without cause ; few were made in that of the first President Adams.    In that of President Jefferson, the circle was greatly enlarged ;  but yet it was kept within  narrow bounds, and with an express disclaimer of the right to  remove for difference of opinion, or otherwise than for some clear public good.

"In the administrations of the subsequent Presidents, Madison, Monroe, and J. Q. Adams, a general moderation and forbearance were exercised, with the approbation of the country, and without disturbing the harmony of the system.    Since the  induction into office of President Jackson, an opposite course has been pursued ; and a system of removals and new appointments to office, has been pursued so  extensively, that it has  reached a  very large  proportion of all  the offices of honor and  profit in the civil  departments of  the country.    This is matter of fact, and beyond the statement of the fact, it is not the intention of the commentator to  proceed. This extraordinary change of  system has awakened  general attention, and brought back the  whole controversy,  with  regard to the executive power of removal, to a severe scrutiny.    Many of the most eminent statesmen in the country, have expressed a deliberate opinion, that it is  utterly indefensible, and  that the only sound interpretation of the Constitution, is that avowed upon its adoption ;  that is to say, that the  power of  removal belongs to the appointing power.

"Whether the predictions of the original advocates of the executive power, or  those of  the  opposers of it, are  likely in the future progress of the government to be realized, must  be  left to the sober judgment of  the community and to the  impartial  award of time.    If there has been any aberration from the true constitutional exposition of the power of  removal, which the reader must decide for himself, it will be  difficult, and  perhaps impracticable, after forty years' experience, to recall the practice to the correct

theory. But at all events, it will be a consolation to those who love the union, and honor a devotion to the patriotic discharge of duty, that in regard to " inferior offices," which appellation probably includes ninety-nine out of a hundred of the lucrative offices in the government, the remedy for any permanent abuse, is still within the power of Congress, by the simple expedient of requiring the consent of the Senate to removals in such cases."

Who, after reading this extract can doubt, that in the opinion of this eminent judge, the practice established by the decision of Congress in 1789, is contrary to the " correct theory" of the Constitution. His language is emphatic, that " the power to nominate does not naturally or necessarily include the power to remove ; and if the power to appoint does include it, then, the latter belongs conjointly to the executive and the Senate."

In truth, does not the history of the last ten years clearly prove, that while the advocates in Congress of the doctrine, that to the President belongs the power of removal, were dreaming dreams ; the opponents of that doctrine were seeing realities ?

In a late work, entitled " Democracy in America," published in 1838, I find that it is the opinion of John C. Spencer, a lawyer of distinguished abilities, in the State of New York, that the question as to the right of the President to remove from office, is still " an unsettled question."

The members of Congress in 1789 differed very much, as to which clause of the Constitution contained the power of removal. Some found it in one clause, and some in another, and a large minority of the House of Representatives, including some members of the Convention, and one half of the Senate, denied that the President had the power.

When the adoption of the Constitution of the United States was under discussion, no friend of its adoption had advocated the doctrine that the President could exercise this power under the clause of the Constitution giving him the executive power, nor under the clause requiring him to take care that the laws be faithfully executed. In the debate in Congress, before referred to, Mr. Madison says, that " The doctrine, however, which seems to stand most in opposition to the principles I contend for, is, that the power to annul an appointment, is, in the nature of things, incidental to the power which makes the appointment. I agree, that if nothing more was said in the Constitution, than that the President, by and with the advice and consent of the Senate, should appoint to office, there would be great force in saying, that the power of removal resulted, by a natural implication, from the power of appointing. But there is another part of the Constitution no less explicit, than the one on which the gentleman's doctrine is founded. It is that part which declares that the executive power shall be vested in a President of the United States. The

association of the Senate with the President in exercising that particular function, is an exception to this general rule, and exceptions to general rules, I conceive, are ever to be taken strictly. But there is another part of the Constitution, which inclines, in my judgment, to favor the construction I put upon it.   The President is required to take care that the laws be faithfully executed. If the duty to see the laws faithfully executed, be required at the hands of the executive magistrate, it would seem that it was generally intended he should have that species of power, which is necessary to accomplish that end."(1)

Elbridge Gerry, who has occupied a large space in the public estimation, and who actively participated in all the measures that led to our Revolution, was a member of the Revolutionary Congress, and as such, signed the declaration of Independence, and the Articles of Confederation, was a member of the Convention that framed the Constitution of the United States ; a member of the first Congress under the Constitution, a former Governor of Massachusetts, and Vice-President of the United States under the administration of James Madison.   This man, so distinguished by the confidence of his country, not only opposed the doctrine, that the President had the power of removal, but raised his warning voice against the evil consequences that inevitably would flow from such a construction of the Constitution.   In the same debate, he says, " It has been said by my colleague, (Mr. Sedgwick) that the President not only nominates, but appoints the officers ; and infers from hence, that as the power of removal is incident to the power of appointing, the President has the power of removal also.   But I should be glad to know how it can with justice be said, that the President appoints.   The Constitution requires the consent of the Senate ; therefore, they are two distinct bodies, and intended to check each other.  If my colleague's is a true construction, it may be extended further, and said, that in the act of nominating, the assent of the Senate is virtually given ; and, therefore, he has a right to make the whole appointment himself, without any interference on the part of the Senate.   I contend there is just as much propriety in the one construction, as in the other.   If we observe the enacting style of the statutes of Britain, we shall find pretty near the same words as what we used in the Constitution with respect to appointments :  ' Be it enacted by the King's most excellent Majesty, by and with the advice and consent of parliament.'   Here it might be said that the king enacts all laws ; but I believe the truth of this fact will be disputed in that country.  I believe no one will pretend to say, that the king is the three branches of parliament ; and unless my colleague will do all this, I never can admit, that the President, in himself, has the power of appointment."(2)

(1) 4 Elliott's Debates 177.          (2) Ibid. 193.

Field *v.* The People.

Mr. Gerry also says, (1) " There is a consistency, under a monarchy, of the king exercising the power of appointment and removal, at pleasure. In Great Britain, this is the prerogative of the throne, where it is likewise held a maxim, that the king can do no wrong. The Chief Magistrate, under this Constitution, (the Constitution of the United States,) is a different character. There is a constitutional tribunal where he may be arraigned, condemned, and punished, if he does wrong. The reason of this distinction, I take to be this: the majesty of the people receives an injury when the President commits an improper act, for which they are to receive satisfaction. Kings have a property in government, and when a monarch acts unwisely, he injures his own interest, but is accountable to none, because satisfaction is due to himself alone. He is established in his office for life; it is an estate to him, which he is interested to transmit to his posterity unimpaired; the good of the people, upon principles of interest, will be his peculiar study; he ought, therefore, to have power to act in such manner as is most likely to secure to him this object; thus, necessarily, he must have the right of choosing and displacing his agents. There can be no difficulty on this point; but in a confederated republic, the Chief Magistrate has no such trust; he is elected but for four years, after which the government goes into other hands; he is not stimulated to improve a patrimony, and, therefore, has no occasion for complete power over the officers of the government. If he has such power, it can only be made useful to himself, by being the means of procuring him a reëlection, — but can never be useful to the people, by inducing him to appoint good officers, or to remove bad ones.

" It appears *to me, that such unbounded power vitiates* the principles of the Constitution, and the officers, instead of being the machinery of the government, moving in the regular order prescribed by the legislature, will be the mere puppets of the President, to be employed or thrown aside as useless lumber, according to his prevailing fancy."

" If gentlemen will take this step, they must take another, and secure the public good by making it the interest of the President to consult it ; they must elect him for life, or what will be more consistent still, they must make his office hereditary ; then gentlemen may say with some degree of truth, that he ought to have the power of removal, to secure in his hands a balance in the government. But if gentlemen are willing to remain where they are, and abide by the Constitution, regarding its true principles, they will not contend that there is a necessity, or even a propriety, in vesting this power in the President alone."

Roger Sherman, who was not only a sagacious statesman, but a

(1) 4 Elliott's Debates 207.

signer of the Declaration of Independence, and a member of the Convention that framed the Constitution, says, that (1) "The Convention who formed this Constitution, thought it would tend to secure the liberties of the people, if they prohibited the President from the sole appointment of all officers. They knew that the crown of Great Britain, by having that prerogative, has been enabled to swallow up the whole administration. The influence of the crown upon the legislature, subjects both houses to its will and pleasure. Perhaps it may be thought by the people of that kingdom, that it is best for the executive magistrate to have such kind of influence; if so, it is very well, and we have no right to complain that it is injurious to them, while they themselves consider it beneficial. But this government is different, and intended by the people to be different. I have not heard any gentleman produce an authority from law or history, which proves that where two branches are interested in the appointment, that one of them has the power of removal.

"I remember that the gentleman from Massachusetts (Mr. Sedgwick) told us that the two houses, notwithstanding the partial negative of the President, possessed the whole legislative power; but will the gentleman infer from that, that because the concurrence of both branches is necessary to pass a law, that a less authority can repeal it? This is all we contend for."

Mr. Tucker, a distinguished and learned judge of Virginia, in his remarks on the bill, says, (2) "It appears to me that the power is not necessarily vested in the President by the Constitution. Neither in the President and Senate. I find no words that fix this power precisely in any branch of the government. It must, however, by implication, be in the legislature; or is nowhere, until the Constitution is amended. I presume the implication is, at least, equally favorable to the legislature as to any other branch, if it necessarily belongs to the government. I apprehend, a law is necessary, in every instance, to determine the exercise of the power. In some cases, it may be proper that the President alone should have it. I am not clear in my own mind, what general rule, if any, can be established on this subject. Perhaps, in other cases, it may be lodged with the President and Senate; or it may be given to the heads of departments. But whosoever is invested with it, it must be in consequence of a law; and the legislature have a right to vest it where they please."

Again, he says, "I would rather a law should pass, vesting the power in improper hands, than that the Constitution should be wrongly construed. If we say, the President may remove from office, it is a grant of power; and we can repeal the law, and prevent the abuse of it; but if we, by law, imply that it is a constitu-

(1) 4 Elliott's Debates 195.          (2) Lloyd's Debates 11.

tional right, vested in the President, there will be a privilege gained, which the legislature cannot affect; at least, the reversion of such a solemn opinion, will occasion much inconvenience, not to say confusion." Mr. Page of Virginia, and Mr. Smith of South Carolina, maintained, in the same debate, that removal from office could only take place by impeachment before the Senate.

From these extracts, (and they might be greatly multiplied,) it will be seen, that the passage of the act, in relation to the appointment of a Secretary for foreign affairs, furnishes but slight evidence of what were the opinions entertained by the members of Congress, of the proper construction of the Constitution of the United States, in relation to the right of removal from office, by the President; and the debate will be consulted in vain, to ascertain in what clause of the Constitution, a majority of the House of Representatives concurred in the opinion, that the power of removal, by the President, was found.

The subsequent legislation of Congress, on the power of removal, shows, that that body did not consider the question definitely settled, that the President has the power of removal, in all cases. In the "*Act to provide for the government of the Territory North of the river Ohio,*" passed in 1789, (1) it is provided, "that the President shall nominate, and, by and with the advice and consent of the Senate, shall appoint all officers, which, by the Ordinance, were to be appointed by the United States, in Congress assembled; and all officers so to be appointed, shall be commissioned by him; and in all cases, where the United States, in Congress assembled, might, by the said Ordinance, revoke any commission, or remove from any office, the President is hereby declared to have the same powers of revocation and removal."

The officers contemplated by this act, had duties assigned them by law, and were not placed under the control of the President, as was the Secretary for foreign affairs, and consequently, instead of using language implying that the President had, by the Constitution, power to remove them, the power is expressly given to him, only to the extent that Congress had the power by the Ordinance.

If the power of removal was vested in the President, by the Constitution, then, this limitation upon his powers, was void, and the authority conferred, wholly unnecessary. Again; Congress, by the first section of an "*Act to limit the term of certain officers, therein named, and for other purposes,*" (2) passed May 15, 1820, declared, "That from and after the passage of this act, all District Attorney, Collectors of the Customs, Naval Officers, and Surveyors of the Customs, Navy Agents, Receivers of Public Money for Lands, Registers of the Land Offices, Paymasters in the Army, the Apothecary General, the Assistant Apothecary General, and

(1) 1 Story's Laws, 32.                    (2) 3 Story's Laws, 1790.

the Commissary General of Purchases, to be appointed under the laws of the United States, shall be appointed for the term of four years; but shall be removable from office, at pleasure.

The language here used, clearly confers on the President, the power of removal, and is entirely different from that used in the act organizing the office of Secretary for foreign affairs. Why did Congress confer the power to remove, on the President, if he already possessed the power, by the Constitution?

From this review of the acts of Congress, I feel warranted in concluding, that down to 1820, Congress did not consider the question settled, that the President has, in all cases, the power of removal, in virtue of his power to nominate. But whether the question be considered as irrevocably settled by Congress or not, still, the question for this Court to decide is, whether the Governor of this State, at his will and pleasure, has the constitutional power to remove the Secretary of State, without any official misconduct on his part? It is conceded on all hands, that the legislature have not conferred this power on the Governor, directly, or by implication. It has been shown, that although our Constitution, in some of its features, is similar to the Constitution of the United States; yet, that other provisions have so entirely changed its character, that even the settled construction of the one instrument, would not furnish a safe guide to construe the other. The objects, also, to be accomplished by the two governments, are entirely dissimilar. The powers delegated by the Constitution of the United States, to the federal government, are principally exercised on external objects. It has the sole management of the questions of peace and war, the negotiation of treaties with foreign nations, and the regulation of commerce.

Hence arises the propriety of conferring on the executive of the United States large discretionary powers, to enable him to manage with skill and prudence our extensive foreign relations; and hence, also, the propriety of giving him the control of such of the officers of government, as are concerned in the management of foreign affairs.

There is, also, a manifest propriety, that those officers should be persons in whom the President can confide. But in this State, it is entirely different. The powers of the government of this State are limited to objects, which, in the ordinary course of affairs, concern the lives, liberties, and property of the people, and the internal prosperity of the State. No relation of confidence exists between the Governor and any of the officers. None of them are placed under his control. All their duties are pointed out by law; and to the law only ought they to be amenable for any violations of official duty. In consequence of this difference in the objects of the two governments, implied powers may be highly necessary to carry on the one government, while the same implied powers may be wholly

unnecessary and mischievous in the other. In the latter case, no implication can arise. Implied powers are not, in their nature, subject to limitation, and ought never to be resorted to, but in cases of imperious necessity. Expediency enters largely into all views of construction, when in search of such powers. The human mind is so constituted, that it readily finds satisfactory reasons for believing that that is granted, which it thinks will be highly useful. As, for example, those statesmen who believe that a system of internal improvements, by the federal government, will be highly conducive " to promote the general welfare," have found in the Constitution of the United States, by implication and construction, authority to construct roads and canals ; while those who believe that the construction of roads and canals leads to great corruption in the government, and to a great waste of the revenues of the nation, are equally clear, that no such power is conferred on Congress. So, again, those who believe that the encouragement of domestic manufactures will greatly promote the interests of that portion of the country where they reside, find abundant authority in the Constitution to foster domestic manufactures, by high duties on foreign manufactures ; while, on the contrary, those whose opinions are, that high duties bear oppressively on their portion of the Union, deny, most vehemently, that the Constitution grants to Congress any power to impose duties on importations, for any other purpose than to raise a sufficient revenue to defray the expenses of the government. These, and other instances that might be mentioned, show the strong tendency of the human mind, to put such a construction on language, as will promote its own views of expediency.

These considerations ought to teach us the wide field of uncertainty that we enter, when we are in search of implied or constructive powers. They should also admonish us of the difficulties that will surround our path, and the danger of straying beyond the line dictated by sound wisdom. For these reasons, also, I am of opinion, that every construction of the Constitution of the United States, by which implied powers are conferred on the President, ought not to be followed in construing our Constitution, unless the same reason can be shown, why the implied power should exist.

From what has already been remarked, and what will hereafter be said on this subject, I trust it will clearly appear, that no strong necessity exists why the Governor should possess the power of removal.

I shall now proceed to examine the practice of the government of this State, and the construction that has been given to our Constitution by the different departments of government, in relation to the power of removal from office.

Our Constitution was adopted in 1818, and six different individuals have filled the gubernatorial office. Till within the last six years, the Governor, by and with the advice and consent of the

Senate, had the appointment of circuit attorneys, recorders of counties, and a variety of other officers; yet, until the present Governor came into office, neither of the Governors ever exercised, or, it is believed, ever claimed, the power to remove a single officer of the State. No one can doubt, who is at all conversant with the frailties of human nature, that had the power to remove existed in the Governor, that frequent occasions must have arisen, where the power could have been exercised to the manifest advantage of the public interests. During the canvass that took place in 1826, and which resulted in the election of the late Governor Edwards, it is well known, that the late George Forquer, Esquire, then Secretary of State, took an active and somewhat violent part against Governor Edwards; yet Governor Edwards, although a sound lawyer, and distinguished for his firmness and decision of character, did not remove Mr. Forquer. The reason that was given, and not then contradicted, was, that the Governor did not believe that he possessed the power. This case presented, particularly if the Secretary is to be considered a confidential officer, or, if strong "political considerations" ought to influence the Governor, a particular fitness for the exercise of the power of removal.

This power underwent, at the time referred to, considerable discussion, and Mr. Forquer, fearing that the Governor (who was well known not to be afraid of taking all proper responsibility,) would remove him, solicited and obtained the opinion of several eminent lawyers, who were all of opinion that the Governor did not possess the power. Among the opinions obtained, was that of the late Hon. Elias K. Kane, who was then a Senator in Congress, and had been a prominent member of the Convention that framed the Constitution. His opinion was decided, that the Governor did not possess the power of removal.

The non-exercise of the power for upwards of twenty years, when frequent cases must have occurred to call it into exercise, if it existed, is strong evidence, to my mind, that no former Governor supposed that he had the power; and goes far, under the circumstances, to establish the doctrine that it does not exist.

In the next place, I shall examine the question of removal from office, as understood and acted upon by the General Assembly of this State. By the act establishing Courts of County Commissioners, passed March 22d, 1819, said Courts are authorized to appoint their own clerks, and "at any time for any cause to be stated on the record, to remove said clerks from office." (1) By the sixth section of the fourth article of the Constitution of this State, "the Supreme Court, or a majority of the justices thereof, the Circuit Courts, or the justices thereof shall respectively appoint

(1) R. L. 142; Gale's Stat. 161.

their own clerks." The language here used is the same with that authorizing the Governor and Senate to appoint a Secretary of State ; and yet, the first legislature that sat under the Constitution, by an act passed March 31st, 1819, gave the "Supreme Court power to hear and determine all impeachments of any clerk or clerks of the Circuit Courts," and, on the hearing of the impeachment, authorized the Supreme Court to remove such clerk.

If the power of removal vests, by the Constitution, in the appointing power, this act was clearly unconstitutional ; yet it received the sanction not only of the General Assembly, but of the Governor and judges, who, under the Constitution, revised and approved the law, as a Council of Revision.

By the *Act regulating the manner of appointing Justices of the Peace*, approved July 19th, 1819, justices of the peace were to hold their offices during good behavior, and in case of misbehavior in office, or wilful omission of duty, they were to be indicted, and, if convicted, to be suspended from office, and the case reported to the House of Representatives, and by them impeached under the Constitution, before the Senate.

By an act passed January 19th, 1821, " When any county commissioner, sheriff, coroner, justice of the peace, clerk of the circuit court, clerk of the county commissioners' court, recorder, or constable shall be guilty of any malconduct or palpable omission in the duties of their respective offices, such officer may be indicted, and, on conviction, removed from office." Some of the officers mentioned in this act were elected by the people, others appointed by the courts, others by the General Assembly ; and one of them, the recorder, by the Governor and Senate.

By the 107th section of the Criminal Code, approved by the Council of Revision, January 30th, 1827, " Every clerk, sheriff, coroner, constable, county commissioner, justice of the peace, recorder, county surveyor, attorney general, or circuit attorney, who shall wilfully and corruptly be guilty of oppression, malfeasance, or partiality in the discharge of his official duties ; or shall be guilty of palpable omissions of duty, " are liable to indictment, and, on conviction and the recommendation of the jury, to removal from office. The legislature, in 1833, (1) reënacted the same provision. Here, again, these various officers are appointed, some by the people, some by the courts, under the Constitution, others by the legislature, and circuit attorneys and recorders, under the Constitution, by the Governor and Senate. This act would also be a palpable violation of the Constitution, if the appointing power impliedly gave, also, the power of removal, at discretion ; and yet, all the three departments of the government concurred in the passage of the law.

(1) R. L. 195 ; Gale's Stat. 218.

The first section of the *Act regulating the Office of Clerk of the Supreme Court,* approved February 15th, 1831, provided " The Supreme Court, or a majority thereof, shall have power to remove any clerk of said Court for neglect of duty, incompetency to perform the duties of his office, or for any misconduct in office of which he may be guilty, or for any other cause which shall be satisfactory to said Court, or a majority thereof; *Provided,* that the cause of removal of said clerk shall be expressed on the records of said Court." By the second section of said act, the Court is, in a certain event, " authorized and required to remove said clerk from office."

The appointment of clerk of the Supreme Court, is, by the Constitution, vested in the Court; and, upon the doctrine that the appointing power has the power of removal, at discretion, the first section of this act was wholly unnecessary, and the second section an infringement upon the rights of the Court; yet the Governor and judges concurred in the passage of the act.

Other acts might be referred to, to show that the power of removal from office has, ever since the adoption of the Constitution, been considered a legislative power, and only to be exercised according to law. Not only have all the departments of the government, when acting in their legislative capacity, given their sanction to this doctrine, but the judges of the Supreme Court, when sitting in their judicial capacity, have, on two different occasions, affirmed the same principle. These cases have heretofore been referred to, and it is unnecessary further to remark on them.

From this review, we have these results, as to the practice of our State.

First. The Governors of this State, for upwards of twenty years, never exercised the power of removal, although, doubtless, during that time many cases occurred that would have rendered the exercise of it proper and useful, if it had existed. We have also the opinion of one of the most prominent members of the Convention, who was also a distinguished lawyer, that the Governor did not possess the power of removal, and this opinion is sustained by other members of the profession. The Governor and judges had also approved of laws pointing out the mode in which removals should be made. The Governor, by giving his sanction to these laws, has virtually acknowledged that the power to appoint does not necessarily include the power to remove.

Secondly. The legislature, by the passage of these laws, has repeatedly declared the doctrine, that removal from office is a legal power, and does not belong to the appointing power, nor any functionary of the government, except as vested in them by law.

Thirdly. The judiciary, on two different occasions, and in which two different sets of judges were unanimous, have, in effect, given it as their opinion, that the appointing power has not the power of removal.

After this expression of opinion on the part of all the different departments of the government, it seems to follow, as a necessary consequence, that it is the settled usage and practical construction of the Constitution of this State, that the Governor does not possess the power to remove the Secretary of State, or any other officer of the government, under the Constitution.

When the decision of this case was made at the last term of the Court, none of the members of the Court had seen the decision of the Supreme Court of the United States, in the case of Hennen, who had been removed by the District judge, of the District of Louisiana, from the office of clerk of that Court. It appears, from a newspaper report of the decision, published since the last term, that Hennen had been removed by the District judge, and John Winthrop appointed as his successor. That, at a Circuit Court subsequently held in Louisiana, both persons presented themselves, claiming to be clerk ; that Judge McKinley, one of the judges of the Supreme Court of the United States, was of opinion, that Hennen was the legal clerk of the Court ; and the District judge, that Winthrop was clerk, and, being unable to agree who was clerk of the Court, the Court adjourned without doing any business. Subsequently, Hennen filed a petition in the Supreme Court of the United States, praying for a *mandamus* to the District Court of Louisiana, to restore the petitioner to the clerkship. On the argument of this motion, the Supreme Court of the United States decided, that the District judge, being the appointing power, had the power of removal, at his will and discretion. (1) All the information possessed by this Court, at the last term, of the case of Hennen, was, that the judges of the Circuit Court of Louisiana differed in opinion, as to the power of the District judge to remove the clerk, and that the Supreme Court, on the application, refused to allow a *mandamus* ; but, whether that refusal was upon the merits, or upon some technical ground not involving the power of removal, we were unadvised.

The opinion which we have seen, apparently conflicts with the decision of the Supreme Court of this State, in the case of The People *v.* Mobley. (2) This conflict, however, arises from the difference in the two Constitutions, and from the different legislation and practice that has prevailed in administering the two governments.

The Constitution of the United States confers the whole appointing power on the President and Senate, with the exception of such inferior officers as Congress might vest in the President alone, in the heads of departments and in the Courts.

None of the appointing power belongs to the people, or the two houses of Congress ; and Congress had, by its repeated action,

(1) 13 Peters.  (2) 1 Scam. 215.

either acknowledged, that the removing power was in the Presi-
dent, or had expressly conferred it upon him.   The power of re-
moval, could also be readily exercised by the appointing power.
The case, however, is widely different, under the Constitution of
this State.

The power of appointment is vested in the Governor and Sen-
ate, in the two houses of the General Assembly, in the courts,
and in the people.   Consequently, a general rule, that the appoint-
ing power should possess the power of removal, could not be car-
ried out in practice.   It would be impossible for the people to
exercise the function.   It would also be extremely inconvenient
for the two houses of the General Assembly to exercise it.

The legislature of this State, doubtless foreseeing the diffi-
culty that would arise, if they recognised the doctrine, that the
appointing power was vested with the removing power ; and prob-
ably believing that the doctrine of vesting a discretionary power in
the Governor, or any other functionary of the government, to re-
move from office at his pleasure, was despotic in principle, and
contrary to the genius of republican government, have, as I con-
ceive, wisely legislated in the manner I have referred to.   This
course of legislation, for upwards of twenty years, has, in my
opinion, settled the policy of this State, in regard to removal from
office, on correct and safe principles.   Should, however, further
experience prove, that the discretionary power of removal would
be more conducive to the honest and faithful discharge of official
duties, it will be in the power of the legislature so to ordain.

It would be painful to this Court, if they should find that their
opinion conflicts with the opinion of the Supreme Court of the
United States, in a case where one or the other opinion must
necessarily be wrong.   I entertain for that exalted tribunal the
most unfeigned respect ; and I have the utmost confidence in the
purity of character, and great learning of the venerable and enlight-
ened judge, who delivered the opinion in the case of Hennen.

I however think, that, by the Constitution, laws, and practice of
this State, different considerations ought to govern this Court, and
that, in reality, there is no discrepancy between that decision and
this.   That decision was made from their understanding of what,
to use the words of Judge Thompson, who gave that opinion,
" is the settled usage and practical construction of the Constitu-
tion and laws under which these offices are held."   This decis-
ion is based on our views of " the settled usage and practical
construction of the Constitution and laws of this State," in regard
to the power of removal.   I consequently feel no disposition to
controvert the correctness of the conclusion that the Supreme
Court of the United States arrived at, in that case ; yet, a re-
gard to my own consistency requires me to notice some remarks

contained in that opinion.   The remarks are as follows : " This power of removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained, in the early history of this government.   This related, however, to the power of the President to remove officers, appointed with the con-currence of the Senate, and the great question was, whether the removal was to be by the President alone, or with the concur-rence of the Senate, both constituting the appointing power.   No one denied the power of the President and  Senate jointly to re-move, where the tenure of the office was not fixed by the Consti-tution ; which was a full recognition that the power of removal was incident to the power of appointment.   But it was very early adopted as a practical construction of the Constitution, that this power was vested in the President alone.   And such would ap-pear to be the legislative construction of the Constitution."(1)   The able judge, who delivered this opinion, could not recently have read the debate that arose in the Congress of 1789, upon the or-ganization of the department for foreign affairs, or he certainly could not have said, that " no one denied the power of the Presi-dent and Senate jointly to remove," &c.   If the extracts taken from Lloyd's and Elliott's Debates, which are given in a previous part of this opinion, truly represent the views of the speakers, then, certainly, a number of the members strongly denied that the power of removal, under the Constitution, belonged to the Presi-dent alone, or to the President and  Senate jointly, as a reference to the debate will clearly show.

The principle, that the  power of removal was  incident to the power of appointment, was  not only denied by  some, but was strongly resisted by  several of the most enlightened and  patriotic members of that body.

Indeed, so violently were some of the members opposed to the principle of the bill, that Mr. Page of Virginia, who was of opin-ion, that removal could only take place by impeachment, declared, that the act contained the " seed of royal prerogative."

Mr. Smith, of South Carolina, said, " The gentleman from Virginia has said that the power of removal is executive in its nature.   I do not believe this to be the case.   I have turned over the Constitutions of most of the States, and I do not find that any of them have granted this power to the Governor.   In some in-stances I find the executive magistrate suspends, but none of them have the right to remove officers ; and I take it, that the Constitu-tion of the United States has distributed the powers of govern-ment on the same principles which most of the State Constitutions have adopted.   For it will not be contended but that the State gov-

(1) 13 Peters.

ernments furnished the members of the late Convention with the skeleton of this Constitution."(1)

General Sumpter, of North Carolina, said, " This bill appears to my mind so subversive of the Constitution, and in its consequences so destructive to the liberties of the people, that I cannot consent to let it pass, without expressing my detestation of the principle it contains. I do it in this public manner, in order to fulfill what I think to be my duty to my country, and to discharge myself of any concern in a matter that I do not approve."

I have, however, not the least doubt, that the mistake of Judge Thompson arose from misrecollection of the various views of the members in that debate. I notice this discrepancy for no other purpose, than to vindicate my statement of the great contrariety of opinions that were advanced by the members of Congress in 1789.

Having arrived at the result, that the Constitution of this State does not authorize the Governor to remove the Secretary of State, and that no law has expressly, or by implication, vested any such power in him, I might close this opinion ; but as several, as was supposed, strong reasons were urged why the Governor should possess this power of removal, I will give them a passing notice.

It was urged in the argument, that the Secretary of State was a confidential officer, and, therefore, the Governor ought to have the power of removal.

I am willing to concede that, had our Constitution created such an officer as that of Secretary of Foreign Affairs, and authorized the Governor, at his discretion, to designate what duties he should perform, and how he should perform them ; and had the Governor a right to call on him for counsel and advice how to administer the government, there would undoubtedly be great force in the argument, that such an officer was a confidential officer, and that the Governor ought to possess the power of removal. But the Constitution has created no such officer. All the duties of the Secretary are either defined in the Constitution, or in the laws ; and nowhere is any authority given to the Governor, either to direct what he shall do, how he shall do it, or even to call on him for counsel or advice. On the contrary, I think it is fairly inferable, from the terms of the Constitution, not only that the Secretary is not a confidential officer of the Governor, but that it was intended he should not be one. The Secretary, by the Constitution, when required, " shall lay the official acts of the Governor, and all papers, minutes, and vouchers relative thereto, before either branch of the General Assembly." If the Secretary is to be considered a confidential officer of the Governor, and removable at his pleasure, it would be in the power of the Governor, at any time, if he

(1) 4 Elliott's Debates 153.

Field *v.* The People.

wished to conceal his acts from the legislature, to defeat this provision of the Constitution. And if the Governor did not resort to removal, and was unwilling his acts should be known by the General Assembly, this confidential officer would be placed in the unpleasant dilemma of betraying the confidence of his principal, or violating the Constitution of his country. But is the Secretary of State a confidential officer ? The duties of his office, in all the States of the Union, are essentially the same.

I have examined the Constitutions of all the States, and find, that in thirteen States, the Secretary is appointed by the two branches of the legislature. In two of the States, he is elected by the people. In seven States, he is appointed by the Governor, or Governor and Senate. In four of the States, I could not ascertain how he was appointed. From this examination, it appears, that in fifteen States, the Governor has no agency whatever in appointing the Secretary. In several of these States, the duties of the Secretary are identical with the duties of Secretary in this State, and particularly in Mississippi, where the people elect their Secretary. Clearly, in none of the States where the Governor has no agency in the appointment of this officer, can he be considered a confidential one.

The probability is, that the duties of our Secretary were copied from the Tennessee, Ohio, or Indiana Constitutions, in each of which States the legislature appoints that officer.

There is, therefore, not the least propriety in considering the Secretary a confidential officer of the Governor.

Again, it was urged as a strong reason why the Governor should possess the power of removal, that the Secretary might obstinately refuse to perform important legal duties, and thus the public interests might suffer. A number of cases were supposed ; and it was said that the Secretary, by refusing to do his duty, might frustrate important objects of legislation, and even stop the wheels of government. For example, it was asked, suppose he should refractorily refuse to place the seal of State to the internal improvement bond, or to commissions for officers legally elected, where would be the remedy ? In answer to all this, I say, if the Constitution has not conferred the power of removal on the Governor, as I think has been sufficiently shown, the Governor cannot exercise the power, however beneficial its exercise might be.

But, should such cases ever occur, the Constitution and laws are not so defective, but that a speedy remedy may be obtained. The Secretary can be impeached and removed from office ; he can be indicted and punished ; and he can be compelled to do his duty by *mandamus* ; and in case an individual sustains an injury, he may be prosecuted for damages. If all these remedies prove inadequate to compel a faithful performance of his official duties, and the public are likely to sustain detriment by delay, the Governor

can call a special session of the legislature, and the power of removal can be conferred on the Governor, if the legislature deem that the exigencies of the case require it.

But improbable or extravagant suppositions neither prove nor establish principles, as I will show. Suppose the Governor should refuse to sign internal improvement bonds ; or should refuse to commission the multifarious officers, that are elected every year ? In the first case, is it not evident, that an important measure of the legislature would be defeated ; and, in the other, would not the wheels of government be effectually arrested ? And, in such cases, where is the remedy ? The only remedy would be an impeachment, which could only take place once in two years, as it is not probable the Governor would call a special session of the legislature to enable that body to impeach himself.

The courts cannot compel obedience, by *mandamus,* because the Governor, being one of the coördinate departments of the government, is not liable, in his official capacity, to be called before the courts. As impeachment is confessedly a dilatory remedy, what, then, must be done ? I answer, if the law furnishes no adequate remedy, it is a good reason for concluding, that it is highly improbable, that so high a functionary as the Governor will ever be guilty of so gross and palpable a dereliction of his official duties, as the supposition would imply.

It is doubtless to be expected, in the course of events, that evils will arise in the administration of the government, that no human sagacity could have anticipated, and for which, of course, no remedy could be provided. When such evils arise, the wisdom of the times must be left to provide remedies against their recurrence. " Sufficient unto the day is the evil thereof."

Lastly, It was contended by one of the counsel for the relator, that the Secretary held his office only during the term of the Governor by whom he was appointed ; and, consequently, that Field went out of office in December, 1830. If this construction of the Constitution be correct, each of the Governors of this State, with the exception of the first, have been guilty of a palpable violation of the Constitution. Even the present Governor himself would be obnoxious to the charge of permitting Field to usurp the office for more than a month after his inauguration. But, in order to justify this interpretation of the Constitution, it will be necessary to interpolate into the Constitution, the word " each," before the word Governor, so as to make it read, that " each Governor shall nominate," &c. Had the Convention designed that each Governor should appoint a Secretary of State, the same or similar language to that employed in the Constitutions of Pennsylvania and Delaware, would have been used, to wit : " That a Secretary shall be appointed and commissioned during the Governor's continuance in office, if he shall so long behave himself well ; "

or, as in the Constitutions of the States of Kentucky and Louisiana, to wit : " A Secretary shall be appointed and commissioned during the term for which the Governor shall have been elected, if he shall so long behave himself well." I am, consequently, compelled to conclude, that when a Secretary is once appointed, the Governor's power of appointment is suspended until a vacancy occurs.

*Judgment reversed.*